UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JERIEL ALEXANDER,

                          Plaintiff,                      **DECISION AND ORDER**

        -against-                           22-cv-9557 (AEK)

THE STOP AND SHOP SUPERMARKET
COMPANY, LLC,

                          Defendant.
------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**

       Plaintiff Jeriel Alexander, proceeding *pro se*, brought this action against Defendant The Stop and Shop Supermarket Company, LLC ("Stop & Shop"), asserting claims for racial discrimination pursuant to 42 U.S.C. § 1981; the New York Human Rights Law ("NYHRL"), New York Exec. Law § 296 *et seq.*; the New York City Human Rights Law, New York City Admin. Code § 8-101 *et seq.*; and New York Civil Rights Law § 40. *See* ECF No. 37 ("Amended Complaint" or "Am. Compl."). Following the Court's decision on the parties' cross motions for summary judgment, the remaining claims in the case are Plaintiff's Section 1981 "equal benefit" claim based on the events of August 7, 2020, and his discrimination claims under the NYHRL and New York Civil Rights Law for these same events. ECF No. 109. The trial in this case is scheduled to begin on March 17, 2025. ECF No. 111 ("Trial Scheduling Order"). Currently before the Court are the parties' motions *in limine*. ECF Nos. 126, 132. For the reasons that follow, Plaintiff's motion *in limine* is GRANTED IN PART AND DENIED IN PART, and Stop & Shop's motion *in limine* is DENIED.

## DISCUSSION

### I.    Legal Standard Governing Motions *in Limine*

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Uzhca v. Wal-Mart Stores, Inc.*, No. 17-cv-3850 (NSR), 2023 WL 2529186, at *5 (S.D.N.Y. Mar. 15, 2023) (quotation marks omitted).[1] "'The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Id.* (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "Evidence challenged in a motion *in limine* should only be precluded when it is clearly inadmissible on all possible grounds." *Id.* (quotation marks omitted).

### II.    Plaintiff's Motion *in Limine*

Plaintiff moves (i) to exclude certain potential exhibits identified by Stop & Shop, and (ii) to preclude the trial testimony of a late-disclosed defense witness.  ECF No. 132.

With respect to the documents, Plaintiff specifically objects to the inclusion of three items in the parties' proposed Joint Pretrial Order, ECF No. 125 ("JPTO")—Stop & Shop's proposed trial exhibits E, H, and Y—that he contends were never produced during discovery. Exhibit E, according to Stop & Shop, is a photograph of the self-checkout area of the Stop & Shop supermarket where the incident that is the subject of this action allegedly occurred.  *See* ECF No. 136-3.  Exhibit H is an affidavit of Stop & Shop employee Elia Cardenas, which was first provided to Plaintiff in connection with Stop & Shop's reply in further support of its motion

---

[1] In light of Plaintiff's *pro se* status, the Court attaches to this Decision and Order copies of this case and other cases cited herein that are unpublished or only available by electronic database.

for summary judgment. *See* ECF No. 136-2 at 2-3; ECF No. 98-1 at 2-3. Exhibit Y is email correspondence between Plaintiff and defense counsel, dated June 28, 2023. *See* ECF No. 136-4. Meanwhile, the late-disclosed defense witness whose trial testimony Plaintiff seeks to have precluded is the same Ms. Cardenas who submitted the disputed affidavit.

### A.    Stop & Shop's Proposed Exhibits E, H, and Y

#### i.    Exhibit E

According to counsel for Stop & Shop, at or around the time of the filing of the JPTO, Stop & Shop identified and described to Plaintiff its proposed Exhibit E, which purportedly is a photograph of the self-checkout area in the Stop & Shop store where the August 7, 2020 incident allegedly occurred, that Stop & Shop intends to use "for demonstrative purposes to show the jury the appearance of the self-checkout area." ECF No. 136 ("Opp. Mem.") at 4. Stop & Shop asserts that counsel discussed the use of this exhibit with Plaintiff in a phone call regarding the JPTO, and Plaintiff "took no issue with it after explanation." *Id.* In his motion *in limine*, however, Plaintiff seeks to preclude the use of this exhibit at trial on the ground that it was never produced during discovery.

In the JPTO, Stop & Shop indicated that it seeks use the photograph at Exhibit E "for demonstrative purposes only." JPTO at 9. The term "demonstrative evidence" generally refers to certain types of visual, graphic, or sound aides that are used to explain or illustrate a witness's testimony or the presentation of the case. Some demonstrative exhibits may be admitted in evidence under certain circumstances, but oftentimes demonstrative exhibits are displayed to the jury for brief periods of time during a trial without ever being admitted in evidence. It is not clear from the JPTO or Stop & Shop's opposition to the motion *in limine* whether it even intends to attempt to offer the photograph into evidence during the trial. Typically, demonstrative

evidence is not subject to production under Rules 26 or 34 of the Federal Rules of Civil Procedure. *See Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 217 (S.D.N.Y. 2021). "The Second Circuit has noted the great desirability of making demonstrative evidence available to the opposing party a reasonable time before trial, but there is no requirement for pretrial disclosure of such materials at a specific time." *Id.* (cleaned up). Accordingly, the only argument that Plaintiff has offered for the exclusion of the demonstrative evidence—that it was not timely produced during discovery—is not a basis to preclude the use of the photograph.

While Plaintiff had not received a copy of Exhibit E until Stop & Shop filed its opposition to Plaintiff's motion *in limine*, this disclosure, nearly three weeks before the start of trial, is still a "reasonable time before trial" for purposes of disclosing demonstrative evidence. Because Stop & Shop has represented that it intends to use Exhibit E for demonstrative purposes only, to the extent Plaintiff's motion *in limine* seeks to bar the use of Stop & Shop's Exhibit E at trial because of Stop & Shop's supposedly late disclosure, the motion is DENIED. The Court does have additional questions for the parties about this document, which will be addressed at the final pretrial conference.

### ii. Exhibit H (and Exhibit I)

With respect to Exhibit H, the affidavit of Stop & Shop employee Elia Cardenas, "courts in this Circuit have found that affidavits cannot be used in place of the testimony of the available affiant." *Dickson v. New York State Off. of Child. & Fam. Servs.*, No. 18-cv-7212 (JMW), 2023 WL 8788908, at *4 (E.D.N.Y. Dec. 19, 2023). Since, as explained below, the Court will allow Ms. Cardenas to testify at trial, Plaintiff's motion to preclude the use of Ms. Cardenas's affidavit at trial is GRANTED.

It is not clear whether Plaintiff intended to seek the exclusion of Stop & Shop's proposed Exhibit I, a redacted "punch report" which was attached as an exhibit to Ms. Cardenas's affidavit when the affidavit was filed originally at the summary judgment stage. The "redacted punch report" is listed separately as an exhibit in the JPTO, without any objection from Plaintiff. *See* JPTO at 10. To the extent that Plaintiff's motion is intended to apply to Exhibit I, the Court makes no ruling with respect to Exhibit I at this time. Plaintiff has been in possession of the "redacted punch report" since June 14, 2024, when it was included in the reply submission in support of Stop & Shop's motion for summary judgment. *See* ECF No. 98-1. For the same reasons set forth in Section II.B below, the Court is unlikely to exclude the document based on the timing of the disclosure. That said, the Court has questions as to whether Ms. Cardenas will be able to authenticate the "redacted punch report," especially if Ms. Cardenas was not the person who applied the redactions to the report. The parties should be prepared to discuss this and any other issues regarding Exhibit I at the final pretrial conference.

### iii.    Exhibit Y

Exhibit Y is a document that includes emails that Plaintiff sent to Stop & Shop's counsel on June 28, 2023. There appears to be no dispute that Defendant did not produce these emails to Plaintiff during discovery. Still, Plaintiff cannot claim to be surprised about the contents of these messages—he is the sender or recipient of each of the messages in the email chain. *See* ECF No. 136-4. Stop & Shop states that it would use this exhibit "for purposes of demonstrating inconsistent statements made by Plaintiff . . . ." Opp. Mem. at 4.

Stop & Shop's argument regarding the potential use of the emails implies that it will only use the document at trial for purposes of impeachment, and there is no obligation to produce in discovery documents that are to be used solely for impeachment. *See Loc. 3621, EMS Officers*

*Union, DC-37, AFSCME, AFL-CIO v. City of New York*, No. 18-cv-4476 (LJL) (SLC), 2021 WL

5362256, at *14 (S.D.N.Y. June 2, 2021), *adopted by* 2021 WL 4706162 (S.D.N.Y. Oct. 7,

2021); *HDI Glob. Ins. Co. v. Kuehne + Nagel, Inc.*, No. 23-cv-6351 (LJL), 2024 WL 5247216,

at *2 (S.D.N.Y. Dec. 30, 2024).  Accordingly, Plaintiff's motion with respect to Exhibit Y is

DENIED at this time, to the extent Stop & Shop's use of Exhibit Y is limited to impeachment.

Should Stop & Shop seek to use Exhibit Y at trial for purposes other than impeachment, Plaintiff

may renew his objection and the Court will reconsider its ruling at that point.

      **B.**    **Testimony of Elia Cardenas**

      Rule 37(c)(1) of the Federal Rules of Civil Procedure states that "[i]f a party fails to

provide information or identify a witness as required by Rule 26(a) or (e), the party is not

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a

trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Nevertheless, "[t]he Court has the ultimate discretion on whether to preclude witnesses from

testifying at trial under Rule 37(c)(1)."  *Smith v. Perez*, No. 19-cv-1758 (VAB), 2023 WL

4540439, at *8 (D. Conn. July 14, 2023) (cleaned up).  "When considering whether to preclude

evidence or witness testimony, district courts in this Circuit are instructed to assess several

factors, including the party's explanation for the failure to disclose, the importance of the

evidence to be precluded, the prejudice suffered by the opposing party if the evidence were not

precluded, and the possibility of a continuance."  *Id.* (quotation marks omitted).  "Preclusion of

evidence for failure to comply with initial disclosure requirements is a drastic remedy and should

be exercised with discretion and caution."  *Id.* (quotation marks omitted).

      Here, Stop & Shop acknowledges that Ms. Cardenas was first disclosed as a witness as

part of its reply submission in further support of its motion for summary judgment.  Opp. Mem.

at 2; *see* ECF No. 98 at 1.  According to Stop & Shop, Ms. Cardenas was not disclosed as a witness sooner because "[i]t was not until Plaintiff filed his memorandum of law in support of his cross-motion for summary judgment on April 24, 2024, that he affirmatively disclose[d] that the employee's name who allegedly discriminated him [*sic*] was abbreviated as 'Eli.'"  Opp. Mem. at 2.  Stop & Shop contends that it needs to offer Ms. Cardenas's testimony at trial since "she [was] the only employee working in the store on [the] day [of the alleged incident] with the potential for such an 'abbreviated' name."  *Id.* at 3.  Stop & Shop further asserts that Ms. Cardenas's testimony is relevant because she would testify that she was not involved in this incident, and neither she nor any other employee on duty at the time of the alleged incident matches the physical description of the employee who allegedly interacted with Plaintiff.  *See id.*

Considering all of the relevant factors here, the "drastic" remedy of precluding Ms. Cardenas from testifying is not warranted.  First, Stop & Shop's explanation for its failure to disclose Ms. Cardenas as a potential witness is reasonable.  Even though Plaintiff offered some vague and confusing testimony at his October 2023 deposition about a Stop & Shop employee named "Ellie," *see* ECF No. 136-1 at 14 (deposition pg. 37), it is understandable that Stop & Shop did not definitively understand that it would want to rely on Ms. Cardenas's testimony until after it received Plaintiff's first summary judgment submission.  Second, it is clear that the testimony of Ms. Cardenas is important to this case—indeed, Ms. Cardenas is the only witness who Stop & Shop intends to call at trial.  *See* JPTO at 5.  Third, there is only limited prejudice to Plaintiff in allowing the testimony of Ms. Cardenas to be presented at the trial.  Plaintiff has been aware of the existence of "Eli," the employee who allegedly was involved in the incident, since before he filed his cross-motion for summary judgment, and because he received Ms. Cardenas's affidavit in June 2024, he has some idea of what her testimony will be.  Moreover, to mitigate

any potential prejudice to Plaintiff, the Court will afford Plaintiff the opportunity to depose Ms.

Cardenas in advance of trial so as to restore Plaintiff to the same position he would have been in

had Stop & Shop timely disclosed Ms. Cardenas as a witness.  Based on the current schedule,

with trial set to begin on March 17, 2025, if Plaintiff wishes to depose Ms. Cardenas, Stop &

Shop must make Ms. Cardenas available to testify by no later than March 12, 2025.  If Plaintiff

chooses to take Ms. Cardenas's deposition, Plaintiff will be responsible for the costs associated

with the deposition, including any court reporting services.  *See* Fed. R. Civ. P. 30(b)(3)(A).  The

Court also would consider the possibility of an adjournment of the trial date to allow additional

time for Plaintiff to conduct the deposition, should Plaintiff request such a continuance.  *See*

*Widman v. Stegman*, No. 13-cv-193 (BKS) (DEP), 2015 WL 13832105, at *5 (N.D.N.Y. Apr.

28, 2015) ("The possibility of a continuance exists in every case to mitigate the effects of a

party's delays, omissions, and defective discovery responses.") (quotation marks omitted).

For all of these reasons, Plaintiff's motion *in limine* to preclude Ms. Cardenas from

testifying at trial is DENIED.

### C. Application for Sanctions

Finally, insofar as Plaintiff requests sanctions against Stop & Shop for seeking either to

use these exhibits or to call this witness at trial, such application is DENIED.  Plaintiff has

previously been cautioned against seeking sanctions against Stop & Shop or its counsel without

any basis.  Plaintiff once again presents no evidence that Stop & Shop or its counsel has acted in

anything other than good faith throughout the course of this litigation.

### III. Stop & Shop's Motion *in Limine*

Stop & Shop moves to preclude the trial testimony of Glyda Alexander, Plaintiff's

mother, on the ground that she was not able to hear what allegedly transpired between Plaintiff

and the Stop & Shop employee during the incident in question, and therefore has "no personal knowledge" of what happened.  *See* ECF No. 126.  But while Ms. Alexander testified at her deposition that she was not able to hear the interaction in the self-checkout area, she did testify as to what she saw.  *See* ECF No. 126-1 at 4-5, 7-8 (deposition pgs. 8-9, 13-14).  Of course, a witness's visual observations are also a component of his or her "personal knowledge" of a given set of circumstances; Stop & Shop provides no compelling explanation as to why Ms. Alexander should be barred from testifying as to what she visually observed, and the Court finds none. Accordingly, Stop & Shop's motion *in limine* is DENIED.

## CONCLUSION

For the reasons stated above, Plaintiff's motion *in limine* (ECF No. 132) is GRANTED IN PART AND DENIED IN PART, and Stop & Shop's motion *in limine* (ECF No. 126) is DENIED.

In accordance with the Trial Scheduling Order, the Court will conduct the final pretrial conference in person on **March 6, 2025 at 10:00 a.m.** in Courtroom 250 at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601.

The Court has not been able to locate *pro bono* counsel who will be able to represent Plaintiff at a trial starting on March 17, 2025.  If Plaintiff were to request an adjournment of the trial date, however, the Court would continue in its efforts to attempt to locate an attorney to represent Plaintiff *pro bono*.  And if there is an adjournment, a *pro bono* attorney also may be able to assist Plaintiff with taking a deposition of Ms. Cardenas, in addition to representing Plaintiff at trial.  At the final pretrial conference, Plaintiff should be prepared to discuss whether he would like to request an adjournment to enable the Court to attempt to locate *pro bono* counsel.  If the March 17, 2025 trial date is adjourned, the Court would look to schedule the trial

in June, July, or August 2025, taking into account the schedules of the parties and the Court.

Accordingly, all parties must be prepared at the final pretrial conference to discuss their

availability for trial in June, July, or August 2025 in case an adjournment is requested.

Dated: February 28, 2025
       White Plains, New York

                                        **SO ORDERED.**

                                        _____
                                        ANDREW E. KRAUSE
                                        United States Magistrate Judge

Uzhca v. Wal-Mart Stores, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2529186

2023 WL 2529186
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Luis UZHCA and Maria Smith, Plaintiffs,

v.

WAL-MART STORES, INC., Sam's East, Inc. and
Inland-Greenburgh Delaware Business Trust, Defendants.

17 Civ. 3850 (NSR)
|
Signed March 15, 2023

**Attorneys and Law Firms**

Nicholas E. Warywoda, Parker Waichman LLP, Port
Washington, NY, Robert J. Genis, Sonin & Genis, Esqs.,
Bronx, NY, Michael F. Kremins, Raskin & Kremins, LLP,
New York, NY, for Plaintiff Luis Uzhca.

Robert J. Genis, Sonin & Genis, Esqs., Bronx, NY, Michael
F. Kremins, Raskin & Kremins, LLP, New York, NY, for
Plaintiff Maria Smith.

Patricia A. O'Connor, Scott A. Brody, Jonathan F. Banks,
Brody, O'Connor & O'Connor, Esqs., Northport, NY, for
Defendant Wal-Mart Stores Inc.

Patricia A. O'Connor, Scott A. Brody, Aisha K. Brosnan,
Jonathan F. Banks, Brody, O'Connor & O'Connor, Esqs.,
Northport, NY, for Defendant Sam's East Inc.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiffs Luis Uzhca ("Uzcha") and Maria Smith
("Smith") (collectively, "Plaintiffs") commenced this
diversity personal injury action against Defendants Wal-Mart
Stores, Inc. ("Walmart"), Sam's East, Inc. ("Sam's East"),
and Inland-Greenburgh Delaware Business Trust ("IGDBT")
(collectively, "Defendants") on May 22, 2017. (ECF No. 1.)
A jury trial, originally scheduled for October 12, 2022, has
been adjourned *sine die.* (ECF No. 191.)

Presently before the Court are the parties' motions in limine
(ECF Nos. 164, 165, 166, 167, 168, 169) and Defendants'
motion for sanctions (ECF No. 195). The motions are
resolved as follows:

(1) Defendants' motion at ECF No. 164 is DENIED;

(2) Defendants' motion at ECF No. 165 is GRANTED IN
PART, DENIED IN PART;

(3) Defendants' motion at ECF No. 166 is DENIED;

(4) Plaintiffs' motion at ECF No. 167 is GRANTED IN
PART, DENIED IN PART;

(5) Plaintiffs' motion at ECF No. 168 is GRANTED IN
PART, DENIED IN PART;

(6) Plaintiffs' motion at ECF No. 169 is GRANTED IN
PART, DENIED IN PART; and

(7) Defendants' motion at ECF No. 195 is GRANTED IN
PART, DENIED IN PART.

**BACKGROUND**

**I. Facts**
The following undisputed facts are drawn from the record.

**A. Uzhca's Accident**
Uzhca was an employee of Sani-Pro Disposal Services Corp.
and had been assigned to work at the American Independent
Paper Mills Supply Company, Inc. ("American Paper"),
located at 15 S. Depot Plaza, Tarrytown, New York. (Compl. ¶
14.) Sam's East is the operator of the Sam's Club in Elmsford,
New York ("Sam's Club"), and Wal-Mart is, indirectly, the
parent company of Sam's East. (Defs.' Local Rule 56.1
Statement ("Defs. 56.1"), ECF No. 65, at n.3; Compl. ¶¶
11-12; Aff. of Patricia O'Connor ("O'Connor Aff."), ECF No.
65-15, Ex. B at 1.)

While working at American Paper, Uzhca was responsible
for getting truck cabs, securing them to one of approximately
10 or 11 trailers parked onsite, and moving the chosen trailer
to within eight to ten feet of the loading dock. (Defs. 56.1 ¶
2; O'Connor Aff. Ex. D ("Uzhca Dep. Tr.") at 27:11-33:11,
52:10-19.) Once a trailer was about eight to ten feet away
from the loading dock, Uzhca would open its rear doors and
then finish backing it into the loading dock. (Uzhca Dep. Tr. at
34:6-35:6.) Uzhca had done this type of work approximately
40 to 50 times prior to the date of his accident. (Defs. 56.1 ¶
2; Uzhca Dep. Tr. at 66:10-15.)

2023 WL 2529186

On May 29, 2015, at approximately 10:00 a.m., Uzhca's supervisor, Winston Ash ("Ash"), identified a trailer that he wanted Uzhca to move to the loading dock. (Defs. 56.1 ¶ 3; Uzhca Dep. Tr. at 36:3-19, 51:5-19.) The trailer, which is identified by the number 3263 ("Trailer 3263") contained bales of cardboard that had been delivered from Sam's East. (Pl.'s Rule 56.1 Statement ("Pl. 56.1"), ECF No. 66-15, ¶¶ 14, 21; O'Connor Aff. Ex. E ("Ash Dep. Tr.") at 19:19-20:6, 36:25-38:4, 41:17-25; O'Connor Aff. Ex. H ("Kelly Dep. Tr.") at 29:10-31:18, 33:17-34:6.)

Upon receiving Ash's instruction, Uzhca retrieved the truck cab and backed it into Trailer 3263, causing the two to physically connect. (Defs. 56.1 ¶ 4; Uzhca Dep. Tr. at 53:4-54:22.) After connecting the truck cab and the trailer, Uzhca got out of the cab to make sure the connection was proper. (Defs. 56.1 ¶ 5; Uzhca Dep. Tr. at 54:23-55:5.) Uzhca then lifted up the legs of the trailer so that it could be moved. (Defs. 56.1 ¶ 5; Uzhca Dep. Tr. at 55:22-56:11.) Thereafter, Uzhca backed the trailer into a position approximately eight feet away from the loading dock. (Defs. 56.1 ¶ 6; Uzhca Dep. Tr. at 56:12-57:5.)

**\*2** Uzhca again got out of the truck cab and proceeded toward the rear of the trailer. (Defs. 56.1 ¶ 7; Uzhca Dep. Tr. at 57:19-25.) Uzhca first opened the right-hand door of the trailer and secured it to prevent the door from closing. (Defs. 56.1 ¶ 8; Uzhca Dep. Tr. at 60:3-61:7.) Upon opening the right-hand door, Uzhca saw the contents of the truck—bales of cardboard weighing between 600 to 900 pounds each. (Uzhca Dep. Tr. at 61:13-62:24, 63:11-19.) Uzhca testified that he saw a bundle of cardboard "touching the top" of the left door, while the bottom bundles were four inches from the door. (Defs. 56.1 ¶ 10; Uzhca Dep. Tr. at 62:21-65:10.) But Uzhca also testified that the contents of the trailer did not look any different than in the past, and that they "always c[a]me[ ] like that." (Uzhca Dep. at Tr. 62:25-63:5, 65:4-10.)

After opening and securing the right-hand door, Uzhca proceeded to unlock the left-hand door of the trailer. (*Id.* at Tr. 67:6-10.) At that moment, the cardboard bales fell out of the trailer and caused the left-hand door to swing open and strike Uzhca's chest. (Defs. 56.1 ¶ 11; Uzhca Dep. Tr. at 67:11-68:2.) Uzhca was knocked to the ground and, after the first two bales fell, he tried to drag himself out of the way. (Uzhca Dep. Tr. at 68:3-12.) As he was moving, the last bale fell out of the trailer, causing Uzhca to lift out his right foot to prevent the bale from crushing him. (Defs. 56.1 ¶ 12; Uzhca Dep. Tr. at

68:24-69:24.) The bale's sheer weight ultimately crushed and broke his foot. (Uzhca Dep. Tr. at 69:25-70:11.)

## B. The Recyclable Cardboard Bale Loading and Transportation Process

### i. *Sam's East's Loading of American Paper's Trailers*

On the date of Uzhca's accident, Sam's East was a customer of American Paper and would use American Paper to move recyclable cardboard from Sam's East's Sam's Club location in Elmsford, New York to American Paper's location in Tarrytown, New York. (Defs. 56.1 ¶ 16; Ash Dep. Tr. at 19:19-20:6, O'Connor Aff. Ex. F ("Javier Dep. Tr.") at 22:19-25; O'Connor Aff. Ex. G ("O'Neill Dep. Tr.") at 38:6-39:3.) The process would begin with an American Paper driver delivering an empty 53-foot trailer to Sam's Club. (Defs. 56.1 ¶ 17; *see also* O'Neill Dep. Tr. at 47:15-24, 52:23-54:8.) At Sam's Club, the empty trailer would eventually be placed in bay seven of the store's loading dock ("Bay Seven"), which was next to Sam's Club's compactor. (Defs. 56.1 ¶ 17; O'Neill Dep. Tr. at 67:2-17.)

Sam's Club's employees would compact cardboard boxes together into bales that were approximately 36 inches high and five feet wide. (Defs. 56.1 ¶ 17; Pl. 56.1 ¶ 24, O'Neill Dep. Tr. at 40:16-44:13.) The bales were then loaded onto the trailer using forklifts. (Defs. 56.1 ¶ 17; O'Neill Dep. Tr. at 54:13-55:3.) As Sam's Club's general manager, Robert O'Neill ("O'Neill"), testified, each trailer was filled to capacity, in part because of cost but also because it created more stability. (Pl. 56.1 ¶ 25; O'Neill Dep. Tr. at 55:10-20, 68:8-69:3.) Ash corroborated this practice during his deposition, noting that trailers were packed until full. (Defs. 56.1 ¶ 20; Ash Dep. Tr. at 77:21-78:9; *see also* Aff. of Michael Kremins ("Kremins Aff."), ECF No. 66-1, Ex. A ("Caminade Dep. Tr.") at 39:10-40:7, 54:4-21.)

Sam's Club's employees would load bales onto the trailer from the front of the trailer to the rear, stacking them three high and in one row. (Pl. 56.1 ¶¶ 4, 25, 28; O'Neill Dep. Tr. at 53:19-55:3, 90:9-13, 103:5-20; Caminade Dep. Tr. at 69:15-73:15.) When fully stacked, the bales would be within 12 inches of the trailer's ceiling. (Defs. 56.1 ¶ 21; Pl. 56.1 ¶ 4; Ash Dep. Tr. at 99:6-99:17; Caminade Dep. Tr. at 71:21-72:13.) There would only be a limited amount of space on either side of the stacked row, making it too small of a space for a person to access. (Pl. 56.1 ¶ 28; O'Neill Dep.

2023 WL 2529186

Tr. at 119:18-120:512.) If the loaded materials were tilting in anyway, a forklift operator would remove those bales and restack them in the trailer. [1] (Defs. 56.1 ¶ 23; Pl. 56.1 ¶ 27; O'Neill Dep. Tr. at 90:14-24; *see also* Caminade Dep. Tr. at 76:19-77:8.)

[1]   O'Neill visually inspected the loaded materials "[a] few times a day" by looking for whether "something was either tilting or something as not straight" in the load. (O'Neill Dep. Tr. at 87:21-89:22.)

**\*3**  Walter Caminade, a former Sam's Club employee whose duties included loading cardboard bales into trailers, testified that Sam's Club did not use any tying or tethering device or straps (also known as low bars) to secure the cardboard bales. (Pl. 56.1 ¶ 7; Caminade Dep. Tr. at 80:8-23.) Caminade further testified that, when loading the bales on to the trailer, Sam's Club did not use anti-skid or anti-slipping sheets. (Pl. 56.1 ¶ 10; Caminade Dep. Tr. at 104:16-105:11.) However, in terms of securing the load, Plaintiff's expert, Brooks Rugemer ("Rugemer"), testified that the enclosed trailers—the kind into which Sam's Club cardboard bales were loaded—did not require the same level of securement as open flatbed trailers. (Defs. 56.1 ¶ 32; Pl. 56.1 ¶ 34; O'Connor Aff. Ex. L ("Rugemer Dep. Tr.") at 31:2-22.) More specifically, Rugemer testified that "cargo that's within an enclosed box trailer does not need additional load securement" because "freight within a closed trailer that's loaded next to freight and next to the walls is considered secure and no other devices are required." (Defs. 56.1 ¶ 32; Rugemer Dep. Tr. at 57:4-58:6, 64:12-25.)

### ii. *American Paper's Transportation of Loaded Trailers*

Once a trailer was almost full, Sam's Club would call American Paper to schedule a pickup. (Defs. 56.1 ¶ 17; Ash Dep. Tr. at 12:9-14; Javier Dep. Tr. at 12:11-18; O'Neill Dep. Tr. at 53:25-54:4.) American Paper would, in turn, send a driver to bring another empty trailer to Sam's Club. (Defs. 56.1 ¶ 18; O'Neill Dep. Tr. at 69:4-10.) The driver would unhook the empty trailer upon arrival at Sam's Club and then hook the truck cab to the full trailer at Bay Seven. (Defs. 56.1 ¶ 18; O'Neill Dep. Tr. at 69:24-70:6.) The driver would pull the full trailer about 60 to 80 feet away from the loading docks —going over a storm water drain and with the trailer's rear doors open—and park it on the side of the building. (O'Neill Dep. Tr. at 71:14-72:6, 72:21-74:19, 76:18-24.)

After pulling out the trailer, the driver would inspect the load to make sure it was safe for travel. (Defs. 56.1 ¶ 18; Pl. 56.1 ¶ 15; O'Connor Aff. Ex. H ("Kelly Dep. Tr.") at 18:21-25, 36:17-37:12) The driver did so because, while it was Sam's Club's responsibility to load the trailer correctly and safely (Pl. 56.1 ¶ 22; Ash Dep. Tr. at 91:16-18, 118:15-22), it was ultimately "required by law" that American Paper's driver make sure that the trailer was properly loaded and safe to transport. (Defs. 56.1 ¶ 30; Kelly Dep. Tr. at 37:9-12; Ash Dep. Tr. at 15:13-16:23, 91:18-21.) As explained by Brian Kelly, a former American Paper driver who was responsible for transporting Trailer 3263 on May 29, 2015, drivers were to make sure that the load was secure, nothing was "hanging there," and a safety bar was set in place. (Defs. 56.1 ¶ 30; Pl. 56.1 ¶¶ 14-15; Kelly Dep. Tr. at 19:17-25.) To this end, although he confirmed that the space inside the trailer was too tight for a driver to climb or walk into, Kelly testified that drivers could at least evaluate whether the bales "were even" and that "nothing was rocking."[2] (Pl. 56.1 ¶¶ 16-17; Kelly Dep. Tr. at 71:10-73:9; *see also* Ash Dep. Tr. at 94:6-11, 120:10-12 ("The way to observe [the load] is to check how far it is from the edge of the trailer, and to make sure that they're stacked up and down, or ... straight.")). If the cardboard bales were not properly loaded, the driver would not take the load until it was fixed. (Defs. 56.1 ¶ 29; Ash Dep. Tr. at 94:17-95:8.)

[2]   Typically, the trailer would have a horizontal bar —supplied by American Paper—locked in place in front of the last row of bales to help secure the load. (Pl. 56.1 ¶ 17, Kelly Dep. Tr. at 76:5-79:20.) At his deposition, Kelly could not recall whether he strapped the bar prior to transporting Trailer 3263 on May 29, 2015. (Pl. 56.1 ¶ 17; Kelly Dep. Tr. at 106:6-9.)

After the check was complete, the driver would close the trailer's doors and drive to American Paper. (Defs. 56.1 ¶ 18; Kelly Dep. Tr. at 17:17-19:2.) The distance from Sam's Club to American Paper was approximately five miles and the drive would take 10 minutes. (Defs. 56.1 ¶ 18; Kelly Dep. Tr. at 107:13-18.) The drive required the cab and trailer to go down some hills. (Defs. 56.1 ¶ 18; Kelly Dep. Tr. at 107:24-108:4.)

### iii. *Deponents Prior Experiences with Sam's Club's Bale Loads*

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 14 of 67

Uzhca v. Wal-Mart Stores, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2529186

**\*4**  Although none witnessed Uzhca's accident, several individuals have testified regarding their prior experiences with Sam's Club's cardboard bale loads. For example, O'Neill has testified that, over the course of seeing approximately 50 American Pulp trailers being pulled away from Sam's Club's loading dock, he never observed any of the bales inside the trailers move. (Defs. 56.1 ¶ 23; O'Neill Dep. Tr. at 76:4-78:7.) Similarly, Ash testified that he did not recall any issues with Sam's Club's trailers, but noted that, if a driver saw an issue, he or she would report it and Ash would, in turn, raise the issue with Sam's Club. (Defs. 56.1 ¶ 25; Ash Dep. Tr. at 89:6-17.) And for his part, Kelly noted that he had never had a problem with Sam's Club's loading practices. (Defs. 56.1 ¶ 26; Kelly Dep. Tr. at 36:9-16.)

Conversely, Uzhca's co-worker, Cesar Javier, recalled sometimes seeing trailers with bales that were "not leveled," "misleveled," or "unstable." (Javier Dep. Tr. at 66:20-25.) He further explained, depending on who was driving or the conditions of the roads, "some of those bales could be straight" but "sometimes they flip over" or are "on the side." (Defs. 56.1 ¶ 27; Javier Dep. Tr. at 67:10-15.) Nevertheless, Javier clarified that he ultimately did not know how the bales got to be in this condition. (Javier Dep. Tr. at 67:16-24.)

### C. Expert Opinions on Proper Bale Loading and Securing Practice

Rugemer has opined that Sam's East is a shipper of cardboard bales that should have followed the standards set by the Institute of Scrap Recycling Industries, Inc. ("ISRI"). (*See* O'Connor Aff. Ex. K ("Rugemer Report") at 3-6; Rugemer Dep. Tr. at 26:13-29:23.) Rugemer further testified that, regardless of whether Sam's East received a copy of the guidelines, the guidelines were "easily researchable," and it was incumbent on Sam's East to "understand the proper way to ship [ ] recycled bales." (*See* Pl. 56.1 ¶ 33; Rugemer Dep. Tr. at 29:2-23.) Of note, Defendants' expert, Christopher Ferrone ("Ferrone"), generally agreed with ISRI's guidance. (Pl. 56.1 ¶ 39; Kremins Aff. Ex. F ("Ferrone Dep. Tr.")[3] at 279:13-19.)

3    A complete transcript of the Deposition of Christopher Ferrone is attached as Exhibit B to the Reply Affidavit of Patricia O'Connor. (ECF No. 68-2.)

According to ISRI's safe shipping guidance, it is acceptable to stack three bales on top of each other while loading a trailer, but this does not apply to the last row of bales next to the trailer's door. (O'Connor Ex. M at 6.) Instead, for this last row, "[b]ales *MUST be* no more than 2 high and turned lengthwise with the length of the trailer."[4] (*Id.* at 8 (emphasis in original); *see also* Rugemer Report at 4.) Drawing on these guidelines, Rugemer determined that, by loading the last row of bales three high, "Sam['s] Club failed to follow industry recognized best practices for safe loading of cardboard bales into a truck trailer." (Defs. 56.1 ¶ 34; Pl. 56.1 ¶ 35; Rugemer Report at 6; Rugemer Dep. Tr. at 34:5-11.) Accordingly, Rugemer concluded, Defendants' method of loading cardboard bales created a "dangerous condition." (Rugemer Report at 6.)

4    Although Caminade appeared to agree that the ISRI guidance shown to him during his deposition contained standards for safe shipping (Pl. 56.1 ¶ 12), there is also indication from his testimony that he had not previously seen the ISRI guidelines and/or was not aware of their applicability in or around May 2015. (*See* Caminade Dep. Tr. at 102:10-23, 114:8-15.)

In contrast, Ferrone opined that the bales were "placed properly" and that it was on the "motor carrier" to ensure proper securement. (Ferrone Dep. Tr. at 301:9-20.) He further countered that the loading method contemplated by ISRI's guidance was simply "an option" that was not needed if the bales had already been secured. (*Id.* at Tr. 241:24-242:10.) Rather, as he explains, there are "different means" for placing and securing cargo. (*Id.* at Tr. 243:21-244:16.)

### II. Summary Judgment Denied

**\*5**  By Opinion and Order dated September 14, 2020 ("September 14, 2020 Opinion"), this Court denied Defendants' motion for summary judgment. (ECF No. 71.) Specifically, the Court (1) declined to preclude Rugemer's report on bale loading and securing practice; (2) held that whether Plaintiff should have been aware of an issue with the loading is a question of fact best left to the jury; and (3) declined to hold that Plaintiff was the sole proximate cause for his injuries. (*Id.*)

Following the Court's denial of summary judgment, the parties proceeded to complete discovery. A jury trial was scheduled for October 6, 2022, with an alternate date of October 11, 2022. (ECF No. 160.)

### III. Adjournment *Sine Die*

On September 16, 2022, Plaintiff's counsel stunned this Court by revealing—for the first time and during a conference less than three weeks before trial—that Plaintiff sustained additional injury in a motor vehicle accident on or about April 22, 2022 ("the April 2022 accident"). Defendants' counsel reported that they first learned of the April 2022 accident when Plaintiff's counsel sent a drop-box to Defendants' law firm on September 9, 2022. (ECF No. 196.) The drop-box, according to Defendants, contained (1) Plaintiff's medical records from Phelps Memorial Hospital; (2) the Ambulance Call Report for the motor vehicle accident; (3) a HIPPA authorization addressed to Phelps Memorial Hospital; and (4) copies of an X-ray of Plaintiff's lumbar spine and CT of his cervical spine performed at Phelps Memorial Hospital in relation to the April 22, 2022 accident. (*Id.* at 7.)

Considering Plaintiff's failure to timely disclose the April 2022 accident, which affects his injuries, the Court determines that the parties were not ready to proceed to trial as originally scheduled. (ECF No. 191.) The trial is accordingly adjourned *sine die* to allow time for additional discovery. (*Id.*)

### LEGAL STANDARD

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quotation omitted). Evidence challenged in a motion in limine "should only be precluded when it is clearly inadmissible on all possible grounds." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (quotation omitted). Nonetheless, "a court's decision on the admissibility of evidence on a motion in limine may be subject to change when the case unfolds ... because the actual evidence changes from that proffered by the movant." *Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913, 917–18 (S.D.N.Y. 2021) (citing *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 479 (S.D.N.Y. 2016)).

### DISCUSSION

#### I. Securement of Load (ECF No. 164)

Defendants first seek to preclude any reference to the "securement" of the load, citing Rugemer's statement that enclosed trailers do not require additional securement devices. (ECF No. 164-A).

This Court has closely reviewed and considered Rugemer's statement in denying Defendants' motion for summary judgment. To reiterate, a question of fact exists as to "whether any purported defect [in the loaded bales' condition] was readily apparent to Plaintiff." (ECF No. 71.) The jury shall assess Rugemer's report; it is up to the jury to decide how much weight to be attributed to his testimony. The preclusion of "securement" fetters the jury in its understanding of the bale's condition, which will inevitably hinder the jury's determination of the purported defect question in dispute.

**\*6** Accordingly, the Court will not preclude any reference to securement at this time.

#### II. Defendants' Wealth, Other Accidents Involving Defendants, and "Reptile Theory" Tactics (ECF No. 165)

Defendants next seek to preclude testimony regarding (1) Defendants'—in particular, Walmart's—wealth of resources, which include size, financial status, and profits; (2) other accidents, claims, and settlements involving Defendants; and (3) the use of the so-called "Reptile Theory" tactics [5] . (ECF No. 165.) The Court addresses each in turn.

[5]     As one court observed, the Reptile Theory tactic, deriving its name from a 2009 book on plaintiffs' trial strategy in tort cases, "consists of arguing that the appropriate measure of damages is not the amount of harm actually caused in the case, but rather the maximum or cumulative harm that the defendant's alleged conduct could have caused." *Belvin v. Electchester Mgmt., LLC*, No. 17 Civ. 6303(NGG)(MMH), 2022 WL 10586743, at \*7 (E.D.N.Y. Oct. 18, 2022) (internal quotation omitted).

#### A. Defendants' Wealth, Size, Financial Status, and Profits

Defendants' motion to preclude testimony regarding Walmart's wealth evinces their concern that jurors will be

Uzhca v. Wal-Mart Stores, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2529186

biased toward finding liability as a result due to Walmart's deep pocket. Plaintiffs responded in its opposition that, while they "have no intention of referencing the size of [Defendants] for purposes of claiming deep pockets" (Pl. Opp. at 4, n.1), Defendants' wealth of resources is demonstrative of their experience and knowledge of safety practice in cargo loading and shipment, which is relevant and admissible.

Evidence of "the wealth of a party is never admissible, directly or otherwise, unless in those exceptional cases, where position or wealth is necessarily involved in determining the damages sustained." *Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 318 (2d Cir. 2004) (internal citations omitted.) Nonetheless, evidence of wealth may "be admitted to impeach the testimony of a witness who 'open[s] the door' to the subject." *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 266 (2d Cir. 1999) (internal citations omitted). To be admissible, the wealth evidence "must actually be inconsistent with the witness's testimony." *Id.* (citing *United States v.* Hale, 422 U.S. 171, 176 (1975)).

The case at bar is not "exceptional" within the meaning of *Tesser*, 370 F.3d 318-19. Plaintiffs' broad and elusive opposition, based upon speculations such as "[o]ne would expect defendants to have far greater knowledge, experience and expertise ... than a small mom and pop bodega," fails to identify any relevant ground upon which Defendants' wealth, size, or financial status becomes admissible. (Pl. Opp. at 4.)

Accordingly, the Court grants Defendants' motion to preclude testimony regarding their wealth of resources, including Defendants' size, financial status, or profits. If Defendants' wealth becomes admissible for impeachment purposes during trial, Plaintiffs may move, at that point, for such wealth evidence to be admitted.

**B. Other Dissimilar Accidents, Claims, and Settlement**

*\*7* Defendants moves to preclude other unrelated accidents, claims, and settlement testimony proffered by Plaintiffs.

It is well settled that "[e]vidence of other accidents is admissible when the conditions surrounding the other accidents are 'substantially similar' to the accident which is the subject of the current litigation." *Bellinger v. Deere & Co.*, 881 F. Supp. 813, 817–18 (N.D.N.Y. 1995) (citing *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986); *Bowen v. Whitehall Labs., Inc.*, 41 F.R.D. 359 (S.D.N.Y. 1966); *Sawyer v. Dreis & Krump Mfg. Co.*, 67

N.Y.2d 328, 336 (1986); *Hyde v. County of Rensselaer*, 51 N.Y.2d 927, 929 (1980) (prior accident evidence admissible only upon showing of "substantially the same" conditions)).

Plaintiffs are not permitted to introduce evidence of prior accidents, claims, and settlements where the conditions are not *substantially* similar to that surrounding the instant case. To illustrate, merchandises falling from racks in a retail location of Defendants is not a substantially similar condition, and is thus not admissible. Neither are claims involving expired infant formula.

Accordingly, the Court grants Defendants' motion to preclude unrelated accidents, claims, and settlement that are not *substantially* similar to the instant case.

**C. "General Safety Rule" and "Reptile Theory Tactic"**
Defendants urge the Court to prohibit Plaintiffs' alleged attempt to "establish a general safety rule with which no rational person would disagree" through repetitive questioning.[6] Defendants further request that the Court preclude Plaintiffs from employing the Reptile Theory tactic.

[6]     Defendants provided the following example of Plaintiffs' questioning in their brief:

Q. Do we agree according to good and accepted practices and procedures a warehouse is never allowed to unnecessarily expose anyone to harm?

Q. Do we agree according to good and accepted practices and procedures a shipper is never allowed to unnecessarily expose anyone to harm?

Q. I'm going to get into all that later. Right now I'm just asking nice, simple yes/no questions.

Q. So the answer to my question was you agree, correct, that according to good and accepted practices and procedures a shipper is never allowed to unnecessarily expose anyone to harm, true?

Q. Do we agree according to the standards of care a shipper is never allowed to unnecessarily expose anyone to harm?

(ECF No. 165-1.)

A district court is entitled to give attorneys wide latitude in formulating their arguments, *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 271 (2d Cir. 1999), and this Court declines to set a categorical ban on any trial tactics, either reptilian

Uzcha v. Wal-Mart Stores, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2529186

or with respect to the general safety standard. However, Plaintiffs' counsel is sternly forewarned that the Court will not indulge repetitive questions of marginal relevance at any point during trial.

Accordingly, the Court denies Defendants' motion to prohibit Plaintiffs' usage of the Reptile Theory tactic and to preclude Plaintiff's attempt at establishing an unobjectionable general safety standard.

### III. Dr. Richard Radna, Dr. James Gallina and Plaintiff's Cervical Fusion (ECF No. 166)

**\*8** Defendants next move to preclude evidence and testimony by Dr. Richard Radna and Dr. James Gallina that Uzcha's cervical fusion was causally related to the May 29, 2015 accident. (ECF No. 166.) The gist of Defendants' argument is that Uzcha did not report any cervical injury following the falling-bale accident in 2015, and that subsequent medical record does not establish that Uzcha's congenital cervical stenosis was traumatically induced. The Court disagrees.

As an initial matter, the Court reminds Defendants that the purpose of a *motion in limine* is not to function as a belated motion for summary judgment.[7] *See Romanelli v. Long Island R. Co.*, 898 F. Supp. 2d 626, 629 (S.D.N.Y. 2012) ("The purpose of a motion in limine is to allow a court to rule on the admissibility of potential evidence in advance of trial.") While Defendants' instant motion purports to exclude Dr. Radna and Dr. Gallina on evidentiary bases, what Defendants truly seek here is a summary denial of the triability of Defendants' cervical condition, which clearly should not have been made in limine at this point.

[7]   The Court shares, in earnest, our colleague's sentiment: "I sometimes cannot believe the things that lawyers do. This is not a motion *in limine*. It is a thinly –and not at all cleverly – disguised motion for summary judgment ..." *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15 Civ. 6549(CMR)(WL), 2022 WL 3362429, at \*2 (S.D.N.Y. Aug. 15, 2022).

Second, Defendants fail to establish any valid bases upon which Dr. Richard Radna and Dr. James Gallina should be excluded. Specifically, with respect to Dr. Radna, Defendants assert that his conclusion on the cause of Uzcha's cervical condition was too speculative and unsupported by medical evidence.[8] With respect to Dr. Gallina, Defendants aver that he was Uzcha's treating physician only as to the cervical condition which, according to Defendants, is a pre-existing condition. These arguments lay bare a disputed issue of fact, namely, the scope of Uzcha's injury. (ECF No. 166-7.) This issue will be determined by the trier of facts.

[8]   Without converting the instant opinion into one for summary judgment, the Court is of the view that this issue is far from "clear and unequivocal," as Defendants assert, based on a review of record. (ECF No. 166-7.)

Accordingly, the Court denies Defendants' motion to preclude Dr. Radna and Dr. Gallina in relation to Plaintiff's cervical fusion. Defendants' request for a *Daubert* hearing "outside the presence of the jury and [on the] theories of causal relationship between the accident and Plaintiff's cervical fusion" is also denied. (ECF No. 166-7.) Defendants' motion to dismiss the related damages claims is denied as well.

### IV. Plaintiff's Omnibus Motion (ECF No. 167)

Plaintiff moves to preclude (1) Defendants from offering an apology to the jury for Plaintiffs' injuries; (2) any evidence concerning Plaintiffs' financial status; (3) the statement "anyone can file a lawsuit"; (4) any statement or suggestion at trial that Plaintiffs filed this lawsuit for the purpose of financial gain; (5) evidence of Uzcha's marital or parental status; (6) opinion evidence by lay witnesses; (7) Defendants from raising the "Affirmative Defense of Failure to Mitigate"; (8) Defendants from offering an "Empty Chair" defense; (9) testimony concerning Plaintiffs' citizenship; (10) testimony concerning any prior convictions, arrests, and charges of Plaintiffs, if any; and (11) statements by Defendants indicating that there were "no prior accidents."

**\*9** This motion exemplifies petulance. The Court would like to advise Plaintiffs' counsel of a basic principle of our system of evidence: irrelevant evidence is not admissible. Fed. R. Evid. 402. In addition, petulant motions, in Plaintiffs' counsel's own words, "degrades the American legal process and the principles of justice and equity." (Pl. Omnibus Mem. ¶ 18, ECF No. 167.) This motion is decided as follows:

With respect to the apology, Defendants shall not apologize to the jury for Plaintiffs' injuries. Yet the Court will not preclude Defendants from suggesting that "no party wishes an accident to happen, or that someone would be injured." (ECF No. 170.)

Uzhca v. Wal-Mart Stores, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2529186

Plaintiffs' financial status is precluded for the same reason as that of Defendants, which has been discussed in Section II-A of this opinion.

The statement "anyone can file a lawsuit" is precluded as irrelevant.

The Court declines to set a categorical preclusion on statements to the effect that Plaintiffs filed this lawsuit for the purpose of financial gain at this time. Similarly, the Court will not categorically preclude evidence of Plaintiffs' marital status, parental status, citizenship, collateral source payments,[9] prior convictions, arrests, and charges. Such evidence that is relevant to liability or damages may be admitted, and unduly prejudicial testimony will be stricken. Fed. R. Evid. 404(b).

9      The Court reminds Defendants that "[t]he burden is on the defendant to prove that a plaintiff's award should be reduced by payments received from collateral sources." *LaMarca v. United States*, 31 F. Supp. 2d 110, 132 (E.D.N.Y. 1998) (citing *Damiano v. Exide Corp.*, 970 F.Supp. 222, 229 (S.D.N.Y. 1997)).

With respect to "opinion evidence by lay witnesses," Plaintiffs seek to limit the testimony of Winston Ash ("Mr. Ash") and Brian Kelly ("Mr. Kelly") about the activities of employees of American Paper. Mr. Ash was Uzhca's direct supervisor when the May 2015 accident took place. Mr. Kelly was the driver who dropped off the empty trailer and picked up the loaded trailer on the day of the accident. Mr. Ash and Mr. Kelly are slated to introduce testimony, based upon their personal perceptions and experience, regarding their job responsibilities as employees of American Paper. Such evidence, if in the form of an opinion, will be admitted as long as it is rationally based on the witnesses' personal knowledge and "helpful to a clear understanding of the witness's testimony." *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 427 (S.D.N.Y. 2000) (citing Fed. R. Evid. 701; *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992)). At this time, the Court sees no basis to limit Mr. Ash and Mr. Kelly's testimony. Plaintiffs may renew their motion to preclude during trial if Mr. Ash or Mr. Kelly improperly proffers opinion testimony based on specialized knowledge within the scope of Fed. R. Evid. 702.

With respect to the affirmative defense of failure to mitigate, Plaintiffs chiefly contend that Defendants are required by law to prove failure to mitigate through expert testimony, and that Defendants fail to proffer such expert witnesses. Plaintiffs misstate the law. While the burden indeed falls on Defendants to prove failure to mitigate, *see, e.g.*, *LaMarca v. United States*, 31 F. Supp. 2d 110, 131 (E.D.N.Y. 1998), there is no requirement that the proof must be provided through expert testimony. As such, Defendants are permitted to raise the affirmative defense of failure to mitigate.

 *10  With respect to the "Empty Chair" defense, Plaintiffs appear to assert that Defendants should not be permitted to attribute liability to American Paper, a nonparty. For the same reason stated in Section II-C, the Court declines to preclude Defendants from invoking such trial tactics.

Lastly, Plaintiffs provide no persuasive bases for the Court to preclude evidence of the absence of prior accidents, which is "generally admissible on the issues of notice and foreseeability." *Melini v. 71st Lexington Corp.*, No. 7 Civ. 701 (JCF), 2009 WL 1905032, at *4 (S.D.N.Y. July 2, 2009) (citing *McDonough v. Celebrity Cruises, Inc.*, 64 F.Supp.2d 259, 265 (S.D.N.Y. 1999); *Orlick v. Granit Hotel and Country Club,* 30 N.Y.2d 246, 248–50 (1972)). Accordingly, such evidence will be admitted if relevant, unless the Court determines, during trial, that the proffer evidence is unduly prejudicial under Fed. R. Evid. 404(b).

Accordingly, the Court grants Plaintiffs' omnibus motion *only to the extent expressly set forth above.*

## V. Christopher Ferrone (ECF No. 168)

Christopher Ferrone ("Mr. Ferrone"), Defendants' expert witness, is expected to testify in person that (1) "the ISRI guideline found on the internet by Plaintiffs' expert is not a recognized industry standard and it was the responsibility of American Paper, the carrier, not [Sam's East], the shipper, to ensure the safety of the load"; and (2) "the *Savage* rule [10] applies here and that the standard is an objective, not a subjective one." (Parties' Joint Pretrial Order at 11, ECF No. 163.)

10      The *Savage* rule refers to the Fourth Circuit's holding in *United States v. Savage Truck Line, Inc.* that, while "[t]he primary duty as to the safe loading of property is [ ] upon the carrier, [w]hen the shipper assumes the responsibility of loading,

2023 WL 2529186

the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper." *Uzcha v. Wal-Mart Stores, Inc.*, No. 17-CV-3850 (NSR), 2020 WL 5518591, at *8–9 (S.D.N.Y. Sept. 14, 2020) (citing *Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953)).

Plaintiffs seek to preclude Mr. Ferrone on the following four bases: alleged failure to fully comply with the requirements of Fed. R. Civ. P. 26(a)(2)(B) during discovery; lack of qualifications as an expert witness on loading, placing, and securing cargo; lack of qualification as an accident reconstructionist; and lack of proper methodology.

Plaintiffs further seek to limit Mr. Ferrone's testimony in two aspects, averring that: first, Mr. Ferrone is not permitted to testify to the meaning, intent, applicability, and the alleged non-delegable nature of regulations prescribed by the Federal Motor Carrier Safety Administration (FMCSA), a federal agency of the Department of Transportation (DOT); and second, Mr. Ferrone is not permitted to opine on other witnesses' credibility. The Court address each of Plaintiffs' arguments in turn.

With respect to the Fed. R. Civ. P. 26(a)(2)(B) requirements, this Court had made abundantly clear—in multiple pretrial conferences—that all discovery issues must be resolved before the presiding Magistrate Judge. Discovery is now closed. As such, the Court will not entertain the instant motion on the basis of Fed. R. Civ. P. 26(a)(2)(B).

*11 With respect to Mr. Ferrone's qualifications as an expert witness, the Court, having reviewed Mr. Ferrone's CV (ECF No. 168-C), concludes that Mr. Ferrone "qualifie[s] as an expert by knowledge, skill, experience, training, or education" for his proposed testimony regarding the ISRI guideline. Fed. R. Evid. 702. Mr. Ferrone has decades of industry experience involving heavy trucks, which includes the scrap recycling industries. Mr. Ferrone's extensive knowledge of industry practice may "assist the trier of fact" in weighing the ISRI guideline and its acceptance by the industry. Fed. R. Evid. 702. A specialized focus of expertise on "loading, placing, and securing cargo," as Plaintiffs assert, is not necessary.

The Court is further of the view that Mr. Ferrone is qualified as an expert on accident reconstruction, as Mr. Ferrone's CV indicates a substantial number of publications [11] and professional presentations [12] on accident reconstruction. It is undisputed, however, that Mr. Ferrone did not conduct a reconstruction of Uzcha's May 2015 accident. As such, Mr. Ferrone is not permitted to base any of his testimony regarding the underlying accident on or in relation to accident reconstruction. *Cf.* Fed. R. Evid. 702.; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (holding that the proposed expert testimony must be based "on a reliable foundation" grounded on "sufficient facts or data").

[11]    See, for example, Goebelbecaker, J.M., Ferrone, C.W., "Utilizing Electronic Control Module Data in Accident Reconstruction," S.A.E. Paper 2000-01-0466, March, 2000; "Accident Reconstruction: Analysis, Simulation and Visualization." (SP-1491). (Ferrone's CV at 16, ECF No. 168, Exhibit C.) *See also* Ferrone's CV at 21, ¶ 99.

[12]    See, for example, Ferrone's CV at 30, ¶ 27a; at 31, ¶ 45a; at 33, ¶ 67-68; at 34, ¶ 78; at 35, ¶ 87; at 36, ¶ 96.

With respect to the FMCSA regulations, the Court agrees that "an expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court." *DeGregorio v. Metro-N. R. Co.*, No. 5 Civ. 533 (JGM), 2006 WL 3462554, at *3 (D. Conn. Nov. 1, 2006) (citing *United States v. Scop*, 846 F.2d 135, 140–42 (2d Cir. 1988)). Thus, Mr. Ferrone is not permitted to testify to the meaning, intent, or applicability of any FMCSA regulations or other federal regulations. Mr. Ferrone is also not permitted to testify on the applicability of the *Savage* rule. Mr. Ferrone is further not permitted to offer his opinion on whether such regulations are delegable. In addition, Mr. Ferrone may not state to the jury, in any form, whether a regulation was violated. However, while Mr. Ferrone is not allowed to draw any legal conclusions in his testimony, he is permitted to reference the relevant federal regulations if his testimony is based on such regulations in addition to his industry experience.

With respect to Mr. Ferrone's testimony "criticizing other witnesses' credibility" (ECF No. 168), Plaintiffs are referring to Mr. Ferrone's statements regarding one of Plaintiffs' witnesses' knowledge of the FMCSA rules.

Uzhca v. Wal-Mart Stores, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2529186

Specifically, Plaintiffs' counsel and Mr. Ferrone made the following statements in an apparently heated exchange during deposition:

> Q: Okay. So the bottom line is you can't be a little pregnant. It's one or the other. Either [Mr. Walter Caminade [13], in his former capacity as one of Sam's Club employees] can walk away knowing it's not – that they loaded it, placed it and it's not properly secured and that could unnecessarily harm someone and they could walk away or not. Which is it?
>
> A: The reason that I can't answer that is it's a nonanswerable –
>
> **\*12** Q: If you can't, just say you can't answer it. I don't need to know the reason. You can't answer it, you can't answer it. That's all I need to know.
>
> A: I am not done yet.
>
> Q: That's it. Either you agree, you disagree or you can't answer it. Those are the possibilities.
>
> A: **There's a third possibility. Your question is incomplete. That assumes that they don't realize that the next step is securement. They are sophisticated shippers. They know that the next step after placement and loading and whatever terms you use, they are aware as sophisticated shippers that the next step out of the three that you love to wave your fingers at me the next step is securement. They also know that that's the motor carrier's responsibility.**
>
> Q: So you are reading their state of mind there. You are entering their state of mind. Is that what you are doing?
>
> A: **Let me just tell you how this works.**
>
> Q: No, I don't need to know how it works. The way it works is ask questions. You answer my questions instead of giving the speeches you want to give. That's the way it works. I move to strike that again.

(Ferrone Tr. at 225-227.) The parley speaks for itself.

According to the parties' joint pretrial order, Mr. Walter Caminade, a former employee of Sam's Club, is expected to testify "as to the duties of Defendants to ensure that the bales of recycled cardboard were properly loaded, placed, and secured; that Defendants packed trailers to

the ceiling in order to maximize their profits; that Defendants herein failed to comply with their own good and accepted practices/standards of care, proximately causing this incident." (ECF No. 163.)

This part of the motion is resolved as follows: During trial, Mr. Ferrone is permitted to testify to the industry practice based on his knowledge and experience, or, stated differently, how things work. Mr. Ferrone is not permitted to speculate as to other witnesses' state of mind. Plaintiffs' counsel is strongly encouraged to deliver his questions in a civil and courteous manner.

Accordingly, the Court grants Plaintiffs' motion to limit Mr. Ferrone's testimony *only to the extent expressly set forth above*. Plaintiffs' request for a *Daubert* hearing is denied.

**VI. Dr. Scott V. Haig (ECF No. 169)**
Scott V. Haig, M.D. ("Dr. Haig"), Defendants' expert witness, is expected to testify that (1) only Uzhca's right ankle fracture is causally related to the May 2015 accident; and (2) Uzcha "refused active ranges of motion" when examined by Dr. Haig on March 21, 2019. (ECF No. 163.)

Plaintiffs move to limit Dr. Haig's testimony. A painstaking review of Plaintiffs' liberally written and loosely organized briefs reveals a principal grievance that Dr. Haig is allegedly biased against Uzca, questioning his "motivation" and referring to him as a "malingerer." (Pl. Mem. at 3, ECF No. 169.)

This motion is resolved as follows: Dr. Haig is not permitted to state that Uzhca was "malingering" or that Uzhca was a "malingerer." Dr. Haig is also not permitted to testify to Uzhca's state of mind. However, Dr. Haig is permitted to testify to any factual occurrence based on his personal observation. Specifically, Dr. Haig is permitted to give testimony regarding any movements that Uzhca made, as well as those that Uzcha refused to make, during the physical examination at issue. Dr. Haig is further permitted, as an orthopedic surgeon and a qualified expert witness, to give opinion testimony within a reasonable degree of medical certainty, as to whether his examination of Uzcha revealed inconsistencies between Uzhca's subjective reports of symptoms and the objective impairment as determined by Dr. Haig.

**\*13** Accordingly, the Court grants Plaintiffs' motion to limit Dr. Haig's testimony *only to the extent expressly set forth above.* Plaintiffs' request for a *Daubert* hearing is denied.

### VII. Plaintiffs' Post-2019 Medical Record (ECF No. 195)

This motion arises from Uzhca's astonishing disclosure of his April 2022 accident during the September 16, 2022 pretrial conference. Defendants presently moved under Fed. R. Civ. P. 37 ("Rule 37"), seeking: (1) to preclude Dr. Radna from offering any testimony at the time of trial with respect to facts and opinions presented in his August 15, 2022 Supplemental Report[14]; (2) to preclude Uzcha from claiming that he cannot work as a delivery driver based on Dr. Radna's recent examination; (3) to preclude any of the diagnostic films mentioned or reviewed in Dr. Radna's Supplemental Report including, but not limited to the serial stereo-3D sagittal views of the cervical spine taken on March 19, 2019; (4) to preclude the most recent office clinic note of Dr. Daniel Zelazny or any testimony from Dr. Zelazny or others regarding its contents; (5) to preclude Uzcha's physician, Dr. Darren Friedman, from offering any testimony at the time of trial with respect to facts and opinions presented in his "updated Narrative Report;" (6) to preclude Dr. Darren Friedman's notes of August 4, 2022 and September 1, 2022 or any testimony from Dr. Friedman or others regarding their contents; (7) to preclude the "updated Narrative Report" of Dr. Landis Barnes; (8) to preclude the August 3, 2022 and August 31, 2022 notes of Dr. Landis Barnes or any testimony from Dr. Barnes or others regarding its contents; and (9) reasonable expenses incurred by Defendants in making the instant motion, including attorneys' fees.

[14]    Defendants submit that such testimony includes, but is not limited to, Dr. Radna's opinion regarding his recent examination of Uzcha and his opinions regarding causation of Uzcha's injuries.

Plaintiffs submit that "[i]f Defendants wish that Plaintiff not testify or introduce evidence concerning the recent incident, Plaintiff is [sic] consents, as there is nothing to discuss." (Pl. Opp. ¶ 8, ECF No. 198.) Nonetheless, Plaintiffs object to the preclusion of Dr. Radna's 2019 report, which Plaintiffs argue was first served in 2019, and was then "re-served prophylactically in 2022." (*Id.* ¶ 9.)

Rule 37(b)(2) provides that when a party "fails to obey an order to provide or permit discovery, the court ... may issue further just orders," which include "prohibiting the disobedient party from supporting or opposing designated

claims or defenses, or from introducing designated matters in evidence"; "striking pleadings in whole or in part"; or "rendering a default judgment against the disobedient party[.]" Fed. R. Civ. P. 37(b)(2)(A). The Court has "wide discretion in imposing sanctions under Rule 37[.]" *S.E. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (internal quotation and citation omitted). The Court considers the following factors when exercising its discretion to impose sanctions: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (internal quotation and citation omitted). In addition, "the court must order the disobedient party ... to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified, or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *see also* Fed. R. Civ. P. 16(f)(2).

**\*14** This motion is resolved as follows:

Any materials produced or served by Plaintiffs after August 1, 2022—in blatant violation of this Court's order during the January 6, 2022 conference—is strictly precluded. Such precluded materials include all items disclosed in Plaintiffs' September 6, 2022 and September 19, 2022 communications with Defendants.

Regarding Dr. Radna's report, only the version based on his examination of Uzhca on March 18, 2019 is admissible. The "supplemental" version that was "prophylactically reserved" in 2022 is strictly precluded. In addition, Dr. Radna is not permitted to offer any testimony with respect to any examination of Uzcha, or any review of Uzcha's medical record, after March 18, 2019. Any testimony concerning Dr. Radna's examination of Uzcha on August 15, 2022 is inadmissible. With respect to the diagnostic films mentioned or reviewed in Dr. Radna's August 15, 2022 report, which include the serial stereo-3D sagittal views of the cervical spine taken on March 19, 2019, such materials are admissible only to the extent that they were already mentioned or reviewed in Dr. Radna's March 2019 report.

The Court further grants the following reliefs without objection from Plaintiffs:

2023 WL 2529186

Dr. Daniel Zelazny's notes based on his August 11, 2022 examination of Uzcha are precluded. Any testimony from Dr. Zelazny or others regarding the contents of such notes is also precluded.

Dr. Darren Friedman is precluded from offering any testimony concerning facts and opinions presented in his "updated Narrative Report" based on his August 2022 examination of Uzcha.

Dr. Darren Friedman's notes of his examination of Uzcha on August 4, 2022 and September 1, 2022 are precluded. Any testimony from Dr. Friedman or others regarding the contents of such notes is also precluded.

Dr. Landis Barnes, whom Uzcha first saw on August 3, 2022, is precluded from testifying at this trial. Any medical record produced by Dr. Barnes is also precluded.

Uzcha is not permitted to claim that he cannot work as a delivery driver if such claims are based on Dr. Radna's examination of Uzcha any time after March 2019. Defendants are permitted to introduce evidence that Uzcha was driving when he was involved in a vehicle collision in April 2022.

Accordingly, the Court grants Defendants' motion to the extent set forth above. Defendants' request for expenses and fees is denied.

## CONCLUSION

For the foregoing reasons, the Court resolves the parties' motions as follows:

(1) Defendants' motion at ECF No. 164 is DENIED;

(2) Defendants' motion at ECF No. 165 is GRANTED IN PART, DENIED IN PART;

(3) Defendants' motion at ECF No. 166 is DENIED;

(4) Plaintiffs' motion at ECF No. 167 is GRANTED IN PART, DENIED IN PART;

(5) Plaintiffs' motion at ECF No. 168 is GRANTED IN PART, DENIED IN PART;

(6) Plaintiffs' motion at ECF No. 169 is GRANTED IN PART, DENIED IN PART; and

(7) Defendants' motion at ECF No. 195 is GRANTED IN PART, DENIED IN PART.

**\*15** The parties are directed to appear in person before this Court for a pretrial conference on May 3, 2023 at 11:00AM.

## All Citations

Not Reported in Fed. Supp., 2023 WL 2529186

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 8788908
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Joseph DICKSON, Plaintiff,

v.

NEW YORK STATE OFFICE OF CHILDREN
AND FAMILY SERVICES, Defendant.

18-cv-07212 (JMW)
|
Signed December 19, 2023

**Attorneys and Law Firms**

Gennady Litvin, Esq., Law Office of Yuriy Moshes, P.C., 517 Brighton Beach Avenue, 2nd Floor, Brooklyn, NY 11235, Attorney for Plaintiff.

Jessenia Maldonado, Esq., Law Office of Yuriy Moshes, PC., 322 West 48th Street, 6th Floor, New York, NY 10036, Attorney for Plaintiff.

Junou Odige, Esq., Robert T. Reilly, Esq., 52 Broadway, 9th Floor, New York, NY 10004, Attorney for Plaintiff.

Toni E. Logue, Esq., Richard H. Yorke, Esq., NYS Attorney General's Office, 200 Old Country Road, Suite 460, Mineola, NY 11501, Attorneys for Defendant.

## ORDER

WICKS, Magistrate Judge:

**\*1** Plaintiff Joseph Dickson commenced this action against Defendant New York State Office of Children and Family Services ("OCFS") pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act") and the New York State Human Rights Law, New York State Executive Law § 296 *et seq.* Jury selection for trial has been rescheduled for January 29, 2023. Presently before the Court is Defendant's motion *in limine* (ECF No. 71) which seeks to preclude the introduction of various testimony and exhibits, namely, (1) the testimony and Affidavit of Linda Driscoll; and (2) Plaintiff's proposed Exhibits number 3 and 4 (an internal complaint and subsequent investigation conducted by Defendant after receiving Plaintiff's New York State Division of Human Rights complaint), Exhibit 14 (Hilton Cooper's Affidavit), Exhibit 15 (Sayed Madar's

Statement), Exhibit 20 (EEO complaints against Associate Commissioner Farooq Mallick), and Exhibit 21 (EEO complaints against Assistant Director of the Brentwood Facility James Murdocco).

For the reasons that follow, the Court grants in part and denies in part Defendant's motion filed at ECF No. 71.[1]

[1]    Plaintiff also submitted its own motion *in limine* (ECF No. 74), but that motion has since been withdrawn. (*See* Electronic Order dated Nov. 9, 2023.)

## BACKGROUND

Plaintiff worked as a Youth Division Aide for Defendant in the Goshen Secure Center. (ECF No. 1 ¶ 21.) Around December 16, 2013, Plaintiff sustained a work-related injury to his head and was diagnosed with a "post-concussive syndrome." (*Id.* ¶ 26.) He requested accommodations for his disability and provided Defendant with a supporting letter from his physician. (*Id.* ¶ 28.) However, since Defendant took no action, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in 2015. (*Id.* ¶ 25.) Defendant subsequently began to accommodate Plaintiff's doctor's orders in October 2015 but shortly after, Plaintiff sustained another work-related injury and was forced to go out on leave. (*Id.* ¶¶ 32-33.)

Plaintiff returned to work in 2016 and, after a few months, applied for a promotion at the Brentwood Residential Center. (*Id.* ¶ 39.) He was told by several personnel that he would get the position. (*Id.* ¶¶ 39-40, 42-43.) However, according to Plaintiff, James Murdocco, Brentwood Residential Center Assistant Director, began rumors about Plaintiff and was allegedly responsible for halting Plaintiff's promotion. (*Id.* ¶ 44.) Instead, less qualified candidates were being hired for that same position. (*Id.* ¶ 49.) Plaintiff claims he was not promoted because his prior complaint contained allegations of a close friend of the employees responsible for the hiring/promotion decisions. (*Id.* ¶¶ 44, 52.)

Plaintiff initially brought this action alleging injuries suffered as a result of being retaliated against, demoted, denied a promotion, and eventually terminated by his employer. (*See generally* ECF No. 1.) However, on August 5, 2022, the Court partially granted Defendant's motion for summary judgment dismissing Plaintiff's termination and demotion claims. (ECF

No. 57.) The remaining claim left to be tried before a jury is Plaintiff's claim that Defendant retaliated against him by not promoting him. (*Id.*) On December 23, 2022, the parties filed their Joint Pre-trial Order ("JPTO"). (ECF No. 63.) Parties then consented to the undersigned for all further proceedings, including trial. (ECF No. 68.) Defendant and Plaintiff thereafter filed the instant motion *in limine*. (ECF No. 71.)

**\*2** The parties filed a status report on November 8, 2023 essentially stating (1) Plaintiff adopted the proposed witness list and trial exhibit list in the Joint Pre-trial Order (ECF No. 63) and (2) Defendant was withdrawing its claims set forth in Plaintiff's separately filed motion *in limine* (ECF No. 74). (*See* ECF No. 85.) What remains is Defendant's motion *in limine* to preclude admission of certain testimony and exhibits.

## DISCUSSION

### I. The Legal Framework for Motions *in Limine*

Before a trial, parties may seek *in limine* relief to exclude anticipated evidence that may be inadmissible or irrelevant. *See Jaquez v. Flores* (*In re Estate of Jaquez*), No. 10-cv-2881 (KBF), 2016 WL 1084145, at \*1, 2016 U.S. Dist. LEXIS 34521, at \*4 (S.D.N.Y. Mar. 17, 2016). "The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)).

"Evidence should not be excluded on a motion *in limine* unless such evidence is clearly inadmissible on all potential grounds." [2] *Colon v. City of New York*, No. 16-CV-4540 (VSB), 2023 WL 6497650 at \*1, 2023 U.S. Dist. LEXIS 179763 at \*4 (S.D.N.Y. Oct. 5, 2023). "The movant has the burden of establishing that the evidence is not admissible for any purpose." *Walker v. Schult,* 365 F. Supp. 3d 266, 275 (N.D.N.Y. 2019). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (2023); *Rivera v. Inc. Vill. of Farmingdale*, 29 F. Supp. 3d 121, 125 (E.D.N.Y. 2013) ("A motion *in limine* lies in this Court's 'inherent authority to manage the course of its trials.")

(quoting *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008)).

[2]    Even though an *in limine* ruling is made pre-trial, the ruling may nevertheless be reviewed at trial, and " 'the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.' " *Great Earth Intern. Franchising Corp. v. Milks Dev.,* 311 F. Supp.2d 419, 424 (S.D.N.Y. 2004) (quoting *Luce,* 469 U.S. at 41-42, 105 S.Ct. 460).

It is under this framework that the Court analyzes the Defendant's motion *in limine*.

### II. Defendant's Motion *in Limine*

Defendant's motion *in limine* seeks to preclude the following testimony and evidence based on relevance grounds under Fed. R. Evid. 401-403 [3] : (1) Testimony and the associated affidavit of Linda Driscoll (Exhibit 13); and (2) Plaintiff's Exhibits, including an internal investigation report after receipt of Plaintiff's 2015 NYSDHR complaint (Exhibits 3 and 4); Hilton Cooper's Affidavit (Exhibit 14); Sayed Madar's Statement (Exhibit 15); and prior complaints against Mallick and Murdocco (Exhibits 20 and 21). (*See generally* ECF No. 71.) Plaintiff opposes Defendant's motion, arguing that all of the proposed evidence is relevant, has probative value, and is otherwise admissible. (ECF No. 75.) Each argument is considered below in turn.

[3]    Defendant also summarily cites to Fed. R. Evid. 404 as a basis for preclusion, however, makes no argument in support, nor does the Court find that rule applicable. (*See* ECF No. 71.)

### A. Linda Driscoll

#### a. Live Testimony

**\*3** Defendant moves to preclude Plaintiff from eliciting testimony from Linda Driscoll on the grounds that the testimony is "irrelevant, constitute[s] impermissible hearsay, [and has] no probative value." (ECF No. 71 at 2); Fed. R. Evid. 401, 402, and 403. Plaintiff opposes, stating that James Murdocco's (Assistant Director of the Brentwood facility from June to September 2017) statements to Driscoll demonstrate that it was more probable than not that Defendant acted in a discriminatory manner in denying his promotion.

(ECF No. 75.) Further, Plaintiff states the evidence will not be confusing to the jury because of the obvious bias exhibited against Plaintiff. (*Id.*)

The Federal Rules of Evidence provide a test for evidence that is relevant. That is, evidence is relevant if: (a) "it has any tendency to make a fact more or less probable than it would be without the evidence;" and (b) "the fact is of consequence in determining the action." Fed. R. Evid. 401. In other words, this fact must have some effect on "the outcome of the suit under the governing law." *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007). Relatedly, evidence is "not relevant if it does not tend to prove or to disprove a matter at issue in the case." Matthew Bender & Company, Inc., 1 Federal Courtroom Evidence § 401 (2023); *see also Henry v. Wyeth Pharms., Inc.,* 616 F.3d 134, 150 (2d Cir. 2010) (finding that supervisor's alleged remark "so sue me" was only marginally relevant because the supervisor was not involved in any alleged discriminatory decisions for Plaintiff or comparators, and the comments were made years before the incident and unrelated to decision-making process). "So long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *689 Eatery Corp. v. City of New York,* Nos. 02-cv-4432 (LJL), 02-cv-8333 (LJL), 2023 WL 6977060 at *2, 2023 U.S. Dist. LEXIS 189875 at *10 (S.D.N.Y. Oct. 23, 2023) (citing *United States v. Jones,* No. 16-cr-0553 (AJN), 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018)).

Generally, relevant evidence is admissible. Fed. R. Evid. 402. However, there are certain situations and circumstances in which a court may exclude relevant evidence pursuant to Rule 403. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "A District Court has 'broad discretion' to admit or exclude evidence under Rule 403." *United States v. Yousef,* 327 F.3d 56, 121 (2d Cir. 2003). "In making a Rule 403 determination, courts should ask whether the evidence's proper value 'is more than matched by [the possibility] ... that it will divert the jury from the facts which should control their verdict.' " *Bensen v. American Ultramar,* No. 92-cv-4420 (KMW) (NRB), 1996 WL 422262, at *6, 1996 U.S. Dist. LEXIS 10647, at *19 (S.D.N.Y. July 26, 1996) (citing *United States v. Krulewitch,* 145 F.2d 76, 80 (2d Cir. 1944)).

Driscoll was a psychologist at the Brentwood facility working for Defendant until mid-July 2018 and worked in the same unit as Plaintiff from June to September 2017. (ECF No. 71-1 at 2.) Because the affidavit acts as a proffer of Driscoll's anticipated testimony, the Court finds that it is sufficient to establish relevance under Fed. R. Evid. 401. Despite her lack of involvement with Plaintiff's interviewing or promotion process for the position in question, Driscoll *did* work in the same unit as Plaintiff and even possesses information relevant to the sole issue of whether Defendant retaliated against Plaintiff in failing to promote him. (ECF No. 71-1.) Essentially, the testimony and affidavit states that Defendant constantly "warn[ed]" her to stay away from Plaintiff. (ECF No. 75 at 2.) Further, Defendant has not stated how the testimony or affidavit would be prejudicial against Defendant or confusing to the jury. For these reasons, the Court denies Defendant's request to exclude Driscoll's live testimony.[4]

4    Defendant makes a single vague reference that Driscoll's testimony would "constitute impermissible hearsay." (ECF No. 71.) Like the Fed. R. Evid. 404 citation, Defendant offers no support or citation for its hearsay contention and therefore the Court denies to consider preclusion on this ground. Any hearsay objections will be considered as they arise throughout the course of trial.

### b. Affidavit (Exhibit 13)

**\*4** Plaintiff next seeks to admit and use an affidavit by Linda Driscoll. However, courts in this Circuit have found that affidavits cannot be used in place of the testimony of the available affiant. *See Okeke v. N.Y. & Presbyterian Hosp.,* No. 16-cv-570 (CM), 2017 WL 2484200 at *3, 2017 U.S. Dist. LEXIS 87449 at *8 (S.D.N.Y. June 6, 2017) (noting that when a party offers affidavits "in lieu of live testimony or deposition testimony of witnesses" outside the subpoena power of the Court, the Court will exclude such documents since "affidavits cannot be cross-examined."); *see also Rivera v. Baccarat, Inc.,* No. 95-cv-9478 (MBM) (JCF), 1997 WL 777887, at *4, 1997 U.S. Dist. LEXIS 19911, at *10 (S.D.N.Y. Dec. 12, 1997) (admitting depositions where the witness is unavailable but affidavits would not be admitted as direct evidence and only for impeachment purposes). For these reasons, since Driscoll will be testifying at trial, Defendant's request to preclude Driscoll's Affidavit (Exhibit 13) is granted and it shall be stricken from Plaintiff's final exhibit list.

Dickson v. New York State Office of Children and Family..., Not Reported in Fed....

2023 WL 8788908

**B. Exhibits**

Defendant also moves to preclude several of Plaintiff's exhibits (Exhibits 3, 4, 14, 15, 20, and 21) on grounds of relevance, prejudice, and hearsay. The Court examines each argument below.

**a. Internal Investigation Reports (Exhibits 3 and 4)**

Defendant moves to preclude Plaintiff from introducing Plaintiff's exhibits 3 and 4 pursuant to Federal Rules of Evidence 401, 402, and 403. (ECF No. 71 at 2.) These internal documents consist of: (1) the July 23, 2015 Notice of Receipt of Complaint from the Office of Equal Opportunity and Diversity Development ("EODD") related to the retaliatory treatment Plaintiff received after he submitted his 2015 Division of Human Rights complaint and (2) the September 17, 2015 Notice of Submission of Draft Investigation Report stating that an investigation should be opened concerning Plaintiff's retaliation complaint. (ECF No. 71-2.) These documents, Defendant contends, have nothing whatsoever to do with Defendant's alleged failure to promote at the Brentwood Facility and occurred years prior to the promotion decision at issue. (*Id.*); (ECF No. 81.) Plaintiff opposes stating that the investigation refers to the allegations that Plaintiff was retaliated against by Defendant and is therefore relevant and probative to the issue at hand. (ECF No. 75.)

Plaintiff's original complaint alleges that Defendant did not grant him a work accommodation at the Goshen Facility. (ECF No. 1 ¶ 30.) He then made an internal complaint to his employer stating that he was experiencing retaliatory behavior as a result of the original complaint. Here, the subsequent complaint, though occurring years prior to the promotion at issue, would be probative of Plaintiff's instant retaliation claim. It is indicative that Plaintiff took additional steps to voice his concerns about his retaliatory treatment after lodging the failure to accommodate complaint and that Defendant also took steps to investigate the matter. Thus, this evidence can potentially provide the jury with additional context regarding Defendant's rationale for failing to promote Plaintiff.

However, on its face, "evidence of administrative decisions containing 'factual conclusions' ... can pose a significant risk of unfair prejudice to the party against whom it is offered." *Kyle v. City of New York*, No. 03-CV-3540 (SLT) (KAM),

2006 WL 2375462 at *1, 2006 U.S. Dist. LEXIS 61396 at *3 (E.D.N.Y. Aug. 7, 2006) (citing *Abramowitz v. Inta-Boro Acres, Inc.*, No. 98-CV-4139 (ILG), 1999 WL 1288942, at *8 (E.D.N.Y. Nov. 16, 1999)). Thus, for the sake of completeness and fairness to both sides, the entire complaint to the EODD as well as the complete resulting investigative report should be introduced to the jury. [5] *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time."). Introduction of the entire report would alleviate Defendant's concerns that the notice of the complaint and report alone can be potentially prejudicial.

[5]     Defendant raised a similar argument in the Joint Pre-trial Order, not in its motion *in limine*. (*See* ECF No. 63 at 9-10.)

**\*5** Accordingly, introducing the internal retaliation entire complaint, including the notice, as well as the entire investigative report and the notice at trial could provide further context to a fact finder as to why Defendant made its decision not to promote Plaintiff. For these reasons, Defendant's motion is denied.

**b. Hilton Cooper Affidavit (Exhibit 14)**

Defendant next seeks to preclude admission of Hilton Cooper's [6] affidavit, pursuant to Federal Rules of Evidence 401, 402, and 403. [7] Here, according to Plaintiff's witness exhibit list, Cooper will be testifying in person. (ECF No. 63 at 5.)

[6]     Hilton Cooper was a Residential Director of the Brentwood Residential Center. (ECF No. 71-3.)

[7]     The affidavit essentially states that Cooper believed Dickson was "best qualified" for the promotion and he discussed his intention to promote Plaintiff with other employees, including Murdocco and Mallick. (ECF No. 71-3.) However, he states he later learned that Plaintiff would not be promoted allegedly because of a past EEO complaint filed against Defendant. (*Id.*)

Although the affidavit would indeed be relevant, as with Driscoll, because Cooper is on the witness list and expected to testify at trial, Cooper's affidavit is excluded and Defendant's

motion is granted as to that branch. *See Okeke*, 2017 WL 2484200 at *3, 2017 U.S. Dist. LEXIS 87449 at *8 (noting that affidavits will not be admitted in lieu of live testimony). Cooper can indeed be questioned about the contents of the affidavit at trial.

### c. Sayad Madar's Statement (Exhibit 15)

Defendant next seeks to preclude Sayad Madar's (Plaintiff's only comparator) statement [8] pursuant to Federal Rules of Evidence 401, 402, and 403. (ECF No. 71 at 3.) Madar's statement describes his discussion with Cooper about Plaintiff not being promoted which was because of issues that occurred while Plaintiff worked at the Goshen facility. (ECF No. 71-4.) The Court finds that the Madar statement should be excluded for three reasons:

(1) Pursuant to Fed. R. Evid. 403, the statement would be redundant of Cooper's anticipated testimony concerning this same conversation. *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983) (stating that cumulative testimony is testimony that "replicates other admitted evidence").

(2) The statement constitutes impermissible hearsay—a statement that Madar heard from Cooper who heard from Mallick about what was said regarding the Plaintiff's promotion—for which no exception applies. For instance, Plaintiff contends that at least one portion of the statement constitutes a statement against interest by Defendant (Fed. R. Evid. 804(b)(3)). (ECF No. 75.) However, for this exception to apply, the declarant, here Mallick, must be unavailable. Since Mallick will be testifying, Plaintiff's argument fails. (*See* ECF No. 63 at 5) (listing Mallick as a live witness for both parties).

(3) Finally, since Madar will not be testifying, the affidavit cannot be admitted in lieu of live testimony—here, Cooper's testimony. *See Okeke*, 2017 WL 2484200 at *3, 2017 U.S. Dist. LEXIS 87449 at *8; *see also Bleeker v. Dukakis*, No. 78-3172-MA, 1981 U.S. Dist. LEXIS 12008, at *3 (D. Mass May 4, 1981) ("We are mindful that trial by affidavit is not encouraged.") (citing *Redman v. Warrener*, 516 F.2d 766, 768 (1st Cir. 1975)); *Dolence v. Flynn*, 628 F.2d 1280, 1281 (10th Cir. 1980) ("Trial cannot be solely on affidavits.") (citing *Collins v. Hladky*, 603 F.2d 824, 825 (10th Cir. 1979)).

**\*6** For these reasons, Defendant's motion to exclude Madar's statement is granted.

8      The undersigned notes that this document is simply a signed letter with Madar's contact information. It is not a sworn affidavit but rather is a self-prepared statement. (*See* ECF No. 71-4.)

### d. Prior Complaints Against Mallick and Murdocco (Exhibits 20 and 21)

Finally, Defendant seeks to preclude prior written complaints against Farooq Mallick and James Murdocco [9] because they are irrelevant and would offer no probative value to the remaining claim as there is no indication of any final adverse determination against either Mallick or Murdocco. (ECF No. 107 at 3.) Plaintiff concedes that only certain complaints, like those alleging retaliation by Defendant, are relevant and probative and may be admissible. (ECF No. 75 at 3-4) ("Although the Plaintiff admits that some of these 160 pages ... are irrelevant or lack probative value....")

9      Mallick was the Associate Commissioner for Program Services. (ECF No. 63 at 3.)

Plaintiff's Exhibits 20 and 21 consist of 160 pages of documents and includes complaints of race, sex, and age discrimination in addition to claims of retaliation. Although Defendant carries of the burden of proving admissibility (or lack thereof) for a motion *in limine, Walker v. Schult*, 365 F. Supp. 3d 266, 275 (N.D.N.Y. 2019), Plaintiff has admitted that a large portion of the documents are irrelevant and has not identified which of the complaints are indeed relevant. See *Spring/United Mgmt. v. Mendelsohn*, 552 U.S. 379, 388, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008) ("The question of whether evidence of discrimination by other supervisors is relevant ... is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."). For these reasons, Defendant's motion to preclude the prior complaints is granted without prejudice. Plaintiff is given one week from the date of this Order to identify specific, relevant, and admissible documents within Exhibits 20 and 21 that he intends to use at trial so the Court can make its final determination.

## CONCLUSION

For the foregoing reasons, Defendant's motion *in limine* (ECF No. 71) to exclude certain evidence at trial, namely, Plaintiff's Exhibits 3, 4, 13, 14, 15, 20, and 21, is granted in part and denied in part as follows:

- Request to exclude Linda Driscoll's testimony is DENIED and Plaintiff's Exhibit 13 (Driscoll's affidavit) is GRANTED;

- Request to exclude Plaintiff's Exhibits 3 and 4 (Internal Investigation Report) is DENIED;

- Plaintiff's Exhibit 14 (Cooper's affidavit) is GRANTED;

- Plaintiff's Exhibit 15 (Madar's statement) is GRANTED; and

- Plaintiff's Exhibits 20 and 21 (prior complaints about Mallick and Murdocco) are GRANTED without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8788908

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5362256

2021 WL 5362256
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

LOCAL 3621, EMS OFFICERS UNION,
DC-37, AFSCME, AFL-CIO, et al., Plaintiffs,
v.
The CITY OF NEW YORK, et al., Defendants.

CIVIL ACTION NO. 18 Civ. 4476 (LJL) (SLC)
|
Signed 06/02/2021

**Attorneys and Law Firms**

Brian A. Jasinski, Marrinan & Mazzola Mardon, P.C., Erica Tracy Kagan, Yetta G. Kurland, The Kurland Group, New York, NY, for Plaintiffs Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO, Renae Mascol.

Erica Tracy Kagan, Yetta G. Kurland, The Kurland Group, New York, NY, for Plaintiff Luis Rodriguez.

Donna Anne Canfield, Lora Minicucci, New York City Law Department, New York, NY, for Defendants City of New York, New York City Fire Department, Department of Citywide Administrative Services.

**REPORT & RECOMMENDATION**

SARAH L. CAVE, United States Magistrate Judge.

**\*1 TO THE HONORABLE LEWIS J. LIMAN**, United States District Judge:

**I. INTRODUCTION**

Plaintiffs, a union (Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO ("Local 3621")) and two employees of the New York City Fire Department ("FDNY"), bring this putative class action against the City of New York (the "City"), the FDNY, the Department of Citywide Administrative Services ("DCAS"), and several John and Jane Does (collectively, "Defendants"), alleging that employees in the FDNY's Emergency Medical Services Bureau ("EMS") who seek promotions above the rank of lieutenant are subject to disparate treatment and disparate impact based on impermissible considerations. Plaintiffs

assert claims under 42 U.S.C. §§ 1981 and 1983, and the New York State and New York City Human Rights Laws. (ECF Nos. 1 ¶¶ 1, 4; 26 at 2–3).

Before the Court is Plaintiffs' Motion pursuant to Federal Rule of Civil Procedure 37 (the "Motion"), which seeks to preclude Defendants from offering certain evidence in opposition to Plaintiffs' pending Motion for Class Certification (the "Class Motion"). (ECF Nos. 375–79). Specifically, Plaintiffs ask the Court to preclude Defendants from (i) using BLDS, LLC ("BLDS") as an expert, exclude the review by BLDS's Christopher Erath, Ph.D. ("Erath") dated February 18, 2021 (the "Erath Report"), and to strike references to the Erath Report from Defendants' opposition to the Class Motion (the "Class Opposition"); (ii) using an "Applicant List" (discussed further below) and strike any references to the Applicant List from the BLDS Report or the Class Opposition; (iii) using documents Defendants failed to timely produce; and (iv) relying in the Class Opposition on "defamatory and spurious statements" regarding Plaintiff Renae Mascol ("Mascol"). (ECF No. 376 at 3).[1] Defendants have filed a memorandum of law and supporting declarations (the "Opposition"), arguing that Plaintiffs have failed to meet the standard for any of the relief they seek. (ECF Nos. 391–93). Plaintiffs have filed a reply memorandum of law (the "Reply") and declaration (the "Reply Declaration") that attached additional evidence not included with the Motion. (ECF Nos. 398–99).

1    Page numbers refer to the ECF page number, unless otherwise noted.

For the reasons set forth below, the Court respectfully recommends that the Motion be DENIED.

**II. BACKGROUND**

The factual background of this case is set out in detail in the Court's March 11, 2020 Memorandum Opinion & Order resolving various discovery disputes (the "March 11 Opinion"), and is incorporated by reference. Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 1166047, at \*1 (S.D.N.Y. Mar. 11, 2020). As explained in the Court's March 31, 2021 Report and Recommendation concerning Plaintiffs' Motion for an Adverse Inference, the parties have had endless disputes concerning class certification discovery that the Court has attempted—with questionable success—to

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

resolve through innumerable conferences and orders. Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL)(SLC), 2021 WL 1750866, at *1 (S.D.N.Y. Mar. 31, 2021). Class certification discovery closed on November 25, 2020, and the parties began briefing the Class Motion (ECF Nos. 300, 355), until briefing was stayed pending the filing and resolution of this Motion. (ECF No. 365).

**\*2** The factual and procedural backgrounds specific to each of the four types of relief Plaintiffs seek in the Motion are set out separately below.

### III. DISCUSSION

#### A. BLDS

##### 1. Background

Erath joined BLDS in 2011, and since that time has "been consistently retained by the City of New York to serve as an expert consultant in a variety of matters." (ECF No. 392 ¶ 3 (Erath Declaration)). Before joining BLDS, Erath was employed by NERA Economic Consulting, where he had similarly been retained by the City to serve as an expert consultant. (Id. ¶ 4). While at BLDS, Erath and his colleagues have served as expert consultants in over 70 cases for the City, including "a number of high-profile cases," including cases for the Department of Education and the FDNY for which Erath performed damages and disparate impact statistical analyses. (Id. ¶¶ 5–6).

Plaintiffs assert in the Motion that on July 13, 2017, they retained BLDS "to provide consulting services in this matter as Plaintiffs' expert." (ECF No. 376 at 3).[2] The Reply Declaration does attach an engagement letter between Plaintiffs' counsel and BLDS dated July 13, 2017 contemplating that BLDS's David W. Griffin, Ph.D. ("Griffin") would "provide independent and objective consulting services" at a rate of $680 per hour (the "Engagement Letter"), and a single invoice for three days of services totaling 8.25 hours that Griffin performed in early August 2017 (the "Invoice"). (ECF Nos. 399; 399-1).[3] Plaintiffs assert that they provided information to BLDS, which "for over two (2) years ... performed statistical analysis and strategic planning on behalf of Plaintiffs and in support of their claims in this action." (ECF No. 376 at 3). The record on

the Motion does not show that Griffin or anyone else at BLDS performed any services for Plaintiffs after August 10, 2017.

2      Plaintiffs' assertions regarding their retention of BLDS appear not in their Counsel's Declaration (ECF No. 377), but only in Plaintiffs' memorandum of law (ECF No. 376), and therefore "have no evidentiary weight." Leibovitz v. City of New York, No. 15 Civ. 546 (LGS) (HBP), 2017 WL 462515, at *1 n.1 (S.D.N.Y. Feb. 3, 2017) (citing Kulhawik v. Holder, 571 F.3d 296, 298 (2d Cir. 2009)); see Markowitz Jewelry Co. v. Chapal/Zenray, Inc., 988 F. Supp. 404, 407 (S.D.N.Y. 1997) ("[T]estimonial evidence submitted on motions must be in the form of affidavits or declaration. Unsworn statements by counsel simply will not do.") (internal citations omitted).

3      The Reply Declaration does not explain why the Engagement Letter and the Invoice did not accompany the Motion in the first instance.

Attached as an exhibit to the Complaint (but not submitted with the Motion) is a letter dated August 10, 2017 from Griffin consisting of two paragraphs and two charts that analyzed "a current 'snapshot' of all active members of [EMS]." (ECF No. 1-3 (the "Griffin Letter") at 2). The Griffin Letter asserts that the snapshot data on which he relied, which encompassed 4,140 EMS members, "indicates that approximately 52% of those at the rank of Captain and above are white males, compared to 36% of those in the lower ranks," which Griffin stated was "statistically significant at a conventional level and remains true after accounting for differences in age, FDNY service years and education level." (Id.) Plaintiffs assert that they submitted the Griffin Letter to the Equal Employment Opportunity Commission ("EEOC") on an unspecified date. (ECF No. 376 at 3).

**\*3** In late 2018 or early 2019, Erath received a call from Defendants' counsel inquiring why BLDS had performed work for Plaintiffs' counsel, The Kurland Group ("TKG"), given that TKG "regularly litigates" against the City and that Erath and BLDS had acted as expert consultants for the City since at least 2011. (ECF No. 392 ¶ 8). Erath then instructed Griffin to "cease all work with [TKG] involving the City," but "did not discuss or review any of the work" Griffin performed for TKG. (Id. ¶ 9).

To the Court's knowledge, Plaintiffs have not submitted in this action any further analyses by Griffin or any other

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

professionals at BLDS. In support of the Class Motion, Plaintiffs submitted the expert report of Shane Thompson, Ph.D. ("Thompson"), of Precision Analytics Co., LLC (the "Thompson Report"). (ECF No. 307-8).

At a January 15, 2019 conference before the Honorable Paul G. Gardephe (to whom the case was then assigned), the parties represented that they had met and conferred regarding BLDS and agreed that they would submit for the Court's review a stipulation "that there would be a wall put up between the two matters and BLDS would continue to work with the plaintiff in this matter." (ECF No. 75 at 14; see ECF No. 36-4 at 10). [4] Subsequently, however, Defendants' counsel informed TKG that "BLDS now no longer wanted to proceed as an expert in this action," and therefore, the contemplated stipulation did not materialize. (ECF No. 75 at 14). Informed of these developments during a December 19, 2019 conference, at which Defendant's counsel explained that BLDS was "a long time client" of the City and specifically mentioned Erath by name (id. at 10–11), Judge Gardephe explained:

> [I]t's up to BLDS what it wants to do but a rational vendor might well conclude we have a continuing relationship with the City which is an important one to us and we don't want to jeopardize that relationship by taking a one-off matter. And, if BLDS made that determination, which is just a business decision, I don't see the issue that presents. That is just a business decision that BLDS makes. According to Ms. Canfield, they have made that decision.

(Id. at 15). Judge Gardephe then clarified that Defendants did not "have a problem with plaintiff[s'] counsel relying on work that BLDS already has done in this case," and therefore Plaintiffs could "rely on and use the data and the work that BLDS has already done for you for purposes of this case." (Id. at 19).

[4]    Although the official transcript of the January 15, 2019 conference with Judge Gardephe was never formally filed on the docket, Plaintiffs attached a

copy of the transcript to a February 22, 2019 letter to the Court. (ECF No. 36-4).

Plaintiffs contend that they were not aware that Defendants intended to use BLDS in this action until March 11, 2021, when Defendants filed the Class Opposition, which included the Erath Report. (ECF No. 376 at 4; see ECF No. 354-19). In the Erath Report, Erath states that he used "three sources of data": (1) "Two spreadsheets, one for active and one for 'ceased' employees, showing year-end snapshots of EMS employees and the position held for each of 2013-2019" (the "Year-End Spreadsheets"); [5] (2) "Two spreadsheets, one for active and one for 'ceased' employees, showing job changes and their dates for 1999-2019" (the "Job Change Spreadsheets"); [6] and (3) "Documents showing actual applicants to Captain openings for 2014-2019 and the selections made" (the "Applicant Documents"). [7] (ECF No. 354-19 at 2; see ECF No. 392 ¶¶ 12–14). Category (1) encompassed 6,944 EMS employees, but neither the Thompson Report nor the Erath Report indicate the number of EMS employees in Category (2). (ECF Nos. 307-8 at 2; 354-19 at 4). Erath states that Thompson used categories (1) and (2) in the Thompson Report, but not category (3). (ECF No. 354-19 at 2).

[5]    Erath states that the Year-End Spreadsheets were labeled "EMS HRIS Yrly Snapshot 12162020.xlsx" and "EMS HRIS Yrly Ceased Snapshot 12162020.xlsx." (ECF No. 392 ¶ 12).

[6]    Erath states that the Job Change Spreadsheets were labeled "EMS HRIS Promo Histry" and "EMS HRIS Ceased Promo Histry." (ECF No. 392 ¶ 13).

[7]    Erath lists the Applicant Documents in Exhibit 1 to his Declaration. (ECF Nos. 392 ¶ 14; 392-1).

*4    In the Motion, Plaintiffs argue that, because they had previously retained BLDS, "a conflict of interest [ ] precludes Defendants from using BLDS as their expert witness both in the instant matter and moving forward in this proceeding." (ECF No. 376 at 4–5). Plaintiffs argue that disqualification is necessary "to ensure that confidential information and data are safeguarded and privileged communications are protected." (Id. at 5). In their Opposition, Defendants argue that Plaintiffs have failed to provide evidentiary support for their assertion that they provided BLDS with confidential or privileged information or formally engaged BLDS in this action. (ECF No. 393 at 11–13). As noted above, on reply, Plaintiffs provide a copy

of the Engagement Letter and the single Invoice as proof that they had a confidential relationship with Griffin and BLDS, and argue that they were not required to establish that Griffin communicated confidential information to Erath for BLDS to be disqualified. (ECF Nos. 398 at 4; 399-1).

**2. Legal Standard**

"The Court has the inherent power to disqualify an expert witness when such relief is warranted." Rodriguez v. Pataki, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003), aff'd, 293 F. Supp. 2d 315 (S.D.N.Y. 2003) (citation omitted). "Disqualification is designed to protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." Eastman Kodak Co. v. Kyocera Corp., No. 10 Civ. 6334 (CJS), 2012 WL 4103811, at *8 (W.D.N.Y. Sept. 17, 2012) (citation omitted). "Disqualification is a drastic remedy, however, and should be resorted to rarely." Id. at 7 (citation omitted).

A party seeking to disqualify an expert whom it had previously retained but whom an adversary seeks to use as an expert bears the burden to establish: "(1) that it was objectively reasonable for the movant to believe that it had a confidential relationship with the expert and (2) that the movant's confidential information was in fact disclosed to the expert." Rodriguez, 293 F. Supp. 2d at 311; see Rouviere v. DePuy Orthopaedics, Inc., No. 1:18-Civ. 4814 (LJL) (SDA), 2020 WL 6265609, at *2 (S.D.N.Y. Oct. 25, 2020) (quoting Rodriguez, 293 F. Supp. 2d at 311); Auto-Kaps, LLC v. Clorox Co., No. 15 Civ. 1737 (BMC), 2016 WL 1122037, at *2 (E.D.N.Y. Mar. 22, 2016) (listing these two factors); In re Dreier LLP, 482 B.R. 863, 869 (Bankr. S.D.N.Y. 2012) (same). " 'Only if the answers to both questions are affirmative should the witness be disqualified.' " Dreier, 482 B.R. at 869 (quoting Koch Refin. Co. v. Jennifer L. Boudreaux M/V, 85 F.3d 1178, 1181 (5th Cir. 1996)). Some courts in the Second Circuit have also considered a third factor, "the public's interest in preserving judicial integrity and fairness as balanced against the party's right to the assistance of experts who possess specialized knowledge and the right of such experts to pursue their professional calling." Auto-Kaps, 2016 WL 1122037, at *2 (citing Grioli v. Dental Int'l Mach. Corp., 395 F. Supp. 2d 11, 14 (E.D.N.Y. 2005)); see In re Namenda Direct Purch. Antitrust Litig., No. 15 Civ. 7488 (CM) 2017 WL 3613663, at *8 (S.D.N.Y. Aug.

21, 2017) (finding that public policy did "not weigh against disqualifying" expert).

The party seeking disqualification bears the burden of establishing this standard, and cannot do so through "mere conclusory or ipse dixit assertions," but rather must identify "specific and unambiguous disclosures that if revealed would prejudice the party." Kyocera, 2012 WL 4103811, at *8 (internal citations omitted).

**3. Application of Legal Standard**

**a. Existence of confidential relationship**

Courts consider several factors to determine "the reasonableness of a litigant's conclusion that it maintained a confidential relationship with an expert witness," including:

> (1) the length of the relationship and frequency of contact with the expert, including the number of meetings between the expert and the attorneys; (2) whether the expert was provided with confidential information, work product or documents, (3) whether the parties entered into a formal confidentiality agreement, (4) whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, (5) whether the expert was retained to assist in the litigation or testify as a trial witness and/or receive a fee, (6) whether the moving party funded or directed the formation of the opinion to be offered at trial, and (7) whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

**\*5** Dreier, 482 B.R. at 869; see Breitkopf v. Gentile, No. 12 Civ. 1084 (JFB) (AKT), 2014 WL 12843765, at *5 (E.D.N.Y. Mar. 24, 2014) (enumerating five similar factors).

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

Here, the essence of Plaintiffs' demand that Erath be disqualified is their assertion that a conflict of interest exists because Plaintiffs retained BLDS in this matter, "making the need for disqualification even more compelling to ensure that confidential information and data are safeguarded and privileged communications are protected." (ECF No. 376 at 5). But Plaintiffs offer almost no evidence to substantiate this assertion: they do not detail how many times TKG met with or spoke to Griffin, whether a confidentiality agreement was put in place, or whether they asked Griffin not to discuss the case with anyone else, as the cases above direct the Court to consider. Although a declaration from a TKG attorney was submitted as part of the Motion, it contains none of these details. (ECF No. 377). See Rodriguez, 293 F. Supp. 2d at 311–12 (in denying motion to disqualify, noting that "defendants did not proffer any affidavit to support [their] conclusory assertion" that they had "entrusted [the expert] with confidential data, analyses and information"). The Griffin Letter itself—which Plaintiffs did not attach to the Motion, but rather is found as an exhibit to the Complaint (ECF No. 1-3)—does indicate that Griffin analyzed "a data set" at TKG's request. (Id. at 2). At most, then, the Griffin Letter indicates that Griffin provided a preliminary answer to one question posed by TKG about a single snapshot of EMS data, but even assuming that question was posed in a conversation between TKG and Griffin, such a "conversation[ ] between a party and an expert carr[ies] no presumption of confidentiality." Breitkopf, 2014 WL 12843765, at *5 (denying motion to disqualify expert where a single meeting occurred between counsel and expert).

The evidence submitted for the first time on reply—the Engagement Letter and the Invoice—does not alter this conclusion. (ECF No. 399-1). Although the Engagement Letter acknowledges that BLDS will keep confidential information that TKG shared (id. at 2), the Invoice reflects Griffin performing less than ten hours of work on a single analysis of the data and preparation of the Griffin Letter, which Plaintiffs submitted to the EEOC and attached to the Complaint, therefore rebutting any assertion that the data on which it relied was confidential. (ECF Nos. 376 at 3; 1-3). In addition, the record reflects that BLDS performed no further work for Plaintiffs after August 10, 2017, thus undercutting Plaintiffs' conclusory assertion that BLDS received confidential information about Plaintiffs for over two years. (ECF No. 376 at 3).

Finally, Judge Gardephe already considered, and rejected, Plaintiffs' identical argument for BLDS's disqualification

when he pointed out that it was up to BLDS to decide for whom to provide expert services, and that "BLDS [was] not interested in doing more work for plaintiff." (ECF No. 75 at 16–17, 19–20). Plaintiffs' suggestion that Defendants "secretly" engaged BLDS therefore rings hollow: Erath's history of acting as an expert for the City in employment litigation was a matter of public record that made his appearance in this case unsurprising, if not expected with a considerable degree of certainty.[8] In any event, Plaintiffs point to no case management plan that required the City to disclose Erath as an expert any earlier, nor do they explain how the timing of the City's retention of BLDS in this matter is germane to whether Plaintiffs ever had a confidential relationship with BLDS.

[8]   The Court's Westlaw search revealed eleven employment litigation matters in federal court in which the City proffered Erath as an expert. See, e.g., Adams v. City of New York, No. 16 Civ. 3445 (RA), 2021 WL 1791482 (S.D.N.Y. May 5, 2021); Viera v. City of New York, No. 19 Civ. 5773 (SDA), 2021 WL 68982 (S.D.N.Y. Jan. 8, 2021); Lynch v. City of New York, No. 16 Civ. 5677 (KBF), 291 F. Supp. 3d 537 (S.D.N.Y. Mar. 12, 2018); Perry v. City of New York, No. 13 Civ. 1015 (VSB), 2018 WL 1474401 (S.D.N.Y. Mar. 26, 2018); Foster v. City of New York, Nos. 14 Civ. 4142 & 14 Civ. 9220 (PGG), 2017 WL 11591568 (S.D.N.Y. Sept. 30, 2017); New York v. United Parcel Serv., Inc., No. 15 Civ. 1136 (KBF), 2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016); Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York, No. 96 Civ. 8414 (KMW), 2015 WL 5603020 (S.D.N.Y. Sept. 21, 2015); United States v. City of New York, 847 F. Supp. 2d 395 (E.D.N.Y. 2012); Boucaud v. City of New York, No. 07 Civ. 11098 (RJS), 2010 WL 4813784 (S.D.N.Y. Nov. 16, 2010); United States v. City of New York, No. 07 Civ. 2067 (NGG) (RLM), 2010 WL 2838386 (S.D.N.Y. July 19, 2010); Scott v. City of New York, 591 F. Supp. 2d 554 (S.D.N.Y. 2008).

*6  Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden to show that it was objectively reasonable for them "to believe that [they] had a confidential relationship with" BLDS. Rodriguez, 293 F. Supp. 2d at 311.

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

#### b. Confidential disclosure

Even assuming that Plaintiffs had a confidential relationship with Griffin and BLDS past August 10, 2017, the Court nevertheless finds that Plaintiffs have not met their burden to show that TKG disclosed confidential information to BLDS. In the Motion, Plaintiffs fail to identify the source of the "snapshot" data comprised of information about "4,140 EMS members." (ECF No. 1-3 at 2). See Kyocera, 2012 WL 4103811, at *10 (denying motion to disqualify where movant failed to "describe the nature of the information [the expert] learned or what, if any of it, was confidential"). Defendants point out (and Plaintiffs do not dispute) that, in fact, Defendants produced this data to Plaintiffs in response to a Freedom of Information Law request. (ECF Nos. 391-2 at 15; 393 at 12). Thus, the "snapshot" that Griffin analyzed was Defendants' information, not Plaintiffs'. See Gordon v. Kaleida Health, No. 08 Civ. 378S(F), 2013 WL 2250506, at *17 (W.D.N.Y. May 21, 2013) (denying disqualification of expert where the information provided to expert was neither confidential nor privileged); Rodriguez, 293 F. Supp. 2d at 311–12 (denying disqualification where there was no evidence that "the movant's confidential information" had been divulged to expert) (emphasis added). Furthermore, Erath attests that he neither reviewed nor discussed with Griffin any of the analysis Griffin performed for TKG. (ECF No. 392 ¶ 9). Similarly, the Erath Report, which analyzes the Thompson Report, does not give any indication that Erath relied on the same "snapshot" that Griffin considered (even if it were confidential) or any other information confidential to Plaintiffs. (ECF No. 354-19). Finally, the fact that Griffin did not perform any analyses for Plaintiffs after August 10, 2017—and the fact that the analysis he did perform has been published by Plaintiffs—minimizes, if not eliminates, any risk that any confidential information Plaintiffs might have shared with him could have been compromised, much less that any such compromise would have prejudiced Plaintiffs.

Accordingly, the Court finds that Plaintiffs have failed to identify "specific and unambiguous disclosures that[,] if revealed[,] would prejudice" them. Kyocera, 2012 WL 4103811, at *8.

#### c. Public policy

Finally, the Court finds that public policy does not weigh in favor of disqualifying Erath. In contrast to Griffin, who

performed, at most, a single brief analysis for Plaintiffs before this action commenced, Erath has provided grounds for the Court to conclude that he does not possess information that would prejudice Plaintiffs' ability to litigate this action. See Kyocera, 2012 WL 4103811, at *10. Under these circumstances, the Court finds that Plaintiffs have not presented any evidence that would undermine the public interest in preserving judicial integrity. See Gordon, 2013 WL 2250506, at *5 (noting that courts must "protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit").

*7 In sum, the Court finds that Plaintiffs have failed to sustain their burden to show that BLDS and Erath should be disqualified from serving as Defendants' experts and recommends that Plaintiffs' request to preclude the Erath Report and strike references to it in Defendants' Class Opposition be denied.

### B. Applicant List

#### 1. Background

On October 5, 2020, Plaintiffs filed a letter-motion asking the Court to compel Defendants to produce, inter alia, what Plaintiffs defined as an "Application List":

> A complete list of all employees who applied for promotion to Captain, Deputy Chief, or Division Chief/Commander in the EMS Bureau of the FDNY from 2012 to the present with the promotion applied for and regardless of whether or not they participated in the interview, along with a designation when applicable as to why applicants did not so participate in the interview (i.e. withdrew application, found ineligible, etc.)

(ECF No. 192 at 1 (the "10/5/20 Letter")). In their October 30, 2020 response to the 10/5/20 Letter, Defendants referred to "the application materials previously produced," and agreed to produce by November 15, 2020 two categories

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 35 of 67

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

of Demographic Data.[9] (ECF No. 204 (the "10/30/20 Response")).

[9]      Those two categories were the following: (1) Annual reports from the Human Resources Information System ("HRIS"), which is maintained by FDNY's Bureau of Technology Development and Systems ("BTDS") that would include: (a) employee name; (b) employee identification number; (c) gender; (d) race; (e) date(s) of hire; (f) termination and rehire (if applicable); (g) rank; (h) title; and (i) all changes in rank or title that year with effective dates (the "HRIS Data"); and (2) Annual reports from the Payroll Management System ("PMS") database and the City's time-keeping database, "CityTime," containing: (i) salary at start date; (b) total salary; (c) base salary; and (d) start and end dates of any leave that year and reasons for that leave (the "PMS Data"). (ECF No. 204 at 1–2). The Court incorporates by reference the detailed discussion of Demographic Data set forth in the Discovery Order dated December 15, 2020. (ECF No. 267 (the "Demographic Data Order")).

During a conference with the parties on December 3, 2020, Defendants' counsel stated that Defendants had produced information regarding promotion applicants "in the form of operations orders" and "promotional packets," but "to the extent" Plaintiffs "want[ed] it in a list," she would "see if we can print out something." (ECF No. 252 at 66). In a post-conference order, the Court ordered, "[a]s discussed at the conference," Defendants were to produce to Plaintiffs "a list of promotion applicants as Defendants referenced in" the 10/30/20 Response. (ECF No. 246 at 2 (the "12/3/20 Order")).

On December 18, 2020, Defendants produced: (1) "revised HRIS files that resolves [sic] [P]laintiffs' 2 spreadsheets of individuals who were missing from the promo files or the snapshot files," and (2) "the lists of individuals applying for promotion between 2017 and 2020 as located in NYCAPS."[10] (ECF No. 391-1 (the "12/18/20 Production")). According to Defendants' Rule 30(b)(6) witness Aurora Gabriel Perez, who is a former FDNY Human Resources Manager, the FDNY began using NYCAPS in 2017. (ECF Nos. 391 ¶ 3; 391-3 at 4).

[10]      NYCAPS refers to the New York City Automated Personnel System, which "allows [City] employees to get instant access to their Personal Information, Tax and Payroll, Benefit Information, Employment Verification, Jobs, and more." See NYC Payroll Portals, https://www1.nyc.gov/site/opa/other-services/portals.page (last visited May 17, 2021).

**\*8** Erath describes in his Declaration the two categories of documents he reviewed in preparing the Erath Report, that is, four HRIS spreadsheets as well as "a number of documents showing actual applicants to Captain promotional opportunities between the years 2014 and 2019." (ECF No. 392 ¶¶ 12–14). Erath attaches to his Declaration a two-page list of the latter category containing the title of the document and applicable bates-number and which, he understands, "were provided to the Plaintiffs in response to a document request." (ECF Nos. 392 ¶ 14; 392-1). None of the documents is entitled "Applicant List," "Application List," or anything resembling such a document. (ECF No. 392-1). Nor does the list appear to include the nine (9) NYCAPS spreadsheets referenced in Defendants' 12/18/20 Production. (Compare id. with ECF No. 391-1.)

In the Motion, Plaintiffs acknowledge receipt of the 12/18/20 Production, but claim that it is only "partial" and is not "the complete Applicant List." (ECF No. 376 at 6). Because Defendants have not produced the Applicant List pursuant to the 12/3/20 Order, Plaintiffs argue, Defendants should be precluded from using the Applicant List and any references to it should be stricken from the Class Opposition. (Id.)

In their Opposition, Defendants counter that "there is no 'Applicant List,' " they have "turned over to Plaintiffs" all of the "applicant materials collected by FDNY Human Resources directly, or through NYCAPS," and therefore, Defendants have complied with all of their discovery obligations under the 12/3/20 Order. (ECF No. 393 at 14). In addition, Defendants argue that their counsel selected, "from the approximately 11,228 promotional applicant file documents for the 2014-2019 Captain promotional openings," the documents provided to Erath listed on the exhibit to his Declaration, and that all of these documents were produced to Plaintiffs. (Id. at 15).

On reply, Plaintiffs argue that Defendants are "play[ing] numerous word games as to what documents Defendants gave BLDS, what documents BLDS reviewed, and how Defendants accessed these documents." (ECF No. 398 at 5). They claim that Defendants have only provided a "data dump," and that, because Erath "does not deny the existence of the Applicant List," it must exist. (Id. at 6, 6 n.2).

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 36 of 67

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

### 2. Legal Standard

Federal Rule of Civil Procedure 37(b)(2)(A) permits a court to impose sanctions against a party for "Failure to Comply with a Court Order" as follows:

> (A) For Not Obeying a Discovery Order. If a party ... fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: ... (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence....

Fed. R. Civ. P. 37(b)(2)(A)(ii). As this Court has explained in ruling on a previous sanctions motion in this case, " '[a] court order directing compliance with discovery requests is a required predicate to Rule 37(b) sanctions.' " Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO, No. 18 Civ. 4476 (LJL) (SLC), 2021 WL 134566, at *3 (S.D.N.Y. Jan. 14, 2021) (quoting Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 Civ. 1318 (GBD) (BCM), 2017 WL 3671036, at *18 (S.D.N.Y. July 18, 2017)); see Salahuddin v. Harris, 782 F.2d 1127, 1132-33 (2d Cir. 1986) ("The plain language of Rule 37(b) requires that a court order be in effect before sanctions are imposed."). The court order need not be in writing. See Joint Stock Co., 2017 WL 3671036, at *18; JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., No. 03 Civ. 5562 (JGK) (AJP), 2005 WL 1958361, at *14 n.10 (S.D.N.Y. Aug. 16, 2005).

"The purpose of disciplinary sanctions under Rule 37 is threefold: (1) to 'ensure that a party will not benefit from its own failure to comply'; (2) to serve as [a] 'specific deterrent[ ] and seek to obtain compliance with the particular order issued'; [and] (3) 'to serve a general deterrent effect on the case at hand and other litigation, provided that the party against whom they are imposed was in some sense at fault.' " Local 3621, 2021 WL 134566, at *3 (quoting S. New Eng.

Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 149 (2d Cir. 2010) (internal citation omitted)).

**\*9** "Sanctions under Rule 37 are 'a harsh remedy to be used only in extreme situations." Local 3621, 2021 WL 134566, at *3 (quoting Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir. 2009)). "The 'court has broad discretion to determine the type of sanction to impose upon a party, based on all the facts of the case.' " Raymond v. City of New York, No. 15 Civ. 6885 (LTS)(SLC), 2020 WL 1067482, at *8 (S.D.N.Y. Mar. 5, 2020) (quoting Scantibodies Lab., Inc. v. Church & Dwight Co., No. 14 Civ. 2275 (JGK) (DF), 2016 WL 11271874, at *18 (S.D.N.Y. Nov. 4, 2016)), adopted by, 2017 WL 605303 (S.D.N.Y. Feb. 15, 2017) (internal citation omitted); see Gurvey v. Cowan, Liebowitz & Lathman, P.C., No. 06 Civ. 1202 (LGS) (HBP), 2014 WL 715612, at *4 (S.D.N.Y. Feb. 25, 2014) ("The decision to impose sanctions 'is committed to the sound discretion of the district court and may not be reversed absent an abuse of [that] discretion.' ") (quoting Luft v. Crown Publ'rs, Inc., 906 F.2d 862, 865 (2d Cir. 1990)).

Among the sanctions that Rule 37(b)(2) directs a court to make "as are just," include "striking the party's pleading, precluding the introduction of certain evidence, or dismissing the action or rendering a judgment by default." Id. at *5 (citing Fed. R. Civ. P. 37(b)(2)). Any sanction under Rule 37(b)(2)(A) must " 'relate to the particular claim to which the discovery order was addressed.' " Seena Int'l Inc. v. One Step Up, Ltd., No. 15 Civ. 1095 (PKC) (BCM), 2016 WL 2865350, at *14 (S.D.N.Y. 2016) (quoting Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1358 (2d Cir. 1991)). The court must also order the disobedient party to pay reasonable attorneys' fees and expenses "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2). "The party against whom sanctions are sought bears the burden of establishing that its noncompliance was either substantially justified or harmless." Max Impact LLC v. Sherwood Grp., Inc., No. 09 Civ. 902 (JGK) (HBP), 2014 WL 902649, at *4 (S.D.N.Y. Mar. 7, 2014).

In determining whether to impose a sanction for noncompliance with a court order, and which one to impose, under Rule 37(b)(2), district courts in the Second Circuit consider four non-exhaustive factors: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

had been warned of the consequences of noncompliance." S. New Eng. Tel. Co., 624 F.3d at 144 (citation omitted). "The court may also consider the full record in the case and any prejudice to the moving party." Raymond, 2020 WL 1067482, at *8. Noncompliance with a court order may result in sanctions under Rule 37(b)(2) "notwithstanding a lack of wilfulness [sic] or bad faith, although such factors 'are relevant ... to the sanction to be imposed for the failure.' " Auscape Int'l v. Nat'l Geographic Soc'y, No. 02 Civ. 6441 (LAK), 2003 WL 134989, at *4 (S.D.N.Y. Jan. 17, 2003) (quoting 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2283, at 608 (2d ed. 1994)). "In analyzing prejudice to the moving party, 'the Second Circuit has consistently rejected a 'no harm, no foul' standard for evaluating discovery sanctions.' " Raymond, 2020 WL 1067482, at *8 (quoting Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., 328 F.R.D. 100, 120 (S.D.N.Y. 2018)). "No single factor is dispositive." Joint Stock Co., 2017 WL 3671036, at *21.

### 3. Application of legal standard

**\*10** Having considered the full record as well as the standard set forth above, the Court recommends that Plaintiffs' request to preclude Defendants' reliance on the "Applicant List" and strike any references to it in the Class Opposition be denied. As an initial matter, from the record on the Motion, the "Applicant List" as Plaintiffs conceive it, i.e., one comprehensive list of all applicants for promotion at EMS from 2012 to the present, does not appear to exist. As the testimony of Perez demonstrates, FDNY did not begin using NYCAPS until 2017, so a list of promotional applicants for periods before 2017 does not exist in that database. (ECF Nos. 391 ¶ 3; 391-3 at 4). And Defendants have produced the NYCAPS promotional applicant lists that do exist for 2017 to 2020. (ECF No. 391-1). At the December 3, 2020 conference with the Court, Defendants' counsel agreed to "see if we can print out something." (ECF No. 252 at 66). In the 12/3/20 Order, the Court ordered, "[a]s discussed at the conference," Defendants to produce that list. (ECF No. 246 at 2). Defendants then produced the list that did exist, for the full time period that FDNY has been using NYCAPS. (ECF No. 391-1). Defendants have therefore complied with the 12/3/20 Order.

Even if Plaintiffs' conceived "Applicant List" existed and had not been produced, Defendants have rebutted any suggestion that Erath relied on it in preparing his Report, as shown by

the list of sources attached to the Erath Declaration. (ECF No. 392-1). Indeed, Erath does not appear to have reviewed even the NYCAPS promotional applicant lists that do exist and that Defendants produced. (Compare id. with ECF No. 391-1). Plaintiffs provide no support for their contention that Erath's non-denial of the existence of an Applicant List means that it must exist. If Plaintiffs continue to doubt Erath's assertion that the list attached to his Declaration is the complete list of sources on which he relied for the Erath Report, nothing precludes Plaintiffs from asking him at his deposition whether he has ever seen an "Applicant List" as Plaintiffs conceive of it, and whether he relied on it for his Report.

Fourth, to the extent that Plaintiffs are demanding that Defendants produce the list that their counsel "culled from the approximately 11,228 promotional applicant file documents for the 2014-2019 Captain promotional openings," (ECF No. 393 at 15), a list prepared by counsel in the midst of litigation would constitute non-discoverable work product for which Plaintiffs have not, at least on this Motion, demonstrated both the requisite "substantial need" to prepare their case and inability, without "undue hardship" to "obtain [its] substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A); see Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp., No. 00 Civ. 9212 (DF), 2002 WL 31729693, at *11 (S.D.N.Y. Dec. 5, 2002) (quoting Fed. R. Civ. P. 26(b)(3) and holding that movant failed to show sufficient need or hardship to warrant disclosure of adversary's work product).

Accordingly, on the record on this Motion, the Court finds that Plaintiffs have failed to show that Defendants did not comply with the Court's 12/3/20 Order, and therefore, recommends that Plaintiffs' request to preclude Defendants from relying on an "Applicant List" and strike any references in the Class Opposition be denied.

### C. Untimely-Produced Documents

#### 1. Background

Pursuant to a Standing Order of this Court requiring early mediation in this action, the parties were subject to the Mediation Discovery Protocols pursuant to which Defendants were required to produce by November 13, 2018 "[f]or the most recent 5 years of employment, ... the file created for any disciplinary actions taken against the plaintiff." (ECF No. 25 at 2–3). The deadline for exchange of initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) was

March 25, 2019. (ECF No. 37 at 78). Among the information required to be disclosed under Rule 26(a)(1) was "a copy— or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment...." Fed. R. Civ. P. 26(a)(1)(A)(ii). [11] The deadline for all class certification discovery was November 25, 2020. (ECF No. 189).

[11]    The Court notes that Plaintiffs' citation of this Rule in their Motion misleadingly omits the underlined phrase in what appears to be Plaintiffs' attempt to suggest that Defendants were required to produce copies of all such documents at the time of initial disclosures. (ECF No. 376 at 8). Rule 26(a)(1) by its terms does not require actual production of the documents at the time of the initial disclosures. See McDermott v. Liberty Maritime Corp., No. 08 Civ. 1503 (KAM) (ALC), 2011 WL 13300062, at *4 (E.D.N.Y. May 13, 2011). Such an obvious misstatement of a Federal Rule of Civil Procedure compromises Plaintiffs' credibility on this Motion.

*11  On January 14, 2019, Defendants produced summaries and dispositions of Plaintiff Mascol's [Redacted] (the "1/14/19 Production"). (ECF Nos. 391-4; 393 at 17; 36-4 at 2 (transcript of the January 15, 2019 conference, at which Plaintiffs' counsel characterized Defendants' initial production as "basically amount[ing] to personnel files for the two representative plaintiffs.")). Those records reflect that Mascol [Redacted] (ECF No. 391-4). [Redacted]

On September 25, 2020, during Mascol's deposition, Defendants' counsel sought to ask Mascol about the [Redacted]. (ECF No. 377-1 at 6). Plaintiffs' counsel objected, and a conference with the Court followed. (Id.) After hearing the parties' positions, the Court ordered that questions concerning the [Redacted] were "appropriate" on the issue of "Mascol's credibility and suitability as a representative of the class, which is certainly relevant to class[ ]" certification. (Id. at 10). Accordingly, the Court permitted Defendants' counsel to ask "a basic question about the [Redacted] ... on a categorical level of ... the nature of the [Redacted]...." (Id.; see id. at 10–11 (permitting "a very brief series of questions so that we understand the nature of the activity that led to the incident without getting into great details about all of the events")). Defendants' counsel then asked Mascol, "what was the conduct that

led to the [ ] [Redacted]" to which Mascol responded, [Redacted] (Id. at 12). Defendants' counsel sought to ask follow-up questions, including the names of other employees involved in the [Redacted] to which Plaintiffs' counsel objected and resulted in another attempt to call the Court, which was then unavailable. (Id. at 13–19). Defendants' counsel stated that Defendants intended to find and produce to Plaintiffs the underlying [Redacted], on the ground that it "goes to [Mascol's] standing and ability to serve as a class representative...." (Id. at 22). Defendants' counsel added, "I have no documents in my possession that I have not turned over to plaintiffs. I will, however, seek to find the [Redacted], and I will turn that over to plaintiff." (Id. at 29).

On November 30, 2020, Plaintiffs moved for a protective order "preventing Defendants from accessing, putting on the record and/or utilizing Plaintiff Renae Mascol's [Redacted] not related to this action." (ECF No. 242 ("Plaintiffs' Protective Order Motion")). Plaintiffs' Protective Order Motion did not argue that such a production would be untimely, but rather that the records were "irrelevant and highly prejudicial." (Id. at 5). In opposition to Plaintiffs' Protective Order Motion, Defendants alleged that, after Mascol's deposition, they had "located" documents revealing that [Redacted] which Defendants contended were relevant to whether Mascol credible and appropriate to serve as a class representative. (ECF No. 247 at 3–4 ("Defendants' Protective Order Opposition")). On December 9, 2020, the Court denied Plaintiffs' Protective Order Motion, holding that Mascol's [Redacted] were relevant to the question whether Defendants "had a legitimate, non-discriminatory reason for not promoting" Mascol and therefore discoverable. (ECF No. 257 at 11–13 (the "12/9/20 Order")). On December 16, 2020, the Court denied Plaintiffs' motion to reconsider the 12/9/20 Order, which, the Court explained, did not "impose[ ] a limit on the type or scope of information about [Redacted] that would be discoverable." (ECF No. 269 at 2 (the "12/16/20 Order")).

*12  On January 18, 2021, Plaintiffs filed the Class Motion (ECF No. 300). On March 5, 2021, nearly three months after the 12/9/20 Order, Defendants produced 218 pages of Mascol's disciplinary records (the "3/5/21 Production"). (ECF No. 349 at 9). On March 11, 2021, Defendants filed the Class Opposition, which included three exhibits (ECF Nos. 354-5, 354-28, and 354-29 (the "Designated Documents")) [12] that Plaintiffs claim they did not receive until either the 3/5/21 Production or the filing of the Class Opposition. (Id.).

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

12    ECF No. 354-5 is the FDNY's 2020-2022 Diversity and Inclusion Strategic Plan. ECF No. 354-28 is a March 8, 2013 letter to Mascol entitled [Redacted] (the "3/8/13 Notice"). ECF No. 354-29 is a January 13, 2013 FDNY Internal Memorandum from Belinda Delgado to Robert Wallace summarizing [Redacted] (the "1/13/13 Memo").

In the Motion, Plaintiffs argue that Defendants were obligated to produce the Designated Documents no later than the November 25, 2020 class certification discovery deadline, and by waiting until after Plaintiffs filed the Class Motion, Plaintiffs have been prejudiced. (ECF No. 376 at 10–12). Plaintiffs also object to what they characterize as Defendants' use of ECF No. 354-29 "to launch into a wholly improper and unsubstantiated tirade of defamatory accusations against Plaintiffs and Plaintiffs' counsel." (Id. at 12–13).

In their Opposition, Defendants respond that, because they intend to use the Designated Documents only for impeachment purposes, they were not required to produce them previously. (ECF No. 393 at 17).[13] Defendants also contend that the 1/14/19 Production included information about the [Redacted], about which Plaintiffs could have, but failed to, inquire further. (Id.) Finally, Defendants contend that Mascol's [Redacted] is necessary for the Court to have "full information to make a decision on behalf of non-represented class members" pursuant to Federal Rule of Civil Procedure 23. (Id. at 18–19).

13    Defendants state that they "offer this evidence" in their Class Opposition "for impeachment purposes to demonstrate Plaintiff Mascol lied under oath and therefore is unfit to serve as a class representative because of her questionable credibility and trustworthiness." (ECF No. 393 at 16).

In reply, Plaintiffs argue that Defendants' intention to use the Designated Documents only for impeachment amounts to a concession that Mascol's [Redacted] is "irrelevant." (ECF No. 398 at 7). Because the [Redacted], Plaintiffs argue, her [Redacted] is not relevant to Plaintiffs' failure-to-promote claims in this action or otherwise "central to the claims and/or defenses in this action," and it cannot be used to impeach her credibility as a representative plaintiff. (Id. at 7–8). Finally, Plaintiffs contend that the Court's obligation under Rule 23 "does not allow for the improper conduct exhibited by Defendants in this action, which is inexcusable." (Id. at 8).

## 2. Legal standards

As noted above, Rule 26(a)(3) requires disclosure—either categorically or by production of copies—of information a party may use to support claims or defenses "unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Impeachment evidence is " '[e]vidence used to undermine a witness's credibility.' " Wu v. Metro-North Commuter R.R., No. 14 Civ. 7015 (LTS) (FM), 2016 WL 5793971, at *8 (S.D.N.Y. Aug. 4, 2016) (quoting Black's Law Dictionary (10th ed. 2014)); see Friedman v. Rehal, 618 F.3d 142, 153 (2d Cir. 2010) (defining impeachment evidence as "evidence that is offered to discredit a witness ... to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] or [her] testimony") (internal citations omitted).

*13    Federal Rule of Civil Procedure 37(c)(1) provides that, "[i]f a party fails to provide information ... as required by Rule 26(a) ..., the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The range of sanctions a court may impose on a party who fails to comply with its Rule 26(a) obligations "includes—but is not limited to—orders deeming certain facts established; permitting an adverse inference instruction; striking pleadings; prohibiting the 'disobedient' party from making specific claims or introducing certain matters into evidence; dismissing a claim or the entire action or granting default judgment against the disobedient party; or entering an order of contempt." Doug's Word Clocks.com Pty Ltd. v. Princess Int'l Inc., 323 F.R.D. 167, 172 (S.D.N.Y. 2017) (internal citations omitted). "Pursuant to Rule 37(c)(1), preclusion of evidence" that a party fails to disclose under Rule 26(a)(1)(A) "or another listed sanction is automatic unless the non-disclosure was substantially justified or harmless." Vaccaro v. Waterfront Homes Marins, No. 10 Civ. 4288 (NRB), 2011 WL 5980997, at *5 (S.D.N.Y. Nov. 30, 2011).

"A failure to disclose is substantially justified when 'there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request, or if there exists a genuine dispute concerning compliance.' " Wu, 2016 WL 5793971, at *9 (quoting AIG Glob. Asset Mgmt. Hldgs. Corp. v. Branch, No. 04 Civ. 8803 (RMB) (THK), 2005 WL 425494, at *1 (S.D.N.Y. Feb. 18, 2005)). Under Rule

37(c)(1), harmlessness requires an "absence of prejudice" to the receiving party. Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280 F.R.D. 147, 159 (S.D.N.Y. 2012).

"A district court has broad discretion to impose sanctions under Rule 37." McDermott, 2011 WL 13300062, at *2. As discussed above, sanctions serve multiple purposes, including "ensur[ing] that the offending party does not benefit from its noncompliance, act[ing] as a deterrent against future violations, and seek[ing] compliance with the discovery order." Id. "The fundamental purpose of Rule 37(c) is to prevent the practice of 'sandbagging' an adversary with new evidence." Feltenstein v. City of New Rochelle, No. 14 Civ. 5434 (NSR), 2018 WL 3752874, at *6 (S.D.N.Y. Aug. 8, 2018).

Despite these important purposes, "[p]recluding evidence is a severe sanction." McDermott, 2011 WL 13300062, at *2; see Feltenstein, 2018 WL 3752874, at *6 (explaining that preclusion of evidence under Rule 37(c)(1) "remains a drastic remedy and should be exercised with discretion and caution") (internal citations omitted). In deciding whether to exercise discretion to impose sanctions under Rule 37(c)(1), district courts are expected to consider: (1) the disobedient party's explanation for its failure to comply with the disclosure requirement; (2) the importance of the late-disclosed evidence; (3) the prejudice suffered by the opposing party; and (4) the possibility of a continuance to mitigate any such prejudice. Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (quoting Softel, Inc. v. Dragon Med. & Sci. Comme'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997)). "Because preclusion is a harsh remedy, depending on the circumstances, lesser sanctions may be more appropriate[,]" and "[t]he district court may fashion other forms of appropriate sanctions, such as awarding attorney's fees and reasonable expenses, or other types of monetary sanctions." McDermott, 2011 WL 13300062, at *2 (citing Fed. R. Civ. P. 37(b)(2)).

### 3. Application of legal standards

The Court finds it difficult to avoid the conclusion that Plaintiffs' request to preclude consideration of evidence of Mascol's [Redacted] on the Class Motion is, in fact, their third attempt to argue this issue, and for that reason alone, grounds to deny the request. As explained above, in the 12/9/20 Order, the Court held that information about Mascol's [Redacted]

was relevant and discoverable, and denied Plaintiffs' request for a protective order. (ECF No. 257 at 11–13). In the 12/16/20 Order, the Court denied Plaintiffs' request for reconsideration of that conclusion. (ECF No. 269). And in the Motion, Plaintiffs again argue that the Court should not consider Mascol's [Redacted] because it is "irrelevant." (ECF No. 398 at 7). The fact that this is Plaintiffs' "third bite at the apple" is grounds to deny their request. See Arthur Glick Truck Sales, Inc. v. Stuphen East Corp., 965 F. Supp. 2d 402, 404 (S.D.N.Y. 2013) (denying plaintiff's third request for the same relief and quoting Schuster v. Dragone Classic Motor Cars, No. 99 Civ. 2163 (LAK), 2000 WL 1585685, at *2 (S.D.N.Y. Oct. 25, 2000)).

**\*14** Neither of the parties' submissions substantively explain the two factors pivotal to the Court's consideration of whether to impose a sanction under Rule 37(c)(1): substantial justification and harmlessness. See Wu, 2016 WL 5793971, at *9. The Court interprets Defendants to be arguing that the timing of the 3/5/21 Production was "substantially justified" by their intention to rely on the documents for impeachment purposes only. It is certainly true that "Defendants d[id] not have an obligation to produce the documents if they are using the documents solely for impeachment." McDermott, 2011 WL 13300062, at *4. Defendants insist that they only intend to use the 3/5/21 Production to impeach Mascol's credibility as a proposed class representative. (ECF No. 393 at 16–17). If that is their position, they will be held to it, and may not use the documents for any purpose than impeachment of Mascol in connection with the Class Motion. As impeachment evidence only then, under Rule 26(a)(1)(A) (ii), Defendants were not required to produce it sooner. See Stephen v. Hanley, No. 03 Civ. 6226 (KAM) (LB), 2009 WL 1437613, at *6 (E.D.N.Y. May 20, 2009) (denying sanctions because "defendants were under no obligation to disclose" information they did not intend to use "in support of their defenses"). Accordingly, the Court finds Plaintiffs have failed to establish that the timing of Defendants' production of the Designated Documents was not substantially justified. See Doug's Word Clocks.com, 323 F.R.D. at 172 (noting that the "moving party bears the burden of showing that its adversary failed [to] timely [ ] disclose information required by Rule 26") (citation omitted).

Turning to the question of harmlessness, Plaintiffs have known since Mascol's deposition in September 2020 that Defendants intended to use her [Redacted] as a means to impeach her credibility, and Mascol, having been through the [Redacted]. Despite Defendants' counsel's reference during

Mascol's deposition and in their Protective Order Opposition to the existence of additional "documentary evidence" about the [Redacted], Plaintiffs did not move to compel Defendants to produce this information or otherwise seek discovery of it; instead they sought to preclude it. (ECF Nos. 242; 247 at 4; 377-1 at 22). See Stephen, 2009 WL 1437613, at *6 (in denying sanctions motions, noting that plaintiffs never moved to compel production of documents as to which they sought sanctions for failure to disclose). Plaintiffs then offer only conclusory assertions about prejudice from Defendants' delayed production of the 3/8/13 Notice and the 1/13/13 Memo. (ECF Nos. 376 at 11–12; 398 at 7–8). As the named recipient of the 3/8/13 Notice, however, Plaintiffs' claim of prejudice from its late production falls short; Mascol herself should have had this document, and if she did, would have been obligated to produce it in this action. Cf. McDermott, 2011 WL 13300062, at *4 (finding that "Plaintiff's prejudice is mitigated because the records are his own documents"). It is unclear whether Mascol previously saw the 1/13/13 Memo, but Plaintiffs do not specify prejudice from its delayed production, instead insisting that it is not relevant because the [Redacted] would not preclude Mascol from being considered for a promotion. (ECF Nos. 376 at 11; 398 at 8). By arguing that "the nature of the [Redacted] are not central to the claims or defenses in this action," (ECF No. 398 at 8), Plaintiffs undermine their request for preclusion of the Designated Documents; if this were true, Defendants would have had no duty to disclose them under Rule 26(a), which applies only to information a party "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii); see Stephen, 2009 WL 1437613, at *6. But in any event, Plaintiffs' argument goes to the merits of their promotion claims, which is not the focus of either this Motion or the Class Motion. See Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013) (explaining that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage"). Whether Mascol was or was not eligible for promotion is not determinative of the salient issue of Mascol's credibility and suitability as a proposed class representative. (See § III.D.3, infra).

Finally, even if Plaintiffs had established that Defendants were required to produce the Designated Documents at an earlier date, the deadline for Plaintiffs' reply in further support of the Class Motion has already been stayed pending resolution of this Motion (ECF No. 365), and as a result, Plaintiffs will have had an extended time to review the Designated Documents, and any others in the 3/5/21 Production pertaining to Mascol's disciplinary history, and

prepare their arguments in response. The Court's actions have therefore already mitigated any potential prejudice to Plaintiffs. See Feltenstein, 2018 WL 3752874, at *9 (finding that preclusion was not appropriate where court had already postponed trial pending resolution of discovery dispute and that extending discovery deadlines would be an adequate remedy "to correct prejudice to Plaintiff"); Stephen, 2009 WL 1437613, at *5 (finding that preclusion of delayed production was not appropriate where plaintiffs were not harmed and imposing remedy of reopened deposition at defendants' expense). And, as noted above, Plaintiffs are not seeking more discovery about Mascol's [Redacted]—in fact, the opposite—such that, unlike Feltenstein and Stephen, reopening discovery on this topic is not necessary at this juncture.

*15 Accordingly, the Court finds that Plaintiffs have not established that the timing of Defendants' production of the Designated Documents has caused any prejudice that was not already rectified by the extension of the deadline for Plaintiffs' reply in further support of the Class Motion, and therefore neither preclusion nor monetary sanctions are justified in these circumstances.

### D. Defendants' Comments About Plaintiff Renae Mascol and Plaintiffs' Counsel

#### 1. Background

As evidenced by the excerpts of Mascol's deposition that the parties include in their filings on this Motion—which the Court finds unnecessary to repeat and simply incorporates by reference—the dialogue between counsel in this action has deteriorated to a disturbingly low level. (ECF Nos. 376 at 14–15; 393 at 21–26). Multiple examples of this deterioration appear throughout Mascol's deposition—during which the parties sought the Court's intervention twice. (ECF No. 377-1). The portion of Mascol's testimony at issue in this aspect of the Motion is Mascol's answer, in response to the question the Court permitted Defendants' counsel to ask about the nature of the [Redacted] (ECF No. 377-1 at 12). In their Class Opposition, Defendants argue that Mascol's answer was untrue, rendering her inadequate to serve as a class representative and TKG inadequate to serve as class counsel. (ECF No. 355 at 30–34).

In the Motion, Plaintiffs argue that Defendants have taken the dialogue to an even lower level in their Class Opposition

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

by accusing Mascol of lying and TKG of being complicit in that lying. (ECF No. 376 at 15). Plaintiffs contend that "Defendants knew or should have known that the factual assertions that form the basis of the attacks on Plaintiff Mascol are untrue," and therefore, the "purpose of these false accusations is wanton, oppressive, and bad faith [sic]," such that they must be stricken. (Id. at 17). As proof of the untruth of Defendants' accusations, Plaintiffs submit declarations from Mascol (the "Mascol Declaration") and [Redacted], another EMS employee involved in [Redacted] (the "[Redacted] Declaration"). (ECF Nos. 378, 379). Plaintiffs also attach to their Reply the portions of the Class Opposition they ask the Court to strike—the entirety of Defendants' argument (including legal citations) that Mascol is not an adequate representative and that TKG is not adequate class counsel. (ECF No. 399-2 at 30–34). Plaintiffs invoke the Court's " 'inherent power to regulate litigation and sanction parties for conduct that is undertaken in bad faith, vexatiously, wantonly, or for oppressive reasons.' " (ECF No. 376 at 18 (quoting In re Bear Stearns Cos., Inc. Secs., Deriv., & ERISA Litig., 308 F.R.D. 113, 120 (S.D.N.Y. 2015) (internal citation omitted)).

In the Opposition, Defendants argue that the deposition testimony of Mascol and other witnesses in this action contradict both the Mascol Declaration and the [Redacted] Declaration, and thus reinforce that Mascol is an inadequate class representative and TKG is inadequate to serve as class counsel. (ECF No. 393 at 20–27).

In their Reply, Plaintiffs maintain that the record "exonerates" Mascol of lying and press the Court to hold Defendants "accountable for their callous disregard for the integrity of this proceeding" by striking "Defendants' spurious and defamatory comments." (ECF No. 398 at 9–11).

## 2. Legal Standard

In addition to the discretionary authority to award sanctions under Rule 37 discussed above, district courts have "the power to sanction and curb vexatious litigation practices" derived "from the very nature of courts and their need to be able 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " Scott v. Dime Sav. Bank of N.Y. FSB, No. 88 Civ. 2298 (PKL), 1993 WL 330439, at *4 (S.D.N.Y. Aug. 23, 1993) (quoting United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir.

1991) (internal citation omitted)). As the Second Circuit has explained:

> **\*16** One component of a court's inherent power is the power to assess costs and attorneys' fees against [a litigant] where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Sanctions imposed under a court's inherent power ... depend[ ] not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation.

Int'l Bhd. of Teamsters, 948 F.2d at 1345 (internal citations omitted). "The Supreme Court has cautioned that because of the 'very potency' of a court's inherent power, it should be exercised 'with restraint and discretion.' " Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Therefore, "a particularized showing of bad faith" is required "to justify the use of the court's inherent power," id., predicated on "clear evidence that the challenged actions are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes." Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986) (internal citation omitted); Potts v. Postal Trucking Co., No. 17 Civ. 2386 (ARR) (VMS), 2018 WL 794550, at *3 (E.D.N.Y. Feb. 8, 2018) (explaining that sanctions are not warranted under court's inherent power unless "clear and convincing evidence" shows that the conduct was "so beyond the pale," was in "bad faith," or "was taken for an improper purpose, harassment or delay"). As the Second Circuit has also noted, applying this standard to "determin[e] whether a case or conduct falls beyond the pale is perhaps one of the most difficult and unenviable tasks for a court." Schlaifer Nance & Co., Inc. v. Estate of Warhol, 194 F.3d 323, 341 (2d Cir. 1999).

"[A] claim is entirely without color when it lacks any legal or factual basis." Sierra Club v. U.S. Army Corps of Eng'rs, 776 F.2d 383, 390 (2d Cir. 1985) (emphasis added) (citation omitted). A claim is colorable "when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980). Similarly, "[b]ad faith can be inferred when the actions taken are 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose.' " Schlaifer Nance &

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

2021 WL 5362256

Co., 194 F.3d at 338 (quoting People of the State of New York v. Operation Rescue Nat'l, 80 F.3d 64, 72 (2d Cir. 1996)).


### 3. Application of legal standard

The question for this Court on this aspect of the Motion is whether Plaintiffs have shown by clear and convincing evidence that Defendants' challenges to Mascol's credibility and TKG's adequacy are "entirely without color, [or are taken] for reasons of harassment or delay or for other improper purposes." Oliveri, 803 F.2d at 1272. After reviewing the record on the Motion, the Court finds that Plaintiffs have failed to meet that burden.

First, Mascol's credibility, as well as the "character, competence and quality of counsel" seeking to represent the class, are questions that the District Court must scrutinize in deciding the Class Motion. Kingsepp v. Wesleyan Univ., 142 F.R.D. 597, 599 (S.D.N.Y. 1992) (quoting Smith v. Josten's Am. Yearbook Co., 78 F.R.D. 154, 163 (D. Kan. 1978)); see Savino v. Comput. Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998) ("To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff."); In re NYSE Specialists Sec. Litig., 240 F.R.D. 128, 144 (S.D.N.Y. 2007) ("The Second Circuit has allowed for the consideration of characteristics such as honesty, trustworthiness, and credibility in judging the adequacy of a class representative pursuant to Rule 23(a).") (collecting cases). Therefore, Defendants' comparison of Mascol's description during her deposition of the [Redacted] is not a subject that is "beyond the pale" to be raised in the Class Opposition. Schlaifer Nance & Co., 194 F.3d at 341.

*17 Second, Plaintiffs have not shown that Defendants' questioning of Mascol during her deposition or their arguments in the Class Opposition were in bad faith or for an improper purpose. Defendants have every right to oppose the Class Motion, even vigorously. See Schlaifer Nance & Co., 194 F.3d at 340 (finding that "aggressive" attacks on witness's demeanor was "a fully acceptable and expected litigation tactic" that was not sanctionable). Indeed, to minimize the risk of overreach in this case the Court intervened during the deposition to limit the scope of Defendants' questions to "a categorical" description of the [Redacted]. (ECF No. 377-1 at 10). See Schlaifer Nance & Co., 194 F.3d at 340 (noting that the district court previously "put a stop to" conduct that would have "crossed the line" into bad faith). Based on Mascol's deposition testimony, Defendants' counsel believed

that Mascol's answer of the nature of the [Redacted]— questioning the Court specifically authorized after noting that Mascol's credibility was relevant—was at least inconsistent, if not contrary to, [Redacted]. (Compare ECF No. 377-1 at 12 with ECF No. 354-28). While Plaintiffs dispute at length whether there was any such discrepancy (ECF No. 376 at 15–18), again, whether Mascol truthfully answered the question during her deposition, and if she did not, whether it impacts her ability to serve as a class representative, is a proper inquiry for the District Court in deciding the Class Motion. The District Court may well decide that Defendants' attack on Mascol's credibility is not "so sharp as to jeopardize the interests of absent class members should such attack[ ] render [Mascol] inadequate." Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 177–78 (S.D.N.Y. 2008) (finding that "minor discrepancy" between statements did "not impugn Plaintiff's credibility in any meaningful way"). Alternatively, the District Court may conclude that Mascol's deposition testimony represented "a deliberate attempt to conceal information" in which TKG was complicit, sufficient to justify denial of class certification. Kaplan v. Pomerantz, 132 F.R.D. 504, 509–10 (N.D. Ill. 1990) (granting motion to decertify class after named plaintiff gave false deposition testimony in which plaintiff's counsel "was at least a silent accomplice"). Either way, the District Court should have the opportunity to hear the arguments, review the evidence, and render a determination on Mascol's credibility and adequacy, and that of her counsel. Accordingly, the Court finds that Defendants' arguments in the Class Opposition that Mascol's credibility compromises her adequacy to serve as a class representative are not in bad faith or for an improper purpose.

Finally, the cases on which Plaintiffs rely (see ECF No. 376 at 18) involve egregious conduct not evidenced in the record on this Motion and therefore do not support the Court's exercise of its inherent authority to sanction Defendants by striking portions of the Class Opposition. See Potts, 2018 WL 794550, at *4 (denying motion for sanctions on additional ground that plaintiffs failed to provide sufficient legal support). In Bear Stearns, the court sanctioned a plaintiff who went to great lengths to obstruct the deposition of her husband, who had placed the orders for stock purchases at issue in the litigation. 308 F.R.D. at 116–17, 120. Those efforts included evading service of the subpoena to the husband, asserting baseless objections to the subpoena, refusing to confirm a date for the husband's deposition, failing to respond to correspondence from defendants' counsel, and causing defendants' counsel to travel across the country for a deposition at which the husband failed to appear, amounting to over $100,000 in

attorneys' fees and costs. Id. at 118–19. In Truong v. Hung Thi Nguyen, 503 F. App'x 34 (2d Cir. 2012), despite the plaintiff's history of contempt orders, the Second Circuit vacated the imposition of sanctions in the absence of a specific finding that "clear evidence" demonstrated plaintiff's bad faith or improper purpose. Id. at 36. In DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124 (2d Cir. 1998), the Second Circuit affirmed an award of attorneys' fees and costs as sanctions where the defendant initially denied the existence of certain documents, and then inexplicably produced them the day after fact discovery closed, necessitating additional depositions and representing "a pattern of behavior which could reasonably be construed as a bad faith effort to thwart plaintiffs' discovery efforts." Id. at 135–36. In Sassower v. Field, 973 F.2d 75 (2d Cir. 1992), the Second Circuit affirmed an award of monetary sanctions against two pro se plaintiffs whose baseless motions and repeated efforts to relitigate the same issues multiple times, the district court found, represented a pursuit of "th[e] litigation as if it was a holy war and not a court proceeding, managing these proceedings in a fashion that vexatiously, wantonly and for oppressive reasons increased the legal fees enormously." Id. at 78. In Dime Sav. Bank of N.Y., the court warned, but did not sanction, pro se plaintiffs who were "engaged in a program of delay, obfuscation, and circumlocution in an effort to harass the defendant...." 1993 WL 330439, at *2, 4–5. Finally, in Int'l Mining Co., Inc. v. Allen & Co., Inc., 567 F.Supp. 777 (S.D.N.Y. 1983), the court imposed the sanction of dismissal of the complaint based on the plaintiff's "total failure to produce documents and the pervasive nature of the inadequacies of its answers to interrogatories." Id. at 789.

**\*18** Plaintiffs have not demonstrated that the circumstances in the cited cases exist here. Candidly, it is Plaintiffs who have insisted on relitigating the issue of Mascol's [Redacted] three times. (See § III.C.1, supra). In the absence of "clear evidence" that Defendants' arguments about Mascol's credibility in the Class Opposition are "entirely without color and taken for improper purposes," Kortright Cap. Ptrs. LP v. Investcorp Inv. Advisers Ltd., 327 F. Supp. 3d 673, 688, the Court respectfully recommends that "restraint and discretion"

counsel against imposing Plaintiffs' requested sanction of striking portions of the Class Opposition. United States v. HSBC Bank USA, N.A., 863 F.3d 125, 136 (2d Cir. 2017) (quoting Chambers, 501 U.S. at 44).

### IV. CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Plaintiffs' Motion be DENIED.

\* \* \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Liman.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5362256

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4706162
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

LOCAL 3621, EMS OFFICERS UNION,
DC-37, AFSCME, AFL-CIO, et al., Plaintiffs,
v.
The CITY OF NEW YORK, et al., Defendants.

18-cv-4476 (LJL)
|
Signed 10/07/2021

**Attorneys and Law Firms**

Brian A. Jasinski, Marrinan & Mazzola Mardon, P.C., Erica Tracy Kagan, Yetta G. Kurland, The Kurland Group, New York, NY, for Plaintiffs Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO, Renae Mascol.

Erica Tracy Kagan, Yetta G. Kurland, The Kurland Group, New York, NY, for Plaintiff Luis Rodriguez.

Donna Anne Canfield, Lora Minicucci, New York City Law Department, New York, NY, for Defendants.

MEMORANDUM & ORDER

LEWIS J. LIMAN, United States District Judge:

 **\*1** On May 19, 2021, Magistrate Judge Cave issued a Report and Recommendation recommending that the Court deny Plaintiffs' Rule 37 motion to preclude Defendants from offering certain evidence in opposition to Plaintiffs' pending motion for class certification. Dkt. No. 406. On June 16, 2021, Plaintiffs filed objections to the Report and Recommendation, Dkt. No. 418, and, on July 20, 2021, Defendants filed a response in opposition to those objections, Dkt. No. 425.

In reviewing a Magistrate Judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court reviews any portion of the report to which a party makes an objection de novo; in the absence of any objection, the Court reviews the report and recommendation only for clear error. Fed. R. Civ. P. 72(b) Advisory Committee Notes; *Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018). However, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review ...." *Owusu v. New York State Ins.*, 655 F. Supp. 2d 308, 313 (S.D.N.Y. 2009) (quoting *Vega v. Artuz*, 2002 WL 31174466, at \*1 (S.D.N.Y. Sept. 30, 2002)). Were it otherwise, the requirement to make a specific written objection to "portions of the report" or "specified proposed findings," 28 U.S.C. § 636(b)(1), would be an empty formality, and "the magistrate's work [would be reduced] to something akin to a meaningless dress rehearsal." *Vega*, 2002 WL 31174466, at \*1. Thus, when considering objections that "merely re-assert arguments already submitted to the Magistrate Judge, this Court need only review the Report and Recommendation for clear error. *Owusu*, 655 F. Supp. 2d at 313; *see also Pinkney v. Progressive Home Health Servs.*, 2008 WL 2811816, at \*1 (S.D.N.Y. July 21, 2008) ("To the extent, however, that the party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error.... [N]o party [should] be allowed a 'second bite at the apple' by simply relitigating a prior argument."); *Kiggins v. Barnhart*, 2004 WL 1124169, at \*1 (S.D.N.Y. May 20, 2004) (same); *Singh v. U.S. Security Assocs., Inc.*, 2008 WL 2324110, at \*1 (S.D.N.Y. June 4, 2008) (same); *Ortiz v. Chertoff*, 2009 WL 2486007, at \*1 (S.D.N.Y. Aug. 14, 2009) (same).

The Court has conducted a thorough review of the record and finds that Plaintiffs' objections—with one exception —simply reiterate the same arguments Plaintiffs raised in their memorandum of law in support of the motion to preclude, Dkt. No. 376, and their reply memorandum, Dkt. No. 398, and reflect only Plaintiffs' disagreement with Judge Cave's careful and well-reasoned rejection of those identical arguments. [1] Upon this review, the Court agrees with Judge Cave's findings. The Court finds no clear error on the face of the Report and Recommendation.

---

1    Moreover, to the extent that Plaintiffs seek de novo review of Judge Cave's decisions not to impose Rule 37 sanctions, "[m]onetary sanctions pursuant to Rule 37 for noncompliance with discovery orders are usually committed to the discretion of the magistrate, reviewable by the district court under the 'clearly erroneous or contrary to law' standard." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990). Plaintiffs fail to identify

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 46 of 67

Local 3621, EMS Officers Union, DC-37, AFSCME,..., Not Reported in Fed....

any error much less clear error or any decision contrary to law.

**\*2** The single exception is Plaintiffs' argument that Judge Cave's Report and Recommendation must be rejected in light of her subsequent recusal from the case. Judge Cave issued the Report and Recommendation on May 19, 2021; Plaintiffs requested that Judge Cave recuse herself from this matter on June 2, 2021, two weeks after she issued the Report and Recommendation and more than a year after her significant involvement with this case began, *see* Dkt. No. 415. Plaintiffs' letter requesting that Judge Cave recuse herself stated that they "recently learned" that the City of New York was a previous client of Judge Cave's, *id.*, and Plaintiffs' objections cites "recent developments in Defendants' position in this matter coupled with Judge Cave's significant relationship with Defendant the City of New York," including specifically Judge Cave's representation of the City of New York in 2010-2013. Dkt. No. 418 at 4-5.

Defendants' arguments that recusal was not strictly necessary, *see* Dkt. No. 425 at 16-18, are well-taken. Judge Cave represented the City of New York from 2010-2013, and there is no indication that she has any continuing relationship with the City. The plaintiff that Judge Cave represented the City in opposing was licensed to work as an EMS worker but is not a class member here, and the facts in that matter are wholly unrelated to this case. *See In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001) ("Where a case ... involves remote, contingent, indirect or speculative interests, disqualification is not required."); *Nat'l Auto Brokers v. GM*, 572 F.2d 953, 958 (2d Cir. 1978) ("[P]rior representation of a party by a judge or his firm with regard to a matter unrelated to the litigation before him does not automatically require recusal.").

However, even assuming that Judge Cave's recusal was required, "in determining whether a judgement should be vacated for a violation of § 455(a), it is appropriate to consider (1) the risk of injustice to the parties in the particular case, (2) the risk that the denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 875 (1988). The Court finds that there is no risk of injustice nor risk of undermining the public's confidence in the judicial process. Judge Cave rendered a thorough and well-reasoned Report and Recommendation after carefully reviewing extensive submissions on both sides; the Report and Recommendation was based on the objective record and did not involve a hearing in which issues of credibility were presented. During the course of her tenure presiding over this case, she has rendered numerous decisions —some have favored Defendants and some have favored Plaintiffs, including a decision granting Plaintiffs' motions for sanctions against Defendants, Dkt. No. 373.

The Court hereby ORDERS that the Report and Recommendation is ADOPTED in its entirety and DENIES Plaintiff's motion to preclude.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 375.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4706162

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 5247216
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

HDI GLOBAL INSURANCE CO., Plaintiff,

v.

KUEHNE + NAGEL, INC., Defendant.

23-cv-6351 (LJL)
|
Signed December 30, 2024

**Attorneys and Law Firms**

Charles Mitchell Henderson III, James Aloysius Saville Jr., Hill Rivkins LLP, New York, NY, for Plaintiff.

Edward William Floyd, Eva-Maria Mayer, Floyd Zadkovich (US) LLP, New York, NY, for Defendant.

ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1** HDI Global Insurance Co. ("Plaintiff") and Kuehne + Nagel, Inc. ("Defendant") each move in limine in advance of the bench trial scheduled for January 15, 2025, to exclude evidence proposed to be offered by the other party. Dkt. Nos. 61–62. Both motions are denied.

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Id.* (quoting *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164–65 (S.D.N.Y. 2006)); *see also 689 Eatery Corp. v. City of New York*, 2023 WL 6977060, at \*1 (S.D.N.Y. Oct. 23, 2023); *King v. Wang*, 2021 WL 5232454, at \*1 (S.D.N.Y. Nov. 9, 2021).

Plaintiff seeks to preclude Defendant from offering evidence relating to the intent of the parties on the meaning of the term "package" as used in the context of the U.S. Carriage

of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701, and from offering the testimony of defense witness Jenette Prince. Dkt. No. 62. It argues that such testimony is irrelevant. *Id.* However, "[t]he definition of relevance under Fed. R. Evid. 401 is very broad, and as a result, the standard for relevance is very low. So long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Jones*, 2018 WL 1115778, at \*9 (S.D.N.Y. Feb. 27, 2018) (cleaned up). "The standards for relevance and prejudice operate differently in bench trials than in jury trials." *Rekor Sys., Inc. v. Loughlin*, 2023 WL 1777248, at \*4 (S.D.N.Y. Feb. 6, 2023). "The risk of the admission of irrelevant evidence in a bench trial is that it will prolong the proceedings; the risk of its exclusion is that the Court will court error and make a decision on an incomplete record." *Howard Univ. v. Borders*, 2022 WL 3568477, at \*7 (S.D.N.Y. Aug. 17, 2022); *see also Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, 2004 WL 1970144, at \*5 (S.D.N.Y. Sept. 3, 2004) ("While standards for admissible evidence are not out the window entirely in a bench trial, all doubts at a bench trial should be resolved in favor of admissibility." (internal quotation marks omitted omitted)); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2885 (3d ed. 2023) ("In nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence."). The risk that the proceedings will be prolonged in this case is far outweighed by the risk that the improper exclusion of the testimony will result in the Court making a decision on an incomplete record.

**\*2** Defendant seeks to preclude Plaintiff from offering into evidence three documents which constitute bills of lading issued by two other carriers and by Defendant in an unrelated case. *See* Dkt. No. 61. It argues that the documents were not produced in discovery in violation of the request for production of documents and in contravention of Federal Rule of Civil Procedure 26(a)(1), which requires each party to produce to the other, early in the case and without receiving a discovery request, the documents (or a description of the documents) that it may use to supports its claims or defenses, *see* Fed. R. Civ. P. 26(a)(1)(A)(ii), and that the documents cannot be authenticated, *see* Dkt. No. 61. However, Plaintiff was not obliged to produce documents intended only for impeachment, *see Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2021 WL 5362256, at \*14 (S.D.N.Y. June 2, 2021), *report and recommendation adopted*, 2021 WL 4706162 (S.D.N.Y. Oct. 7, 2021), and

**HDI Global Insurance Co. v. Kuehne + Nagel, Inc., Slip Copy (2024)**

2024 WL 5247216

Plaintiff represents that it intends to use the documents only for impeachment, *see* Dkt. No. 64 at 4. Defendant has not demonstrated it would be prejudiced by admission of the documents, nor has Defendant shown that the evidence would be clearly inadmissible on all potential grounds.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 5247216

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Smith v. Perez, Not Reported in Fed. Supp. (2023)

2023 WL 4540439

2023 WL 4540439
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Joshua SMITH, Plaintiff,

v.

Brian PEREZ, et al., Defendants.

No. 3:19-cv-1758 (VAB)
|
Signed July 14, 2023

**Attorneys and Law Firms**

Christian A. Sterling, Katz & Seligman, Hartford, CT, for Plaintiff.

Edward David Rowley, Office of the Attorney General, Hartford, CT, for Defendants Brain Perez, Perez, Dave Snyder, Rollin Cook, Nick Rodriguez.

**RULING AND ORDER ON MOTIONS *IN LIMINE***

Victor A. Bolden, United States District Judge

**\*1** Joshua Smith has filed four motions *in limine* seeking to preclude the introduction of certain categories of evidence during the upcoming jury trial in this case. *See* Pl.'s Mot. in Limine *Re: Conviction of Jack Thomas*, ECF No. 93 ("Thomas MIL"); Pl.'s Mot. in Limine *Re: Conviction of Joshua Smith*, ECF No. 94 ("Smith Conviction MIL"); Pl.'s Mot. in Limine *Re: Other Litigation*, ECF No. 95 ("Other Lit. MIL"); Pl.'s Mot. in Limine *Re: Admission of Witness Statement*, ECF No. 96 ("Thomas Statement MIL"). Defendants also have filed an omnibus motion *in limine. See* Defs.' Mot. in *Limine*, ECF No. 98 ("Defs.' MIL").

For the following reasons, Mr. Smith's motions *in limine* are **GRANTED in part** and **DENIED in part** without prejudice to renewal at trial. Defendants' motion *in limine* is also **GRANTED in part** and **DENIED in part** without prejudice to renewal at trial.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Factual Background**

On November 7, 2019, Joshua Smith ("Mr. Smith"), an inmate who is currently housed at Cheshire Correctional Institution ("Cheshire") under the custody of the Connecticut Department of Correction ("DOC"),[1] filed this civil rights Complaint under 42 U.S.C. § 1983 against Captain Perez, Lieutenant Perez, Lieutenant Ramos, Counselor Supervisor Long, Correction Officer West, Captain Colon, Correction Officer Musa, Correction Officer West, Deputy Warden Snyder, Osborn Warden Gary Wright, and Commissioner Scott Semple, in their official and individual capacities. Compl., ECF No. 1 (Nov. 7, 2019) ("Compl.").

[1]    The Court takes judicial notice of the information on the publicly available Connecticut DOC website. *See Inmate Information*, State of Connecticut Department of Corrections, http://www.ctinmateinfo.state.ct.us/ detailsupv.asp?id_inmt_num=223489; *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (the Court may "take judicial notice of relevant matters of public record").

On initial review, the Court determined that Mr. Smith's case should proceed on his First Amendment Retaliation claim against Captain Perez[2] on his individual capacity for damages. Initial Review Order at 17, ECF No. 9 (May 8, 2020) ("IRO"). The Court also permitted Mr. Smith to proceed on his request for injunctive relief against defendants Cook and Rodriguez in their official capacities. *Id.* at 11. Defendants filed a motion to dismiss, *see* Def.'s Mot. to Dismiss, ECF No. 43 (Apr. 2, 2021), which the Court granted in part and denied in part, *see* Order, ECF No. 50. As result of the Court's Order on the motion to dismiss, and Mr. Smith's voluntary dismissal of certain defendants in this case, *see* Notice of Voluntary Dismissal, ECF No. 52, there are only three remaining defendants in this case: Captain Perez, Commissioner Rollin Cook and Warden Nick Rodriguez (collectively, "Defendants").

[2]    Mr. Smith initially named Counselor Supervisor Long as a defendant in this case. Mr. Smith, however, filed a notice of Voluntary Dismissal asking the Court to dismiss Counselor Supervisor Long form the case, which the Court granted. *See* Order, ECF No. 53 (Feb. 4, 2022).

**\*2** Defendants filed a motion for summary judgment, arguing that Mr. Smith failed to comply with the Prison Litigation Reform Act ("PLRA") and cannot establish the

2023 WL 4540439

requisite elements of his retaliation claim against Captain Perez. *See* Defs.' Mot. for Summ. J., ECF No. 62 (June 29, 2022); Mem. in Support of Mot. for Summ. J., ECF No. 62-1 (June 29, 2022). Mr. Smith filed an opposition. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. 87 (Mar. 21, 2023). The Court denied Defendants' motion for summary judgment on March 31, 2023, and scheduled trial in this case for July 17, 2023. *See* Order, ECF No. 88.[3]

[3]     Because the Court issued its ruling before Defendants had an opportunity to file a reply brief, the Court permitted Defendants to renew their motion for summary judgment in conjunction with any motions *in limine*, if Defendants believed the circumstances warranted it. *See* Order at 2 n.3. Defendants renewed their motion, *see* Defs.' Renewed Mot. for Summ. J., ECF No. 99 and Mr. Smith has filed an objection, *see* Pl.'s Opp'n to Defs.' Renewed MSJ, ECF No. 104. The Court denied the renewed motion for summary judgment. *See* Order, ECF No. 112 (July 14, 2023).

### B. Procedural History

The Court assumes familiarity with the procedural history of the case and includes only events relevant to the motions *in limine*.

Following the close of discovery in this case, Defendants filed a motion for summary judgment. *See* Defs.' Mot. for Summ. J. Plaintiff filed an opposition on March 21, 2023. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J.

On March 31, 2023, the Court denied without prejudice to renewal Defendants' motion for summary judgment. *See* Order, ECF No. 88. Because the Court ruled on Defendants' motion for summary judgment before Defendants filed a reply, the Court permitted Defendants to renew their motion for summary judgment in conjunction with any motions *in limine* to be filed in this case. *See* Order at 2 n.3.

On June 2, 2023, Mr. Smith filed four motions *in limine*. *See* Thomas MIL; Smith Conviction MIL; Other Lit. MIL; Thomas Statement MIL. On the same day, Defendants filed their omnibus motion *in limine*. *See* Defs.' MIL.

Also on June 2, 2023, Defendants filed their renewed motion for summary judgment. *See* Defs.' Renewed MSJ.

On June 16, 2023, Mr. Smith filed his opposition to Defendants' omnibus motion *in limine*. *See* Pl.'s Opp'n to Defs.' MIL, ECF No. 105 ("Smith Opp'n"). On the same day, Defendants filed their Opposition to Plaintiff's motions *in limine*. *See* Defs.' Opp'n to Thomas MIL, ECF No. 100; Defs.' Opp'n to Smith Conviction MIL, ECF No. 101; Defs.' Opp'n to Thomas Statement MIL, ECF No. 96. Defendants also filed a response to Mr. Smith's motion *in limine* regarding other litigation indicating that Defendants do not object to that motion. *See* Defs.' Resp. to Other Lit. MIL, ECF No. 102.

Also on June 16, 2023, Mr. Smith filed an opposition to Defendants' renewed motion for summary judgment. *See* Pl.'s Opp'n to Defs.' Renewed MSJ, ECF No. 104.

On June 23, 2023, Mr. Smith filed a Reply in response to Defendants' opposition to Mr. Smith's motion *in limine* regarding statements by Mr. Thomas. *See* Pl.' Reply in Supp. Thomas Statement MIL, ECF No. 106. On the same day, Defendants filed a Reply in response to Mr. Smith's opposition to Defendants' omnibus motion *in limine*. Defs.' Reply in Supp. of Defs.' MIL, ECF No. 108.

Also on June 23, 2023, Defendants filed a Rely in further support of their renewed motion for summary judgment. *See* Defs.' Reply in Supp. of Renewed MSJ, ECF No. 107.

### II. STANDARD OF REVIEW

Motions *in limine* provide district courts with the opportunity to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce*, 469 U.S. at 41 n.4).

**\*3** A court should exclude evidence on a motion *in limine* only if the evidence is "clearly inadmissible on all potential grounds." *Levinson v. Westport Nat'l Bank*, No. 3:09-cv-1955 (VLB), 2013 WL 3280013, at \*3 (D. Conn. June 27, 2013) (internal quotation marks omitted). The court also retains discretion to "reserve judgment until trial, so that the motion is placed in the appropriate factual context." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009) (internal quotation marks omitted).

2023 WL 4540439

## III. DISCUSSION

### A. Mr. Smith's Motions *in Limine*

#### 1. Joshua Smith's Conviction

Federal Rules of Evidence 609(b) places a limitation on the use of evidence of a conviction to impeach a witness when "more than 10 years have passed since the witness' conviction or release from confinement for [the conviction] whichever is later." *Id.* Thus, by its terms, Rule 609(b) provides that evidence of a crime is not excludable if the witness is still incarcerated for that crime. *See Blake v. Coughlin,* 205 F.3d 1321, 2000 WL 233550, * 1 (2d Cir. 2000) (unpublished table decision) (explaining that evidence of a crime for which a witness is incarcerated is "not excludable under Rule 609(b)" if that witness is still incarcerated for that crime); *Espinosa v. McCabe,* No. 9:10-CV-497 (MAD/CFH), 2014 WL 988832, at *4 (N.D.N.Y. Mar. 12, 2014) ("Since Plaintiff is currently incarcerated as a result of the felony convictions at issue, the Rule 609(b) prohibition does not apply."); *Coleman v. Durkin,* 585 F. Supp. 3d 208, 213 (N.D.N.Y. 2022) (same).

Mr. Smith moves to preclude Defendants from introducing evidence related to the basis for his incarceration. He argues that his conviction is more than 10 years old and should be precluded under Rule 609(b) because the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. Smith Conviction MIL at 1.

In response, Defendants dispute that Mr. Smith's conviction should be analyzed under Rule 609(b). *See* Opp'n to Smith Conviction MIL at 2 ("In this case, although the plaintiff appears to argue that his murder conviction should be analyzed under Rule 609(b), (ECF No. 94, p. 2–3), there can be no dispute that Rule 609(a)(1)(A) applies to the plaintiff's felony conviction for murder."). In their view, because Mr. Smith "has not been released from confinement for this conviction, as he is still serving his sentence of incarceration for this conviction," Rule 609(a)(1)(A) is the appropriate rule under which the Court should analyze Mr. Smith's conviction. *Id.* at 3. When analyzed under that rule, Defendants argue, the relevant factors favor admitting the conviction. *See id.* at 6.

The Court agrees, in part.

Here, because Mr. Smith is currently incarcerated as a result of the felony conviction at issue, the inadmissibility presumption under Rule 609(b) does not apply. The Court will therefore analyze Mr. Smith's felony conviction under Rule 609(a) rather than Rule 609(b). *Espinosa,* 2014 WL 988832, at *4 ("Since Plaintiff is currently incarcerated as a result of the felony convictions at issue, the Rule 609(b) prohibition does not apply.")

"Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully," although "all Rule 609(a)(1) felonies are not equally probative of credibility." *Estrada,* 430 F.3d at 618. Violent crimes such as murder are generally not particularly probative of a witness' credibility. *See id.* at 617–18 (noting that convictions for violent or assaultive crimes generally do not relate to credibility). "[C]rimes requiring planning or preparation," however, "bear more strongly on veracity than violence alone suggests because planning indicates deliberate and injurious violation of basic standards rather than impulse or anger, and usually it involves some element of deceiving the victim." *Id.* at 618 (internal quotation marks omitted).

 *4 Under Rule 609(a)(1), the statutory name of Mr. Smith's conviction, its date, and the sentence imposed are admissible unless "the probative value of that evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Id.* at 620–21 (quoting Fed. R. Evid. 403); *see also id.* at 616 (noting that "while it may be proper to limit, under Rule 609(a)(1), evidence of the underlying facts or details of a crime of which a witness was convicted, inquiry into the 'essential facts' of the conviction, including the nature or statutory name of each offense, its date, and the sentence imposed is presumptively required by the Rule, subject to balancing under Rule 403").

"In balancing the probative value against prejudicial effect under [Rule 609], courts examine the following factors: (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness." *Stephen v. Hanley,* No. 03-CV-6226 (KAM) (LB), 2009 WL 1471180, at *4 (E.D.N.Y. May 21, 2009) (citing *Daniels v. Loizzo,* 986 F. Supp. 245, 250 (S.D.N.Y. 1997)). While "all of these factors are relevant, 'prime among them is the first factor, i.e., whether the crime, by its nature, is probative of a lack of veracity.' " *United*

States v. Brown, 606 F. Supp. 2d 306, 312 (E.D.N.Y. 2009) (alterations omitted) (quoting United States v. Ortiz, 553 F.2d 782, 784 (2d Cir. 1977)). The district court has "wide discretion to impose limitations on the cross-examination of witnesses," United States v. Flaharty, 295 F.3d 182, 191 (2d Cir. 2002), which includes the discretion to "exclude the nature or statutory name of the offense," Brown, 606 F. Supp. 2d at 312.

Here, Mr. Smith's credibility will be important at trial and his murder conviction bears no resemblance to the alleged retaliation claim in this case, thereby reducing potential for prejudice. The other factors, however, favor the opposite conclusion. In particular, by the time of trial, more that twenty-seven years will have passed since Mr. Smith's 1996 murder conviction. See Coleman, 585 F. Supp. 3d at 214 (finding that a conviction from fifteen years ago was remote); Twitty v. Ashcroft, No. 3:04-CV-410 (DFM), 2010 WL 1677757, at *2 (D. Conn. Apr. 23, 2010) (noting that "the probative value of a conviction decreases as its age increases" (citation and internal quotation marks omitted)). Additionally, murder is not a crime of dishonesty that bears directly on the likelihood that Mr. Smith will testify falsely. See Reeder, 2019 WL 3732050, at *3 (explaining that "violent crimes bear marginally on the issue of truthfulness or veracity"); Walker, 974 F.3d at 207 ("[V]iolent crimes, however abhorrent, often are not crimes of dishonesty, and may not meaningfully reflect on a witness's truthfulness." (citation omitted)). Moreover, Mr. Smith's conviction for murder, although dissimilar to the issue of retaliation, is highly prejudicial because "because knowledge that [Mr. Smith] was convicted of ... murder could cause the jurors to evaluate his worth as a witness based on that conviction." Zulu v. Barnhart, No. 9:16-CV-1408 (MAD/ML), 2019 WL 3239397, at *2 (N.D.N.Y. July 18, 2019); see also Olutosin v. Gunsett, No. 14-CV-00685 (NSR), 2019 WL 5616889, at *14 (S.D.N.Y. Oct. 31, 2019) (explaining that "a conviction of murder certainly carries a risk of unfair bias against a testifying witness").

Accordingly, "in order to strike the proper balance between the crime's admissibility under Rule 609(a) and its prejudicial effect" on Mr. Smith, Zulu, 2019 WL 3239397, at *2, the Court will permit Defendants to introduce evidence related to the fact that Mr. Smith was convicted of a felony, and the date of the felony conviction. The Court will preclude Defendants from introducing any other details of Mr. Smith's conviction, including the essential elements, the statutory name of the offense, and the length of his prison sentence.

See Giles v. Rhodes, No. 94 CIV. 6385 (CSH), 2000 WL 1510004, at *1 (S.D.N.Y. Oct. 10, 2000) ("[N]umerous courts have exercised their discretion to admit evidence of the fact that a witness has been convicted of a felony while barring evidence of the underlying details of the offense."); Twitty, 2010 WL 1677757, at *3 (holding that "evidence as to the date of the plaintiff's two felony convictions and the sentence is admissible," but that "the names of the convictions are not" (collecting cases)); Olutosin, 2019 WL 5616889, at *14 ("[G]iven the relatively minimal probative value of murder on veracity compared to the unfair bias it may create, as well as general the remoteness of the conviction, the Court will limit impeachment to the fact that he has a conviction and the sentence it entailed.").[4]

[4]    The length of Mr. Smith's sentence, while often appropriate, may be unduly prejudicial in this context, and lead to unnecessary speculation by the jury about the nature of the underlying offense. As a result, the Court will exercise its discretion under Rule 403 to preclude inquiry into that information as well.

Mr. Smith also seeks to preclude Defendants from introducing his May 22, 2004, and September 10, 2012, weapon and assault convictions, respectively. See Smith Conviction MIL at 1. Defendants have clarified that they "only seek[ ] to impeach [Mr. Smith] as to his felony conviction for murder and do[ ] not intend on introducing evidence or referring to [Mr. Smith's] remaining convictions." Opp'n to Smith Conviction MIL at 1. Those convictions are therefore precluded. The Court will also preclude evidence of those convictions on alternative grounds under Rule 609(b) as they are more than 10 years old, Reeder, 2019 WL 3732050, at *2 ("confinement for one conviction has no effect on calculating the ten years applicable to another conviction" for the purpose of Rule 609(b) (internal quotation marks omitted)), and therefore presumptively inadmissible.

## 2. Jack Thomas's Conviction

**\*5** Evidence of prior convictions may be admitted in some circumstances for limited purposes such as proving motive or impeaching a witness's credibility. See Fed. R. Evid. 404(b) (noting that evidence of past crimes "is not admissible to prove a person's character" but that such evidence "may

be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"); Fed. R. Evid. 601(a) (stating that evidence of criminal conviction for a crime that "was punishable by death or by imprisonment for more than one year ... must be admitted, subject to Rule 403," for the purposes of "attacking a witness's character for truthfulness"). For convictions ten years or older, however, the "evidence of the conviction is admissible only if its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect, and if the adverse party has an opportunity to contest its use." *Fraser v. Caribe*, No. 3:20-CV-00071 (SVN), 2023 WL 2889359, at *1 (D. Conn. Apr. 11, 2023) (citing Fed. R. Evid. 609(b)). Convictions over 10 years old should "be admitted very rarely and only in exceptional circumstances," as "convictions over ten years old generally do not have much probative value." Fed. R. Evid. 609(b) advisory committee's note.

Mr. Smith argues that Defendants should be precluded from introducing any evidence related to arrests or convictions of Jack Thomas, who allegedly witnessed some of the events related to Mr. Smith's retaliation claim against Captain Perez. *See* Thomas MIL at 1, 2. According to Mr. Smith, although the credibility of a "witness will always be an issue," here, the impeachment value of Mr. Thomas's violent crime conviction, which is nearly 10 years old, "bears no resemblance to the pending claim[ ] in this lawsuit." *Id.* at 3. Therefore, in his view, any probative value that the evidence of Mr. Thomas's arrests and convictions provides is substantially outweighed by the danger of unfair prejudice. *See id.* at 1.

Defendants, in response, argue that Mr. Thomas's conviction for assault is admissible under Federal Rules of Evidence 609(a)(1)(A) and that they should be permitted to impeach Mr. Thomas by disclosing the statutory name of his conviction —"Assault, 1[st] Degree-Serious Physical Injury"— and "the other essential facts of the conviction, including the date of the conviction and the sentence imposed." Opp'n to Thomas MIL at 1–2. According to Defendants, because Mr. Thomas's conviction and release from prison are within 10 years, under Rule 609(a)(1)(A), his conviction, for purposes of impeachment, is presumptively admissible. *See id.* at 3. Finally, Defendants argue that the relevant facts under Rule 403 all favor admissibility of Mr. Thomas' conviction.

The Court agrees, in part.

Here, according to Defendants, Mr. Thomas was convicted of Assault 1st Degree on July 1, 2013. *See* Opp'n to Thomas MIL at 3 (arguing that Mr. Thomas was "convicted of this offense within the past 10 years (July 1, 2013)" and that "he was released from prison for this offense within the past 10 years (December 28, 2020)") (footnote omitted). Trial in this case is scheduled for September 18, 2023, meaning more than ten years after Mr. Thomas's July 1, 2013 conviction. *See United States v. Brown*, 606 F. Supp. 2d 306, 313 (E.D.N.Y. 2009) (using the period between the conviction and "the first day of trial in the underlying action" to determine whether the 10-year period under Rule 609(b) has been met); *see also* 28 Fed. Prac. & Proc. EVID. § 6136 (2d ed.) (explaining that "most of the limited authority" on determining "that point in time by which the ten years must have run" under Rule 609(b) has concluded that it is by "the date of trial"); *United States v. Watler*, 461 F.3d 1005, 1008–1009 (8th Cir. 2006) ("Most of the cases interpreting Rule 609 agree with [Defendant] that the ten-year time limit should be measured from the date of the conviction or release to the date that the trial begins, if not the time of the witnesses' testimony." (collecting cases)). Thus, while it is true that Mr. Thomas's conviction was shy of ten years at the time the parties filed their respective motions *in limine*, by the trial date on July 17, 2023, the conviction will have satisfied the 10-year requirement. [5]

[5]    Defendants suggest that although Mr. Thomas was released from confinement on December 28, 2020, the Court should not consider that release date in calculating the timeframe under Rule 609(b) because Mr. Thomas "is still serving his sentence for this offense, as he is currently on special parole." Opp'n to Thomas MIL at 3 n.4. Defendants, however, do not cite any legal authority that supports their contention that a witness on "special parole" is presumed to be under confinement under Rule 609(b). Under Connecticut law, "special parole," however, is "incompatible with being incarcerated unless special parole has been formally revoked." *United States v. Pena*, No. 3:18-CR-0198 (JBA), 2023 WL 4273746, at *2 (D. Conn. June 29, 2023) (citing *Pentland v. Comm'r of Corr.*, 200 Conn. App. 296, 306 (2020)). And for the purposes of Rule 609(b), "confinement" is defined as "physical confinement and, thus, does not include periods on probation or parole." 28 *Fed. Prac. & Proc. Evid.* § 6136; *see also United States v. Wise*, 581

Smith v. Perez, Not Reported in Fed. Supp. (2023)

2023 WL 4540439

F. Supp. 3d 656, 658 (D.N.J. 2022) ("The Court agrees that 'release from confinement' does not include the termination of a probationary period."); *United States v. Rogers*, 542 F.3d 197, 201 (7th Cir. 2008) (" '[C]onfinement' for purposes of the ten-year time limit in Rule 609(b) does not include periods of probation or parole.").

**\*6** But, because Mr. Thomas was released from prison on December 28, 2020, meaning his release from prison for this offense is within the past ten year, Rule 609(b) does not apply. The Court will therefore analyze Mr. Thomas's conviction under Rule 609(a).

As the Court noted, *supra* at 6, violent crimes are generally not particularly probative of a witness' credibility. That is because conviction for violent crimes, such as assault, provide minimal impeachment value as these crimes do not involve dishonesty or untruthfulness. *See United States v. Estrada*, 430 F.3d 606, 618 (2d Cir. 2005) (noting that "crimes of violence generally have limited probative value concerning the witness's credibility and that theft crimes have greater impeachment value" (internal quotation marks omitted)); *United States v. Walker*, 974 F.3d 193, 207 (2d Cir. 2020) ("[V]iolent crimes, however abhorrent, often are not crimes of dishonesty, and may not meaningfully reflect on a witness's truthfulness." (citation omitted)); *Reeder v. Bishop*, No. 9:15-CV-1078 (MAD/TWD), 2019 WL 3732050, at *3 (N.D.N.Y. Aug. 8, 2019) (explaining that "violent crimes bear marginally on the issue of truthfulness or veracity").

Because Mr. Thomas's crime at issue here—Assault 1st Degree—will be more than ten years old at the time of trial, *see Twitty*, 2010 WL 1677757, at *2 (noting that "the probative value of a conviction decreases as its age increases" (citation and internal quotation marks omitted)), and the conviction has marginal impeachment value as it does not relate to dishonesty and untruthfulness, the Court will limit its introduction at trial. More specifically, the Court will permit Defendants to introduce evidence related to the fact that Mr. Thomas was convicted of a felony, and the date of the felony conviction. The Court will preclude Defendants from introducing any other details of Mr. Thomas's conviction, including the essential elements, the statutory name of the offense, and the length of his prison sentence. *See Giles*, 2000 WL 1510004, at *1 ("[N]umerous courts have exercised their discretion to admit evidence of the fact that a witness has been convicted of a felony while barring evidence of the underlying details of the offense."); *Twitty*, 2010 WL 1677757, at *3 (holding that "evidence as to the date of the plaintiff's two

felony convictions and the sentence is admissible," but that "the names of the convictions are not" (collecting cases)); *Olutosin*, 2019 WL 5616889, at *14 ("[G]iven the relatively minimal probative value of murder on veracity compared to the unfair bias it may create, as well as general the remoteness of the conviction, the Court will limit impeachment to the fact that he has a conviction and the sentence it entailed.").

Accordingly, Mr. Smith's motion to preclude Defendants from introducing evidence of Mr. Thomas's conviction is granted in part and denied in part. [6]

6    The parties provide different dates for Mr. Thomas's conviction. Counsel for Mr. Smith notes the date of the Mr. Thomas' conviction as September 6, 2013, *see* Thomas MIL at 1, while Counsel for Defendants states the date as July 1, 2013. *See* Opp'n to Thomas MIL at 1 ("Mr. Thomas was convicted of this offense on July 1, 2013 and sentenced on September 6, 2013. Mr. Thomas received a sentence of 10 years incarceration, followed by 10 years of special parole."). The Court presumes that the date provided by counsel for Defendants—the keepers of inmate records—is the correct date. Nonetheless, to the extent that Mr. Thomas's conviction is definitively determined to be September 6, 2013 instead July 1, 2023, the Court's conclusion remains unchanged.

### 3. Admissibility of Mr. Thomas's Statement Under Rule 807

**\*7** "Rule 807 excepts from hearsay a statement 'supported by sufficient guarantees of trustworthiness' that is 'more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts,' and the opposing party is given reasonable notice." *United States v. Abarca*, No. 19-3751-CR, 2021 WL 6803226, *6 (2d Cir. Dec. 15, 2021) (quoting Fed. R. Evid. 807(a)); A statement will be admitted under Rule 807 if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." *United States v. Morgan*, 385 F.3d 196, 208 (2d Cir. 2004) (quoting *United States v. Bryce*, 208 F.3d 346, 350–51 (2d Cir. 1999)). "Congress intended that the residual hearsay exceptions will

be used very rarely, and only in exceptional circumstances." *United States v. Griffin*, 811 Fed. App'x. 683, 686 (2d Cir. 2020) (quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)).

Mr. Smith seeks to admit Mr. Thomas's Inmate Witness Statement at trial, which he argues, reflects Mr. Thomas observation of aspects of Captain Perez's alleged retaliation against him. *See* Thomas Statement MIL at 3. Specifically, Mr. Smith asserts that Mr. Thomas was present when Captain Perez allegedly identified him as the reason why Mr. Thomas and other inmates were being moved. *Id.* at 4. According to Mr. Smith, Mr. Thomas is unavailable to testify at trial and he has refused to accept service or otherwise make himself available to for deposition. *Id.*

Defendants argue that Mr. Thomas's statement is hearsay and is not subject to Rule 807 exception. In their view, Mr. Thomas's statement "lacks sufficient guarantees of trustworthiness." Opp'n to Thomas Statement MIL at 3. Moreover, they argue that Mr. Thomas's statement is not more probative than other evidence that Mr. Smith can obtained through reasonable efforts. *Id.* at 9.

The Court agrees, in part.

Considering the context in which it was made, Mr. Thomas's statement fails to meet the first requirement of Rule 807, which "is that the proffered hearsay evidence must have circumstantial guarantees of trustworthiness equivalent to those that justify hearsay testimony under the other hearsay exceptions." *United States v. Mejia*, 948 F. Supp. 2d 311, 316 (S.D.N.Y. 2013). First, Mr. Thomas's statement was not made under oath or in an adversarial proceeding subject to cross examination by Defendants. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 233 (S.D.N.Y. 2021) ("When evaluating trustworthiness, courts consider ... whether the testimony was given voluntarily, under oath, subject to cross-examination, and a penalty for perjury." (quotation marks omitted)). Next, although it is true, as Mr. Smith argues, that there is no indication that Mr. Thomas has recanted his testimony or that the statement was not voluntary, Mr. Thomas had a "potentially hostile relationship," *Coleman*, 585 F. Supp. 3d at 215–16, with Captain Perez, who was allegedly involved in Mr. Thomas losing his own single cell status and job. When viewed in this context, Mr. Smith fails to meet his "burden of establishing that the statement is especially trustworthy." *Batoh v. McNeil-*

*PPC, Inc.*, 167 F. Supp. 3d 296, 311 (D. Conn. 2016) (citation and quotation marks omitted).

Accordingly, Mr. Smith's motion to admit Mr. Thomas's witness statement is denied without prejudice to renewal at trial.

To be clear, although the Court has denied Mr. Smith's request to admit the statement as a full exhibit under Rule 807, this ruling does not preclude Mr. Smith from using the relevant portions of Mr. Thomas's statement for the purposes of impeaching Captain Perez at trial. To do so, however, Mr. Smith must lay a sufficient foundation to satisfy the requirements of Rule 801(d)(2)—namely that the relevant testimony by Captain Perez was an "opposing party's statement" that was "made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). *See Leser v. U.S. Bank Nat. Ass'n*, No. 09-CV-2362 (KAM) (MDG), 2012 WL 6738402, at *4 (E.D.N.Y. Dec. 29, 2012) ("[W]hether the foundational predicate has been established for admitting a statement" under Fed. R. Evid. 801(d)(2) "is preliminary matter to be determined by the trial court.").

### B. Defendants Omnibus Motion *in Limine*

#### 1. Witnesses

**\*8** Failure to comply with initial disclosure requirements under this Court's Local rules and Rule 26(a)(1) of the Federal Rules of Civil Procedure can subject a party to preclusion under Rule 37(c)(1), which "provides that a party who fails to make such disclosures [under Rule 26] 'is not allowed to use that information or witness to supply evidence ... unless the failure was substantially justified or is harmless.' " *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2013 WL 5493996, at *1 (S.D.N.Y. Oct. 3, 2013) (quoting Fed. R. Civ. Proc. 37(c)(1)). Although Rule 37(c)(1) is "written in mandatory terms," the imposition of sanctions for abuse of discovery is "a matter within the discretion of the trial court." *Hein v. Cuprum, S.A., De C.V.*, 53 F. App'x 134, 136 (2d Cir. 2002) (citing *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995)).

"The Court has the ultimate discretion on whether to preclude witnesses from testifying at trial [under] Rule 37(c)(1)." *Leong v. 127 Glen Head Inc.*, No. CV135528 (ADS) (AKT), 2016 WL 845325, at *6 (E.D.N.Y. Mar. 2, 2016) (internal citations and quotation marks omitted). When considering

whether to preclude evidence or witness testimony, district courts in this Circuit are instructed to assess several factors, including "the party's explanation for the failure to disclose," "the importance of the evidence to be precluded," "the prejudice suffered by the opposing party if the evidence were not precluded," and "the possibility of a continuance." *Widman v. Stegman*, No. 3:13-CV-00193 (BKS/DEP), 2015 WL 13832105, at *4 (N.D.N.Y. Apr. 28, 2015) (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)). Preclusion of evidence for failure to comply with initial disclosure requirements is a "drastic remedy and should be exercised with discretion and caution." *NIC Holding Corp. v. Lukoil Pan Americas, LLC*, No. 05 CIV 9372 (LAK) (FM), 2007 WL 1467424, at *5 (S.D.N.Y. May 16, 2007) (quoting *Martinez v. Port Auth. of N.Y. & N.J.*, No. 01 Civ. 721 (PKC), 2005 WL 2143333, at *14 (S.D.N.Y. Sept. 2, 2005)).

Defendants have moved to exclude five witnesses from Mr. Smith's trial witness list, including include four current or former DOC inmates and one DOC employee or contractor, because, according to Defendants, Mr. Smith did not timely disclose these witnesses to them. *See* Defs.' MIL at 2–3. According to Defendants, Mr. Smith "had a duty to disclose" these witness under the Court's Initial Disclosure Standing Order and a "continuing duty to correct or supplement his Initial Disclosures throughout the course of this litigation." Defs.' MIL at 3 (first citing Standing Order, ECF No. 13 at 1; and then citing Fed. R. Civ. P. 26(e)). Because he failed to disclose these witnesses until approximate six weeks before trial, Defendants argue the Court should exclude these witnesses from testifying at trial.

In response, Mr. Smith argues that his witnesses should have the opportunity to testify because Defendants "can show no prejudice" for the alleged failure to timely disclose them. Smith Opp'n at 1. Moreover, Mr. Smith argues that the witnesses are inmates in Defendants' custody who are listed in documents in Defendants' possession. *Id.* at 2. In his view, Defendants "in fact had easier access to the witnesses" than he did, and that nothing prevented them from interviewing the witnesses before trial. *Id.*

The Court agrees, in part.

Mr. Smith began this suit *pro se* and he was not appointed counsel until after Defendants filed their motion for summary judgment. *See* Smith Opp'n at 1 (noting that Mr. Smith "initiated this lawsuit as a Pro Se Plaintiff" who "ha[d] no legal training"). As Mr. Smith noted, the witnesses are

all either in the custody of the DOC or employed by the DOC. *See id.* at 2. Moreover, two of the witness in question, Rosado and Thomas, have been known to Defendants as potential witnesses before Mr. Smith even filed this action. [7] Defendants, therefore, had sufficient notice of the identity of some of these witnesses. *See Olutosin*, 2019 WL 5616889, at *13 ("Plaintiff's delay in providing a Rule 26(a)(1) initial disclosure does not warrant preclusion of the witnesses listed therein," in part because "Defendants would have had sufficient notice of the identit[ies] [of the witnesses] and awareness of the context and subject matter of [their] potential testimony[ies].").

[7]  Rosado was Mr. Smith's manager at the prison chapel, and he was mentioned on numerous occasions in the various grievances that Mr. Smith submitted in connection with his complaints against Captain Perez. *See, e.g.*, Smith's Trial Exhibit 6, *infra* Part III.B.2. In fact, in one of Mr. Smith's grievances, he noted Rosado has been advocating for him to get his job back. Thomas likewise had been known to the defendants as a potential witness since he completed an inmate witness statement form in connection with Mr. Smith's complaint. Indeed, this witness statement was signed by a DOC investigator. Although not dispositive, it is notable that the Court's Standing Disclosure Order relied on by Defendants also requires Defendants to provide "Copies of any grievances, complaints, notices, reports filed by the plaintiff, or correspondence from the plaintiff, in the possession of any individual defendant or the DOC that relate to the claims in the Complaint." Initial Disclosure Order at 2. In other words, as part of Defendants' compliance with this Order, they would have been on notice at least as to Rosado and Thomas as they are each mentioned in the various notices and reports filed by Mr. Smith. *See Mugavero v. Arms Acres, Inc.*, No. 03-cv-05724 (PGG), 2009 WL 1904548, at *5 (S.D.N.Y. July 1, 2009) (holding that failure to disclose certain witnesses was harmless where the defendants had reason to know during discovery period that those witnesses would have information relevant to the plaintiff's claims).

**\*9**  More importantly, however, other than in a conclusory fashion, Defendants have not articulated any harm or prejudice to them that would result from these witnesses

being allowed to testify. *See, e.g.*, Defs. MIL at 3–4 ("The plaintiff should not benefit, and Captain Perez should not be prejudiced, due to the plaintiff's clear failure to comply with his discovery and disclosure obligations."). Because Defendants were "well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial," *Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 CIV. 1047 (AJP), 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) (citation omitted), Mr. Smith's failure to disclose these witnesses is harmless. *See Angioletti v. Chao*, 720 F. App'x 41, 44 n. 2 (2d Cir. 2017) (summary order) (affirming a district court's denial of pretrial motion to preclude an undisclosed witness from testifying at trial because movant "did not articulate any prejudice" from non-movant's failure to timely disclose witnesses); *Weiping Liu v. Indium Corp. of Am.*, No. 16-cv-1080 (BKS/TWD), 2019 WL 6310977, at *5 (N.D.N.Y. Nov. 25, 2019) (refusing to preclude witness's testimony at trial on the grounds that "the prejudice is minimal and preclusion would be too harsh a remedy").

Accordingly, Defendants motion to preclude Mr. Smith's witnesses from testifying is denied.[8]

[8] Defendants also move to preclude these witnesses from testifying under Rules 402 and 403. Omnibus MIL at 4. That argument, however, is premature. As the relevance and probative value of these witnesses' testimonies will become evident at trial, the Court will reserve a decision until that time.

### 2. Mr. Smith's Trial Exhibits

Defendants move to preclude Mr. Smith's various exhibits,[9] which according to Defendants, largely "consist of [Mr. Smith's] prior written statements." Defs.' MIL at 5–7. In their view, in addition to being inadmissible hearsay, *id.* at 5, "many of these exhibits are irrelevant and/or any probative value of such exhibits are substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and/or wasting time," *id.* at 6. Defendants, however, note that they do not object to Mr. Smith's Exhibit 7, which consists of a hand-written letter to Deputy Warden Otero-Negron, "to the extent this constitutes the plaintiff's protected conduct in this case." *Id.* at 6 n.9.

[9]   *See* Defs.' MIL at 5–6 (identifying Mr. Smith's Exhibit 1 (February 25, 2018 Letter to Commissioner Semple); Exhibit 4 (November 26, 2018 Advisor Report); Exhibit 5 (November 30, 2018 Letter to Deputy Warden Snyder); Exhibit 6 (December 5, 2018 Letter to Deputy Warden Otero Negron); Exhibit 7 (December 11, 2018 Grievance); Exhibit 8 (December 13, 2018 Advisor Report); Exhibit 10 (December 25, 2018 Letter to Commissioner Semple); Exhibit 12 (January 27, 2019 Grievance); Exhibit 13 (January 30, 2019 Inmate Request Form); Exhibits 14 (February 7, 2019 Grievance Appeal); Exhibit 16 (March 5, 2019 Response to Grievance Appeal); Exhibit 17 (June 25, 2019 Complaint)).

Mr. Smith responds that, at this stage, the Court should reject any arguments "based on relevan[ce] and/or probative value" of the evidence. *See* Opp'n at 2. Moreover, he argues that because Defendants do not object to the admissibility of evidence that constitutes Mr. Smith's protected conducted, *i.e.*, complaints that he has written, they should likewise not object to the admissibility of his Exhibits 4, 5, 7, 12, 14, and 16. *See id.* at 3.

The Court disagrees, in part.

Mr. Smith's retaliation claim, as permitted by the IRO, is Captain Perez's retaliation against him for complaints filed against Captain Perez resulting in the December 11, 2018 Grievance. *See* IRO at 16 ("Mr. Smith has alleged that he filed an Inmate Request Form on December 4, 2018, complaining that Captain Perez and Counselor Supervisor Long were discriminating against him by depriving of him of his housing and job assignments, and, then, Captain Perez and Counselor Supervisor Long retaliated against him by informing the other inmates that he was the reason for their change in housing and employment." (citing Compl. ¶¶ 27, 44)). The Court then concluded that "Mr. Smith has alleged a plausible claim of retaliation." *Id.* Thus the protected conducted here is the entirety of Mr. Smith's initial grievance and the documentation in connection with that grievance, which here includes his December 11, 2018 Grievance (Exhibit 7) along with the December 4, 2018 Inmate Request Form to Deputy Warden Snyder (Exhibit 5) and his letter to Deputy Warden Oterno-Negron (Exhibit 6). His remaining prior written statements, however, are hearsay, and Mr. Smith has not articulated a basis for an exception for their admissibility.

2023 WL 4540439

**\*10** Nonetheless, in light of the Court's clarification of the scope of Mr. Smith's protected activity, the Court will reserve its decision on Defendants' objection to these remaining exhibits until Mr. Smith has had an opportunity to lay the necessary foundation for their admission at trial. [10]

[10]    Defendants also moved to exclude Mr. Smith's Exhibit 9 (Joshua Smith's inmate statement) and Exhibit 15 (Deputy Warden Snyder's E-mail to Deputy Warden Otero-Negron regarding updating the inmate handbook in light of Mr. Smith's Grievance). Consistent with the Court's ruling, *supra* Part III.A.3, that motion as to Exhibit 9 is granted. The Court reserves judgment as to Exhibit 15.

### IV. CONCLUSION

For the following reasons, Mr. Smith's the motions *in limine* are **GRANTED in part** and **DENIED in part** without prejudice to renewal at trial. Defendants' motion *in limine* is also **GRANTED in part** and **DENIED in part** without prejudice to renewal at trial.

**SO ORDERED** at Bridgeport, Connecticut, this 14th day of July, 2023.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4540439

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 59 of 67

Widman v. Stegman, Not Reported in Fed. Supp. (2015)

2015 WL 13832105

2015 WL 13832105
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Annika WIDMAN, Vanessa Cardeno,
and Chelsie Dalton, Plaintiffs,

v.

Steven STEGMAN, August Lodge Cooperstown,
Inc. d/b/a The August Lodge and Spa, and
Juan Ortoo Holdings, Ltd., Defendants.

3:13-CV-00193 (BKS/DEP)
|
Signed 04/28/2015

**Attorneys and Law Firms**

For Plaintiffs: Daniel J. Tuczinski, Tuczinski, Cavalier & Gilchrist, P.C., 54 State Street, Suite 803, Albany, New York 12207.

For Defendants: Bruce S. Huttner, Donohue, Sabo, Varley & Huttner, LLP, 120 Broadway, Second Floor, P.O. Box 15056, Albany, New York 12212-5056.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Court Judge:

**I. INTRODUCTION**

*1 Plaintiffs Annika Widman, Vanessa Cardeno, and Chelsie Dalton ("Plaintiffs"), former employees of the August Lodge Hotel and Spa in Cooperstown, New York, bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") and New York state law against Defendants Steven Stegman, August Lodge Cooperstown, Inc. d/b/a as the August Lodge and Spa, and Juan Ortoo Holdings, Ltd. ("Compl.", Dkt. No. 1). Plaintiffs assert causes of action for: 1) sexual harassment in violation of Title VII; 2) sexual harassment in violation of Article 15 of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 301, and 3) intentional infliction of emotional distress in violation of New York common law. (Compl., pp. 8-10). Plaintiffs allege that from approximately 2009 to 2011, Defendant Stegman, the owner, operator, and manager of August Lodge, "frequently, routinely, openly and flagrantly subjected Plaintiffs to sexually offensive conduct, comments, language, and without Plaintiffs' knowledge or consent,

surreptitiously videotaped the Plaintiffs up their skirts and/or dresses, all on account of the Plaintiffs' gender." (Id., ¶¶ 10, 18).

On July 30, 2014, Defendants moved for summary judgment, on the grounds that: 1) Stegman may not be held individually liable under Title VII; 2) August Lodge Cooperstown, Inc. is not an "employer" under Title VII because it did not have fifteen or more employees for twenty or more weeks; 3) Juan Ortoo Holdings, Ltd. is merely an "out-of-possession landlord"; and 4) the Court should decline to exercise jurisdiction over Plaintiffs' state law claims. (Dkt. No. 21). On August 18, 2014, Plaintiffs opposed Defendants' motion, and made a cross-motion requesting that Defendants be deemed "employers" for purposes of Title VII or, alternatively, that Defendants be precluded from relying upon any witnesses or documents not disclosed in Defendants' Rule 26(a)(1) mandatory initial disclosures for purposes of defending against Plaintiffs' allegation that Defendants are "employers" under Title VII. (Dkt. No. 22). Plaintiffs argue that Defendants failed to disclose during discovery their bookkeeper witness, Nancy Hayen, and certain payroll and employment records, and cannot rely on them now to show how many employees they had. (Dkt. No. 22-9, p. 5). Plaintiffs also argue that even if Defendants' evidence was admissible and properly considered, issues of fact remain as to the number of employees. (Id., p. 11). On August 25, 2014, Defendants opposed Plaintiffs' cross-motion and replied to their summary judgment papers.[1] (Dkt. Nos. 24-26). For the reasons that follow, Defendants' motion is granted in part and denied in part, and Plaintiffs' cross-motion is granted in part and denied in part.

1    This matter was reassigned to the undersigned by Order of Chief Judge Gary L. Sharpe on December 30, 2014. (Dkt. No. 28).

**II. FACTS[2]**

2    Since it is necessary to re-open discovery, the Court will only briefly summarize the facts relevant to discussing the parties' respective motions. The facts stated herein are drawn from the parties' submissions, including Defendants' Statement of Material Facts ("Defs. SMF"), Dkt. No. 21-9; Plaintiffs' Response to Defendants' Statement of Material Facts and Statement of Additional Facts ("Pl. SMF Response"), Dkt. No. 22-10; and the Deposition of Steven Stegman ("Stegman Dep."),

Widman v. Stegman, Not Reported in Fed. Supp. (2015)

2015 WL 13832105

Dkt. No. 22-5. Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); F.R.C.P. 56(e).

For convenience, Defendants' Supporting Memorandum of Law (Dkt. No. 21-8) will be referred to as "Defs. Br."; Defendants' Supporting Affidavit (Dkt. No. 21-1) as "Defs. Aff."; Plaintiffs' Memorandum of Law (Dkt. No. 22-9) as "Pl. Br."; Plaintiffs' Supporting Affidavit (Dkt. No. 22-1) as "Pl. Aff."; Defendants' Reply Memorandum (Dkt. No. 25) as "Defs. Reply"; and Defendants' Supplemental Affidavit (Dkt. No. 26) as "Defs. Supp. Aff." All citations to the parties' submissions reference the page numbers generated and marked by the ECF system.

**\*2** August Lodge is a hotel and spa located in Cooperstown, New York, which was jointly owned from 2005 to 2011 by Steven Stegman and his wife Jamie. (Defs. SMF, ¶¶ 1-2). Stegman had management responsibilities at August Lodge during this time period. (Defs. SMF, ¶ 24; Pl. SMF Response, ¶ 24). Stegman formed two corporations in 2005 related to August Lodge: 1) August Lodge Cooperstown, Inc., which operated August Lodge and officially employed Plaintiffs (Stegman Dep., pp. 13-14, 70); and 2) Juan Ortoo Holdings, Ltd., which owned the land and buildings used for the August Lodge Hotel and Spa and rented them to August Lodge Cooperstown, Inc. (*Id.*, pp. 17-19).

Plaintiff Annika Widman was an employee at August Lodge from approximately June 2010 to July 22, 2011. (Defs. SMF, ¶ 5). Plaintiff Vanessa Cardeno was an employee from approximately June 2010 to July 2011. (*Id.*, ¶ 6). Plaintiff Chelsie Dalton was an employee from approximately May 2009 to August 19, 2011. (*Id.*, ¶ 7). During the time Plaintiffs were employed at August Lodge, Stegman installed a hidden video camera beneath the front desk, which recorded images of Plaintiffs' legs and up their skirts. (Stegman Dep., pp. 36-42). Stegman ultimately pled guilty to Unlawful Surveillance in the Second Degree, N.Y. Penal Law § 250.45(4). (*Id.*, p. 80; *see also* Defendants' Verified Answer, Dkt. No. 9, at ¶ 20).

## III. PLAINTIFFS' CROSS-MOTION FOR DISCOVERY SANCTIONS

In addition to opposing Defendants' motion for summary judgment, Plaintiffs seek "an Order deeming Defendants to be 'employers' for purposes of Title VII of the Civil Rights Act of 1964 and/or precluding Defendants from relying on any witnesses or documents not disclosed pursuant to Federal Rule of Civil Procedure 26(a)(1) in support of their defense that they are not 'employers' under Title VII of the Civil Rights Act of 1964." (Pl. Br., p. 5). Specifically, Plaintiffs argue that Defendants are precluded from relying on the affidavit of their bookkeeper, Nancy Hayen (Dkt. No. 21-7), and a purported summary of pay records (Dkt. No. 21-8), because defendants failed to identify Ms. Hayen or disclose the summary or the underlying records during discovery. (Pl. Br., pp. 5-8). Defendants rely on Ms. Hayen's affidavit, the summary, and the underlying records (Dkt. Nos. 26-1, 26-2, 26-3) for their summary judgment argument that August Lodge Cooperstown, Inc. was not an "employer" under Title VII because it did not have fifteen or more employees for twenty or more weeks. Defendants further argue that they did not "have an affirmative duty to produce these employment records as part of their Rule 26 mandatory disclosure." (Defs. Supp. Aff., ¶ 7).

### A. Applicability of Rule 26 of the Federal Rules of Civil Procedure

Under Rule 26(a) of the Federal Rules of Civil Procedure, a party must provide the following initial disclosures to the other parties, without awaiting a discovery request:

> (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment; [and] (ii) a copy—or a description by category and location —of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 61 of 67

Widman v. Stegman, Not Reported in Fed. Supp. (2015)
2015 WL 13832105

Fed. R. Civ. P. 26(a)(1)(A)(i)-(ii). Under Rule 26(e), a party must supplement its Rule 26(a) initial disclosures, as well as its responses to discovery requests, "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

**\*3** Defendants argue that they met their discovery obligations because the number of employees August Lodge had is not a "defense" subject to Rule 26 disclosure requirements. (Defs. Supp. Aff., ¶ 7). Defendants contend that Plaintiffs bear the burden of proving that August Lodge Cooperstown, Inc. was an "employer" under Title VII and failed to pursue the issue during discovery. (*Id.*, ¶ 8). It is well-settled that "the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). In the Verified Complaint, Plaintiffs alleged that "Defendants are 'employers' within the meaning of [42] U.S.C. [§] 2000e(b) and employ 15 or more employees." (Compl., ¶ 15). Contrary to Defendants' position, Rule 26 "requires a party to disclose information it may use to support its denial or rebuttal of the *allegations*, claim, or defense of another party." Fed. R. Civ. P. 26, Advisory Comm. Notes, 2000 Amendments (emphasis added). Therefore, since Plaintiffs alleged that Defendants are employers under Title VII, a fact requisite to their claim for relief, it was incumbent upon Defendants to disclose any witness or document indicating otherwise.[3]

[3]    Although Plaintiffs could have requested this information, "the purpose of the [Rule 26] mandatory initial disclosure provisions is to require early disclosure of matters that are the subject of formal discovery requests in most cases, thereby obviating the need for those formal discovery requests." 6 MOORE'S FEDERAL PRACTICE § 26.41 (Matthew Bender 3d ed.).

The diligence, or alleged lack thereof, of Plaintiffs' discovery efforts is beside the point.[4] Defendants had an independent obligation to identify Ms. Hayen as a witness and produce any payroll and employment records that they might use to support their denial or rebuttal of Plaintiffs' allegations, without awaiting a discovery request. Moreover, they were not excused from identifying Ms. Hayen simply because

they characterized her as a "rebuttal witness," (Defs. Supp. Aff., ¶ 10), since she would be called to directly rebut an element of Plaintiffs' claim. *See Searles & Van Bebber*, 251 F.3d 869, 877-78 (10th Cir. 2001) (affirming exclusion of undisclosed "rebuttal" witnesses); *Lujan v. Cabana Mgmt.*, 284 F.R.D. 50, 74 (E.D.N.Y. 2012) ("Even if [they] were contacted solely for rebuttal purposes, this does not vitiate defendants' obligation to supplement their Rule 26(a) disclosures by timely informing plaintiffs, in advance of filing their opposition papers, that they intended to rely on these witnesses."); *United States v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 114 (D.D.C. 2007) ("[T]here [is] no 'rebuttal' exception to [Rule 26(a)(1)].").

[4]    In their First Request for Production of Documents and First Set of Interrogatories, Plaintiffs asked Defendants to state "how many employees Defendant August Lodge and Spa had as of June 1[st] in the following years: 2010, 2011, 2012, 2013 and today"; Defendants answered that "[t]he number of employees at the location varied according to the season. During peak season, August Lodge Cooperstown, Inc., employed, upon information and belief, 36 people in 2010; 26 people in 2011; 32 people in 2012; and 39 people in 2013." (Dkt. No. 22-4, p. 3). Plaintiffs did not ask how many employees August Lodge had for twenty or more weeks during these years and did not request related payroll and employment records. (*Id.*). At Stegman's deposition, Plaintiffs' counsel orally requested employment records, but evidently never followed up in writing. (Stegman Dep., pp. 21-22).

To the extent that Defendants believed Ms. Hayen may have had discoverable information regarding the number of employees at August Lodge, they had an obligation to disclose her. Accordingly, the Court finds that Ms. Hayen and Defendants' payroll and employment records relating to the number of their employees are subject to Rule 26, and should have been disclosed in the course of discovery.

**B. Sanctions for Failure to Provide Rule 26 Disclosures**

Rule 37(c) of the Federal Rules of Civil Procedure provides that where "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)

2015 WL 13832105

(1). "The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Haas v. Del. & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (citing *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)). In addition to, or instead of preclusion, a court may inform the jury of the party's failure or "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi)." Fed. R. Civ. P. 37(c)(1)(B)-(C). A court may also issue an order imposing sanctions including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b) (2)(A)(i).

**\*4** Ultimately, preclusion under Rule 37 "is a drastic remedy and should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995). "Before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Outley v. New York*, 837 F.2d 587, 591 (2d Cir. 1988). Discretion remains with the court to order an alternative sanction, even if the court "finds that there is no substantial justification and the failure to disclosure is not harmless." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006). In determining whether evidence should be precluded, a court should consider: (1) the party's explanation for the failure to disclose, (2) the importance of the evidence to be precluded, (3) the prejudice suffered by the opposing party if the evidence were not precluded, and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006); *Design Strategy*, 469 F.3d at 296.

#### 1. Explanation for Failure to Disclose

Defendants' explanation for their failure to disclose Ms. Hayen and August Lodge Cooperstown, Inc.'s payroll and employment records is that they did not believe disclosure was necessary under Rule 26. (Defs. Supp. Aff., ¶ 7). As set forth above, that belief was mistaken. In their Verified Answer, Defendants denied knowledge or information sufficient to form a belief regarding Plaintiffs' allegation that "Defendants are 'employers' within the meaning of [42] U.S.C. [§] 2000e(b) and employ 15 or more employees." (Dkt. No. 9, ¶ 7). In their Initial Disclosures in this action, made on May 31, 2013, Defendants

stated that: aside from the parties, they are "unaware of any other individuals who may have relevant knowledge relating to the events and/or circumstances described or alleged in the plaintiff's complaint," and that "defendants are not in possession of any document, electronically stored information, or tangible thing that they currently intend to use to support a claim or defense." (Dkt. No. 22-2). The parties advised Magistrate Judge David E. Peebles during discovery that mandatory disclosures had been exchanged. (*See* Docket Entry dated September 25, 2013). There is no indication that Defendants ever supplemented their initial disclosures under Rule 26(e).

However, Stegman states in his affidavit that August Lodge hired Ms. Hayen to "prepare its payroll for every two-week pay period during 2009, 2010, and 2011." (Dkt. No. 21-4, ¶ 4). Thus, Defendants should have known from the outset of this action that Ms. Hayen was likely to have discoverable information about the number of employees, since she had prepared the payroll for August Lodge during the time Plaintiffs worked there. Moreover, Stegman testified that August Lodge kept employment records. (Stegman Dep., pp. 20-21, 70).[5] Therefore, during discovery Defendants possessed all the key information they now rely upon to deny Plaintiffs' allegation that they are employers under Title VII. Defendants' mistaken view of their Rule 26 disclosure obligations is not a reasonable explanation for their failure to disclose.

5    The fact that Stegman "openly and freely testified that he had employment records at his place of business, and never made any effort to hide or obfuscate the facts" (Defs. Supp. Aff., ¶ 5) does not excuse Defendants' failure to produce the employment records since Plaintiffs' knowledge of the existence of employment records, absent knowledge of Defendants' defense or denial based upon those records, does not satisfy Defendants' Rule 26 obligation to disclose the records. *See Lujan*, 284 F.R.D. at 72; *Media Alliance, Inc. v. Mirch*, No. 09 Civ. 659, 2012 U.S. Dist. LEXIS 6332 at \* 7, 2012 WL 162375, at \*3 (N.D.N.Y. Jan. 19, 2012).

#### 2. Importance of the Evidence to be Precluded

**\*5** Since "the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief,"

2015 WL 13832105

*Arbaugh*, 546 U.S. at 516, 126 S.Ct. 1235, and Defendants' proffered evidence is used to directly rebut this element, the affidavit and potential trial testimony of Ms. Hayen and the payroll and employment records of August Lodge are of critical importance in this action.

### 3. Prejudice if the Evidence Were Not Precluded

Plaintiffs argue that "not imposing some appropriate disclosure sanction would empower and embolden parties to willfully and callously disregard Rule 26(a)(l)'s mandated initial disclosures, which in this case, has significantly prejudiced Plaintiffs already by precluding them from engaging in appropriate discovery concerning Defendants' status as 'employers' under Title VII of the Civil Rights Act of 1964." (Pl. Br., pp. 8-9). Plaintiffs further state that, as a result of Defendants' failure to disclose, Plaintiffs never "had any opportunity to either depose Ms. Hayen or to review any alleged records on which the document attached to her affidavit is based." (*Id.*, p. 7). In response, Defendants argue that Plaintiffs had the opportunity to pursue the issue of Defendants' Title VII status as employers during discovery, and failed to do so. (Defs. Supp. Aff., ¶ 8). Although there is no evidence that Defendants willfully and callously disregarded their disclosure obligations in bad faith, there is also no question that their failure to disclose Ms. Hayen and the payroll and employment records of August Lodge during discovery was unjustified. If this evidence is not precluded, Plaintiffs face substantial prejudice because they did not have the chance to depose Ms. Hayen, review the relevant records, or seek follow-up discovery. The result would be to unfairly "sandbag" Plaintiffs with new evidence, without the ability challenge it through discovery—the very outcome Rule 37 seeks to avoid. *See Haas*, 282 F. App'x at 86; *DVL, Inc. v. GE Co.*, 811 F. Supp. 2d 579 (N.D.N.Y. 2010).

### 4. Possibility of a Continuance

"The possibility of a continuance exists in every case to mitigate the effects of a party's delays, omissions, and defective discovery responses." *Kullman v. State*, No. 07 Civ. 716, 2009 U.S. Dist. LEXIS 51271 at *30, 2009 WL 1562840, at * 9 (N.D.N.Y. May 20, 2009). A continuance would allow for the re-opening of discovery to depose Ms. Hayen and produce relevant payroll and employment records, which would mitigate the prejudice to Plaintiffs caused by Defendants' Rule 26 omissions. While the closure of

discovery in this action on May 31, 2014 generally weighs against the possibility of a continuance of trial to re-open discovery, *Design Strategy, Inc.*, 469 F.3d at 297, no trial date has been set, and only limited further discovery is necessary to address the issue of Defendants' status as employers under Title VII.

### 5. Balancing the Factors

The Court finds that Defendants' lack of a reasonable explanation for failing to disclose Ms. Hayen and produce payroll and employment records weighs in favor of preclusion. However, the importance of this evidence to proving or disproving Plaintiffs' Title VII claims weighs against preclusion. The substantial prejudice to Plaintiffs if the evidence is allowed without discovery to challenge it weighs in favor of preclusion. But the possibility of a continuance to re-open discovery, which would mitigate this prejudice, weighs strongly against preclusion. Thus, although Defendants had no substantial justification and their failure to disclose was not harmless, the Court must consider "less drastic" remedies before imposing the "extreme sanction of preclusion." *Outley*, 837 F.2d at 591.

**\*6** Alternatively, Plaintiffs request that the Court deem Defendants to be "employers" under Title VII. (Pl. Br., p. 8). While the Court may issue an order directing that designated facts be deemed established, Fed. R. Civ. P. 37(b)(2)(A)(i), this sanction is also a harsh one, and generally requires a finding of willful abuse of discovery by the non-compliant party. *See S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 147 (2d Cir. 2010). Here, Plaintiffs have adduced no evidence in support of their assertion that Defendants deliberately "concealed" Ms. Hayen's identity and the documents underlying her affidavit. (Pl. Aff., ¶ 9). There is no indication that Defendants failed to respond to any discovery request; Plaintiffs never specifically requested the information. Ultimately, it is Plaintiffs' burden to prove that Defendants are employers under Title VII, and it would be inappropriate to deem this fact established when it is both vigorously disputed and susceptible to resolution with limited further discovery.

Accordingly, although Defendants failed to meet their obligation under Rule 26 to disclose the identity of Ms. Hayen and produce payroll and employment records relevant to the number of employees at August Lodge, the Court declines to impose the harsh sanctions of preclusion or an

Widman v. Stegman, Not Reported in Fed. Supp. (2015)

2015 WL 13832105

adverse finding that Defendants are employers under Title VII. Instead, discovery will be re-opened as set forth below.

### C. Discovery is Re-Opened to Permit the Deposition of Ms. Hayen and Production of Relevant Records.

Where a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the Court has discretion to impose "other appropriate sanctions" besides preclusion. Fed. R. Civ. P. 37(c)(1)(C). Discovery sanctions should, "insofar as possible, ... restor[e] the prejudiced party to the same position [it] would have been in absent the wrongful [withholding] of evidence by the opposing party." *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 195 (E.D.N.Y. 2010) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). To mitigate prejudice and put the parties on equal footing, courts may re-open discovery to allow the parties to address issues resulting from the late disclosure of witnesses. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09 Civ. 3255, 2012 U.S. Dist. LEXIS 92435 at *41-42, 2012 WL 2568972, at *14 (S.D.N.Y. July 2, 2012) (re-opening discovery to allow depositions of three witnesses); *United Rentals, Inc. v. Frey*, No. 10 Civ. 1628, 2012 U.S. Dist. LEXIS 46959 at *4, 2012 WL 1119384, at *2 (D. Conn. Apr. 3, 2012) (declining to exclude witness and re-opening discovery for deposition); *McEnery v. City of N.Y.*, No. 03 Civ. 6307, 2007 U.S. Dist. LEXIS 39288 at *7, 2007 WL 1574013, at *2-3 (S.D.N.Y. May 29, 2007) (concluding that plaintiff should be given opportunity to depose late-identified witnesses); *Lesser v. Wildwood*, No. 01 Civ. 4209, 2003 U.S. Dist. LEXIS 16921 at *8, 2003 WL 22228757, at *3 (S.D.N.Y. Sept. 29, 2003) ("Defendants are, however, under an obligation to cure any prejudice suffered by the plaintiffs as a result of defendants' violation of their discovery obligations ... [and] [d]iscovery will be reopened in order to provide plaintiffs an opportunity to depose [the undisclosed witnesses].").

Indeed, Rule 56(d)(2) specifically provides that where a party has moved for summary judgment and the non-movant has shown that "for specified reasons, it cannot present facts essential to justify its opposition," the court may "allow time ... to take discovery." Fed. R. Civ. P. 56(d)(2). Although Plaintiffs have not requested relief under Rule 56(d)(2), they argue that they "have been severely hampered in even responding to this motion for summary judgment" because of Defendants' Rule 26 omissions. (Pl. Br., p. 9 n. 1). Additional discovery may yield information to raise an issue of fact that Defendants are employers under Title VII, or even conclusively resolve this issue. Thus, the rationale of Rule 56(d)(2) further supports a finding that re-opening discovery

is the appropriate remedy to apply here under Rule 37(c)(1) (C).

**\*7** Plaintiffs suggest that while re-opening discovery would "alleviate the prejudice caused by Defendants' noncompliance with Rule 26(a)(1) ... [it] would cause prejudice through additional delay." (Pl. Br., p. 9). The Court is cognizant of the fact that Plaintiffs commenced this action over two years ago, but the additional delay required for re-opening discovery will not be a long one. Discovery will be re-opened for forty-five days, for the limited purpose of taking the deposition of Ms. Hayen and producing documents related to the number of employees at August Lodge from 2008 to 2011, including payroll and employment records. This remedy will mitigate the prejudice to Plaintiffs caused by Defendants' Rule 26 omissions, and afford Plaintiffs the opportunity to discover any evidence available to support their allegation that Defendants are employers under Title VII. Following this limited discovery, the parties will have the opportunity to submit supplemental summary judgment briefing on the issue of whether August Lodge Cooperstown, Inc. is an "employer" under Title VII.

The Court will briefly address Defendants' arguments for summary judgment below, so as to narrow the issues and provide further guidance for the limited discovery ordered herein.

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving

Case 7:22-cv-09557-AEK    Document 137    Filed 02/28/25    Page 65 of 67

Widman v. Stegman, Not Reported in Fed. Supp. (2015)

2015 WL 13832105

party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

**B. Steven Stegman's Title VII Liability**

**\*8** Defendants argue that Stegman cannot be sued in his individual capacity under Title VII. (Defs. Br., p. 6). On this point, Defendants are correct since Title VII does not impose liability on individuals. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004); *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001). Accordingly, Plaintiffs' Title VII claim against Steven Stegman fails as a matter of law, and must be dismissed.

**C. August Lodge Cooperstown, Inc.'s Title VII Liability**

Defendants argue that although August Lodge Cooperstown, Inc. employed Plaintiffs, it is not an "employer" under Title VII because it "did not have an employment relationship with fifteen or more individuals for each working day in twenty or more weeks during the years when the alleged offensive activities took place, or the preceding year." (Defs. Br., p. 7).

Title VII prohibits discrimination based on race, color, religion, sex, or national origin by an "employer." 42 U.S.C. § 2000e-2. An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). "[T]he threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh*, 546 U.S. at 516, 126 S.Ct. 1235. Therefore, a Title VII defendant may seek summary judgment on the issue of the number of employees required for Title VII where "undisputed facts can be presented to defeat coverage." *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 365-366 (2d Cir. 2000).

Since Defendants failed to meet their Rule 26 discovery obligations to disclose their bookkeeper witness, Ms. Hayen, and produce relevant payroll or employment records, the Court has re-opened discovery and will therefore reserve on deciding the merits of Defendants' motion. However, the Court takes this opportunity to state the relevant standard for counting employees under Title VII, to guide the limited discovery and any supplemental briefing on this issue.

For purposes of counting employees under Title VII, "the ultimate touchstone ... is whether an employer has employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question." *Walters v. Metro. Educ. Enters.*, 519 U.S. 202, 212, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997). Thus, the inquiry should focus on "whether the employer has an employment relationship with the employee on the day in question, and not whether the employee actually performs work or receives compensation on the day in question." *Frederick v. United Bhd. of Carpenters & Joiners of Am. (UBCJA) Local 926*, 558 F. App'x 83, 86 (2d Cir. 2014); *Walters*, 519 U.S. at 206, 117 S.Ct. 660. The Supreme Court adopted the "payroll method" to determine the number of individuals an employer employs because "the employment relationship is

Widman v. Stegman, Not Reported in Fed. Supp. (2015)

2015 WL 13832105

most readily demonstrated by the individual's appearance on the employer's payroll." *Walters*, 519 U.S. at 206, 117 S.Ct. 660. Using the payroll method, employees are counted so long as they are on the employer's payroll, even if they do not work or get paid in a particular week. *Id.*, at 207, 211-12, 117 S.Ct. 660.

**\*9** "[A]ll one needs to know about a given employee for a given year is whether the employee started or ended employment during that year and, if so, when. He is counted as an employee for each working day after arrival and before departure." *Id.*, at 211, 117 S.Ct. 660. In sum, the employer must have fifteen or more employees on its payroll at the same time for at least twenty weeks out of the year. Since Plaintiffs allege that Defendants violated Title VII during the period from 2009 to 2011, Compl. ¶¶ 22-26, the relevant years for counting employees here are 2008 to 2011. *See* 42 U.S.C. § 2000e(b) (including preceding year). The Court notes that the evidence so far submitted by Defendants, even if properly considered, only shows the number of employees paid by August Lodge during certain periods, not the total number of employees on the payroll for any length of time. (Dkt. Nos. 26-1, 26-2, 26-3).

**D. Juan Ortoo Holdings, Ltd.'s Title VII Liability**

Defendants argue that Juan Ortoo Holdings, Ltd. is not an "employer" under Title VII because it had no employees and simply owned land and buildings it leased to August Lodge. (Defs. Br., p. 9). Defendants further argue that, since there is no valid federal claim against Stegman or August Lodge Cooperstown, Inc., Juan Ortoo Holdings, Ltd. is merely an "out-of-possession landlord" under New York law. (*Id.*). Plaintiffs counter that August Lodge Cooperstown, Inc. and Juan Ortoo Holdings, Ltd. should be considered a "single employer" for purposes of Title VII because there is a "clear interrelation of operations" between them.[6] (Pl. Br., pp. 13-14).

6    Plaintiffs also argue that Defendants failed to disclose during discovery the Lease Agreement, Dkt. No. 21-5, which Defendants now cite to support the assertion that Juan Ortoo Holdings, Ltd. is simply an "out-of-possession landlord." (Pl. Aff., ¶ 20). However, Plaintiffs have not sought to preclude the Lease Agreement, and indeed they argue that it shows the "lack of an arms-length relationship between Juan Ortoo and August Lodge." (Pl. Br., p. 14). Therefore, the Court

declines to decide the admissibility of the Lease Agreement at this time.

The single employer doctrine is an exception to the general rule that a Title VII action can only be brought against a plaintiff's direct employer; it allows for joint liability "when two nominally separate entities are part of a single integrated enterprise." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005). The issue of single employer status is a question of fact. *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996). But if Juan Ortoo Holdings, Ltd. had no employees and August Lodge Cooperstown, Inc. had less than fifteen for twenty or more weeks, the single employer doctrine could not be used to make the two entities jointly liable.[7] Since the number of employees at August Lodge is still in dispute and now subject to further discovery, it would be premature to address whether the two entities constitute a single employer under Title VII, or whether Juan Ortoo Holdings, Ltd. is an "out-of-possession landlord" under state law. Therefore, the Court will defer decision on Plaintiffs' Title VII claim against Juan Ortoo Holdings, Ltd. until the parties have completed the supplemental briefing set forth below.

7    The single employer doctrine allows an employee to "impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer." *Arculeo*, 425 F.3d at 198. Assuming Juan Ortoo Holdings, Ltd. had no employees of its own, it could not constitute an "employer" under Title VII, and Plaintiffs could not impose single employer liability on Juan Ortoo Holdings, Ltd. unless August Lodge Cooperstown, Inc. was first liable under Title VII.

**E. State Law Claims**

**\*10** Defendants argue that the Court should decline to exercise its supplemental jurisdiction over Plaintiffs' state law claims since Plaintiffs' federal claims must be dismissed. (Defs. Br., pp. 10-11). The Court may decline to exercise supplement jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). However, since discovery will be re-opened, and the Court is not ruling at this point on Defendants' motion to dismiss the federal claims against August Lodge Cooperstown, Inc. and Juan Ortoo Holdings, Ltd., the Court reserves decision on whether to exercise its jurisdiction over Plaintiffs' state law claims. The Court will revisit this

2015 WL 13832105

issue once the parties complete their supplemental briefing regarding Plaintiffs' Title VII claim against August Lodge Cooperstown, Inc.

## V. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 21) is **GRANTED in part and DENIED in part;** and it is further

**ORDERED** that Plaintiffs' Cross-Motion for Discovery Sanctions (Dkt. No. 22) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiffs' First Cause of Action, under Title VII against Defendant Steven Stegman in his individual capacity, is hereby **DISMISSED**; and it is further

**ORDERED** that discovery is hereby **RE-OPENED** for a period of forty-five days, until June 12, 2015, during which time Plaintiffs may take the deposition of Nancy Hayen, and Defendants must produce to Plaintiffs any and all documents regarding the number of employees at August Lodge during the years 2008, 2009, 2010, and 2011, including relevant payroll and employment records; and it is further

**ORDERED** that following discovery, the parties may supplement their summary judgment briefing on the issue of Plaintiffs' Title VII claim against August Lodge Cooperstown, Inc.; and it is further

**ORDERED** that Defendants' supplemental briefing in support of their Motion for Summary Judgment is due by June 26, 2015, and Plaintiffs' supplemental response thereto is due by July 10, 2015; and it is further

**ORDERED** that counsel will confer and contact the Courtroom Deputy to schedule a trial date, and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 13832105

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.